UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA

    -against-                                          12 Cr. 423 (AJN)

MINH QUANG PHAM,

                Defendant.
------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
FOR PARTIAL ATTORNEY-CONDUCTED VOIR DIRE**

**Bobbi C. Sternheim, Esq.**
**33 West 19th Street – 4th Floor**
**New York, NY 10010**
**212-243-1100**

1

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
FOR PARTIAL ATTORNEY-CONDUCTED VOIR DIRE**

**Introduction**

Defendant Minh Quang Pham is charged in a five-count indictment with providing and conspiring to provide material support to a designated foreign terrorist organization; with receiving and conspiring to receive military-type training from or on behalf of a designated foreign terrorist organization; and with possessing, carrying, and using a firearm during and in relation to a crime of violence. Trial in this matter is presently set for February 1, 2016.

In light of the recent terrorist attacks in Paris and in San Bernardino, the widespread publication and broadcasts regarding these events, and public statements by Donald Trump and others concerning Muslims, outcries that have been repeatedly broadcast and discussed by news commentators, the defense requests that the Court permit each side in the case a limited amount of attorney-conducted voir dire, not as a substitute to the Court's voir dire, but as a complement and addition to the Court's voir dire. Supplemental attorney conducted voir dire, while not statutorily or constitutionally mandated, will add an important dimension to the voir dire process in this case.

The defense believes that it will be difficult, if not impossible, to seat a truly impartial New York City jury in the current climate of Islamophobia and hatred of Muslims. The requested supplemental attorney-conducted voir dire will assist in advancing the goal of obtaining an impartial jury through (1) the intelligent exercise of peremptory challenges by counsel and (2) full and informed consideration by the Court of any challenges for cause which may be made.

2

In addition, we further request that after the Court's preliminary address to the venire, members of the venire be questioned individually out of the presence of other prospective jurors.

### Argument

**Attorney-Conducted Voir Dire Will Permit the Most Intelligent Exercise of Peremptory Challenges**

One right the Constitution confers on a defendant is the right to an impartial jury. Voir dire plays a critical function in protecting this constitutional right. *Rosales-Lopez v. United States*, 451 U.S. 181, 188 (1981). Because of the crucial function of the peremptory challenge in acquiring an impartial jury, a "system that prevents or embarrasses the full, unrestricted exercise of that right of challenge must be condemned." *Pointer v. United States*, 151 U.S. 396, 408 (1893).

The decision to allow attorney-conducted voir dire, or a supplemental jury questionnaire, falls within the discretion of the trial court. Fed.R.Civ.P. 24(a)(1) and (2) ("The court may examine prospective jurors or may permit the attorneys for the parties to do so."). Rule 24(a) of the Federal Rules of Criminal Procedure grants the Court broad discretion in conducting the voir dire examination. Included within the broad discretion is the right to control *who* conducts the voir dire. The rule specifically provides that the Court may permit counsel to conduct the entire voir dire examination or permit counsel to conduct some voir dire examination to supplement initial voir dire examination by the Court or permit no voir dire examination by counsel and conduct the entire voir dire examination itself. *See* Fed. R. Crim. Pro. 24(a); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 144 (1994).

3

The Court's discretion under Rule 24(a) is not without limit, however. It is "subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 301 (1931). While attorney conducted voir dire may not always be essential to insure such fairness, there are several reasons it will advance that goal in this case where the combination of the terrorism charges and climate of fear and prejudice prompted by recent acts of terrorism threaten Pham's right to a fair trial by an impartial jury.

**The Importance of Voir Dire to Peremptory Challenges.**

Voir dire provides a means of discovering actual and implied bias. The dual purpose of voir dire is to provide enough information to exercise challenges for cause and enough information to exercise peremptory challenges. *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). These challenges are intended to advance the goal of meeting the constitutional requirement of an impartial jury. Challenges for cause are narrow in scope; they "permit rejection of jurors on narrowly specified, provable and legally cognizable bas[e]s of partiality." *Swain v. Alabama*, 380 U.S. 202, 220 (1965). Peremptory challenges, on the other hand, can be exercised "without a reason stated, without inquiry, and without being subject to the Court's control." *Swain*, 380 U.S. at 220. *But cf. Batson v. Kentucky*, 476 U.S. 79 (1986) and its progeny.

Because of the narrow scope of challenges for cause, the peremptory challenge is often the most useful and important tool for a litigant in picking an impartial jury. As noted by the Supreme Court in *Swain*: "The voir dire in American trials tends to be extensive and probing, operating as a predicate for the exercise of peremptories... The persistence of peremptories and their extensive use demonstrate the long and widely held belief that

4

peremptory challenge is a necessary part of trial by jury." *Swain*, 380 U.S. at 218-219.

In order for a peremptory challenge to serve its purposes, it must be *intelligently* exercised. This requires that the parties obtain sufficient information from the potential jurors upon which to base their challenges. As one court has noted: "Peremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes." *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir.), *cert. denied*, 434 U.S. 902 (1977). *See also United States v. Corey*, 625 F.2d 704, 707 (5th Cir. 1980) ("This Court has previously stressed that voir dire examination not conducted by counsel has little meaning").

**Contribution of Counsels' More In-Depth Knowledge of the Case.**

One reason why a short period of attorney-conducted voir dire after the Court's general voir dire will contribute to more complete information about the potential jurors is the attorneys' more in-depth knowledge of the case. *See, e.g., United States v. Cleveland*, Crim. A. No. 96-207, 1997 WL 2554 at *3 (E.D. La. Jan. 2, 1997). Important follow-up questions are more likely to occur to an advocate than a judge for several reasons, including the fact that a judge "does not have the advocate's awareness that soon [s]he will be making peremptory challenges based on inferences from what prospective jurors have said" and the fact that "the judge does not know the case of either party in detail, so that [s]he cannot realize when responses have opened areas for further inquiry." Babcock, *Voir Dire: Preserving "Its Wonderful Power"*, 27 Stan. L. Rev. 545, 549 (1975). The Fifth Circuit has recognized:

> While Federal Rules [sic] of Criminal Procedure 24(a) gives wide discretion to the trial Court, voir dire may have little meaning if it is not conducted at least in part by counsel. The "federal" practice of almost exclusive voir dire examination by the Court does not take into account the fact that it is the parties, rather than the Court, who have a full grasp of the nuances and the strength and weaknesses of the case... Experience indicates that in the majority of situations questioning by counsel would be more likely to fulfill this need [for information upon which to base the intelligent exercise of peremptory challenges] than an exclusive examination in general terms by the trial Court.

*United States v. Ible,* 630 F.2d 389, 395 (5th Cir. 1980). *Accord United States v. Corey*, 625 F.2d at 707; *United States v. Ledee*, 549 F.2d at 993.

Voir dire conducted *solely* by the Court interferes with the intelligent exercise of peremptory challenges because the Court is usually less familiar with the facts and nuances of the case. Attorneys have been working for months on the case. They are most likely to know the areas of questioning that must be explored further in order to uncover the prejudices that are most pertinent to the evidence that will be presented at trial. They also act with an awareness that they will have to base peremptory challenges on the juror's answers.

**Contribution of Counsels' Different Relationship to Potential Jurors**

A second reason why attorney-conducted voir dire -- *in addition to* Court voir dire -- will elicit more complete information from potential jurors arises out of the attorneys' relationship to the jurors. Psychological studies suggest at least two differences between attorney-juror relationships and judge-juror relationships that should enable attorneys to obtain more or different information from *some* potential jurors. *See* Suggs and Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis,* 56 Ind. L.J. 245, 253-58 (1981).

The first difference which may have an impact is the difference in status between

judges and attorneys. Psychological studies suggest two things about the relationship between self-disclosure and the status of an interviewer: People (1) tend to disclose more to a person who is perceived to have higher status than they but (2) tend to disclose less if the status differential is too great. Suggs and Sales at 253. In other words, a person is likely to provide the most self-disclosure to a person who is perceived to have somewhat greater status but not such greater status that the juror finds it impossible to identify with the interviewer. *See id*. at 253-54.

      This suggests that supplemental attorney-conducted voir dire can add an important dimension to the voir dire process. Potential jurors come from widely varying social backgrounds, ranging from the unemployed, to employed blue-collar workers who have only a high school education, to college students, to established and highly educated professionals. For some of these individuals, the relative "status" of judges and attorneys may be such as to make the judge most likely to obtain complete self-disclosure. But for others it may be the status differential with attorneys that will result in complete self-disclosure. By having both attorneys and the Court conduct voir dire, self-disclosure is most likely to be maximized.

      A second difference in the juror-attorney relationship and the juror-judge relationship is also significant. As one set of commentators has noted, "the judge has an extremely difficult role to fulfill, both intellectually and emotionally. [Sh]e must be the arbiter of fine points of law, coordinate the activities of all parties to facilitate a just result and remain above interparty rivalries, all of which require that [s]he remain aloof and emotionally detached." Suggs and Sales at 254. Attorneys are not so constrained. *See id*. This is reflected most superficially by the fact that it is the judge for whom jurors must

stand upon her entry into the Courtroom, not the attorneys.

This is important to the question of jurors' self-disclosure. Psychological studies show -- consistent with common sense -- that people tend to be less willing to talk and reveal themselves to those who must remain at least somewhat detached. Suggs and Sales, at 254-55. Permitting the attorneys to conduct some follow-up voir dire in addition to the Court's voir dire will counter this problem in the voir dire process.

In sum, attorney conducted voir dire in addition to the Court's voir dire takes advantage of both the attorneys' greater knowledge of the underlying facts of the case and the differences between the attorney-juror relationship and the judge-juror relationship. Permitting attorney-conducted voir dire in addition to Court voir dire will bring the best of both worlds to the process and maximize the information obtained in voir dire.

**Courts Have Recognized The Need And Value Of Attorney-Conducted Voir Dire**

In *United States v. Tavares*, 436 F.Supp.2d 493, 503-04 (E.D.NY 2006), the Honorable Jack B. Weinstein granted a defense request for attorney-conducted voir dire in a capital case and permitted the attorneys to conduct the voir dire, subject to reasonable time limits, to be placed on the record before jury selection.

> The general practice in this district is for the judge to ask all the questions or to supplement those posed in a written questionnaire. In a capital case it is particularly desirable to ensure that counsel for both parties have the opportunity to plumb the venirepersons' views on capital punishment, their understanding of mitigating and aggravating factors, and other issues. Individual voir dire will be conducted in a side room, with defendant present. Each side will be permitted 30 minutes to question each prospective juror. Defendant will begin with each juror, and will have the right to reserve five minutes of his time to follow the government's questioning. Additional time will be granted when the court deems it necessary.

*Id.* at 508-09.

The fact that *Tavares* was a death penalty case does not rule it inapplicable to the present case. Recent pretrial publicity concerning terrorism and proposed policies against Muslims has incited prejudice and paranoia among the public. Consequently, "it is particularly desirable to ensure that counsel for both parties have the opportunity to explore prospective jurors' views based on recent terrorism events and reactions. While recognizing the trial court's discretion in this matter, the Fifth Circuit has noted that "voir dire may have little meaning if it is not conducted at least in part by counsel." *United States v. Ible*, 630 F.2d 389, 395 (5th Cir. 1980). Without the opportunity for counsel to effectively probe for these hidden prejudices, it would be difficult to accomplish the goal of exercising sensitive and intelligent peremptory challenges. *See Ible*, 630 F.2d 389, 395 ("Peremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes.").

The possibility of prejudice in this case is so great that specific voir dire questions are necessary. *See, e.g., United States v. Davis*, 583 F.2d 190, 196–97 (5th Cir. 1978) (district court erred in failing to ask specific, individual questions concerning possible prejudice stemming from pretrial publicity); *United States v. Jones*, 722 F.2d 528, 529-30 (9th Cir. 1983) (indicating need for individual questioning in cases involving racial overtones). Each of these circumstances is pertinent to this case. Courts have "long recognized the substantial risk of unfair prejudice attached to gang affiliation evidence, noting such evidence 'is likely to be damaging to a defendant in the eyes of the jury' and that gangs suffer from 'poor public relations.'" *United States v. Irvin,* 87 F.3d 860, 864 (7th Cir, 1996) (internal citations omitted). A "jury's negative feelings toward gangs" creates a danger that such evidence will improperly influence its verdict because of "guilt by association."*Id*; *cf.*

9

*United States v. Parada-Talamantes,* 32 F.3d 168, 179 (5th Cir. 1994) (vacating conviction because of guilt-by-association evidence). This applies with even greater force to the present case where prejudice attached to association with a recognized terrorist organization is even more problematic.

The Fifth Circuit has recognized that voir dire examination in both civil and criminal cases has little meaning if not conducted by counsel for the parties.

> A judge cannot have the same grasp of the facts, the complexities and nuances as the trial attorneys entrusted with the preparation of the case. The court does not know the strength and weaknesses of each litigant's case. Justice requires that each lawyer be given an opportunity to ferret out possible bias and prejudice of which the juror himself may be unaware until certain facts are revealed.' Frates and Greer, *Jury Voir Dire: The Lawyer's Perspective*, 2 A.B.A. Litigation No. 2 (1976).

*United States vs. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977); *United States vs. Ible*, 630 F.2d 378, 395 (5th Cir. 1980) ("Experience indicates that in the majority of situations questioning by counsel would be more likely to fulfill this need than an exclusive examination in general terms by the trial court").

In *United States v. Davis*, the Fifth Circuit held that the district court erred in not undertaking a more thorough examination of panel members exposed to publicity. *Davis*, 583 F.2d 190, 196. It found that "where the nature of the publicity as a whole raised a significant possibility of prejudice, the cursory questioning by the court was not enough." *Id*. A district court is required, under *Davis*, to determine what in particular each juror may have heard or read and how it may have affected his attitude toward the trial, and whether any juror's impartiality had been destroyed. *Id*; *see also Silverthorne v. United States*, 400 F.2d 627, 638 (9th Cir. 1968) ("[I]n the absence of an examination designed to elicit answers which provide an objective basis for the court's evaluation, 'merely going through

10

the form of obtaining jurors' assurances of impartiality is insufficient [to test that impartiality].") (citation omitted).

Because it is likely that prospective jurors have been exposed to potentially prejudicial pretrial publicity, specific, individual voir dire is required. *Davis*, 583 F.2d at 196–97. In order to increase the likelihood that any hidden prejudices of the jurors will be uncovered, to accomplish the goal of exercising sensitive and intelligent peremptory challenges, and to insure that a fair and impartial jury is empaneled in this case, counsel should be given an opportunity to individually examine prospective jurors.

Most recently, in response to criticism of the Massachusetts court system for its restrictive approach to jury *voir dire*, which largely limited assessments of prospective jurors' impartiality, the Massachusetts Legislature enacted a law authorizing attorney-conducted voir dire in both civil and criminal trials. See Mass. Gen. Laws ch. 234, § 28 (effective February 2, 2015).

**Ability of the Court to Control and Limit Voir Dire Abuse**

There is a concern expressed by some courts and commentators that attorneys may abuse the voir dire process, either by seeking to improperly ingratiate themselves with jurors or argue their theory of the case or by showing no concern for efficiency. *See* Suggs and Sales at 250-51. The advantage of allowing attorney-conducted voir dire only as a supplement to Court voir dire is that the Court can fairly and reasonably control and limit such abuse.

First, if the Court begins by conducting its own voir dire, it can reasonably limit the voir dire it allows the attorneys to conduct. If the Court has already conducted its own voir

dire, the Court can legitimately expect the attorneys not to repeat the questions it has already asked and not to simply go on and on in an effort to establish rapport with the jurors. The Court can rightfully demand that the attorneys restrict themselves to new or proscribed areas of examination or relevant follow-up examination to ferret out bias and prejudice.

In addition, the Court can legitimately place a specific time limit on attorney-conducted voir dire when it begins with its own voir dire. The 30-minute limit on voir dire, which is proposed in this motion, is eminently justifiable when basic voir dire has already been conducted by the Court. An attorney who is given only 30 minutes for additional voir dire examination is unlikely to waste her precious 30 minutes.

**Attorney-Conducted Voir Dire Will Aid the Parties in Identifying and Ferreting Out Bias and Prejudice**

A complete and effective voir dire eliminates any need to rely on generalizations and stereotypes about people. As the Supreme Court recognized in *J.E.B. v. Alabama ex rel. T.B.*, 114 S.Ct. 1419 (1994):

> If conducted properly, voir dire can inform litigants about potential jurors, making reliance upon stereotypical and pejorative notions about a particular gender or race both unnecessary and unwise. Voir dire provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently. Simply put, there is no reason for counsel to rely on stereotypes and generalizations about people if she is permitted to ask specific questions about them.

*J.E.B.*, 114 S.Ct. at 1429.  An attorney conducting voir dire is able to do this more effectively than the Court because the attorney knows what factors she is concerned about and knows the underlying circumstances of the case and what characteristics in jurors are relevant to those circumstances.

**Attorney-Conducted Voir Dire Will Help Avoid Reversible Error on Appeal**

The denial or impairment of the right to exercise peremptory challenges requires reversal of a conviction, without a showing of prejudice. *Lewis v. United States*, 146 U.S. 370, 376 (1892). A Court which insists on conducting all voir dire itself may create grounds for reversal. The Ninth Circuit noted in *United States v. Baldwin*, 607 F.2d 1295 (9th Cir. 1979):

> The trial judge [may] insist on conducting a voir dire examination, but if [s]he does so, [s]he must exercise a sound judicial discretion in the acceptance or rejection of supplemental questions proposed by counsel. Discretion is not properly exercised if the questions are not reasonably sufficient to test the jury for bias or partiality.

*Id.* at 1297. The Court went on to reverse the defendant's conviction for failure of the trial Court to conduct a voir dire that created "reasonable assurances that prejudice would be discovered if present." *Id.* at 1298. Notably, while "resist[ing] categorically requiring specific voir dire procedures or questions" and giving "great deference to the trial court's determination of impartiality," the Fifth Circuit has instructed that "a court may not rely solely on a juror's assertion of impartiality but instead must conduct a sufficiently probing inquiry to permit the court to reach its own conclusion." *United States v. Pratt*, 728 F.3d 463, 470 (5th Cir. 2013)(citations omitted).

Permitting each party a mere 30 minutes of attorney-conducted voir dire each will increase the possibility of rooting out prejudice and bias and of eliminating a reversal of a verdict returned by a jury that was not impartial. Granting counsel for each party 30 minutes for *voir dire* transfers the burden of asking mandatory voir dire questions to counsel and removes that burden from the Court. Any risk of reversal due to insufficient voir dire will thereby be eliminated. *See, e.g., United States v. Rigsby*, 45 F.3d 120, 125 (6th

Cir. 1995) (rejecting claim of error based on failure of Court to ask particular voir dire question where defense attorneys were allowed to conduct additional voir dire after initial voir dire by Court), *cert. denied*, 514 U.S. 1134 (1995).

**This Case in This Extreme Time Requires Attorney-Conducted Voir Dire**

This motion for attorney-conducted individual voir dire targets the inadequacy of this district's traditional jury selection process in terrorism cases and seeks to insure that Pham receives a fair trial by an impartial jury. The conventional voir dire procedures utilized in this district are inadequate to screen venire members for bias and prejudice. We are requesting that the Court alter the conventional practice to probe the impact of pretrial publicity concerning terrorism on prospective jurors' ability to be fair and impartial and conduct questioning of individuals out of the presence of the entire venire.

This application is not seeking to conduct unduly invasive questioning, to "pre-try" the case to the venire, to create impressions or sympathies which will help either party during the course of the trial, or to unreasonably extend the time for jury selection. The Court can permit the attorneys to conduct the voir dire with the goal of identifying bias, prejudice and preconceptions, subject to reasonable time limits, to be placed on the record before jury selection. See, e.g., *United States v. Jayasundera*, WL 6307865 (E.D.MI 2001), where the court permitted attorney-conducted voir dire subject to reasonable time limits in lieu of a juror questionnaire.

This case involves prejudicial pretrial publicity that has incited racial, religious and cultural overtones. Annexed as Exhibit A is a non-exhaustive list of publicity that is of great concern to the defense. Not since the aftermath of the bombing of Pearl Harbor has there

been as much publicity arousing fear and hatred of a particular ethnic or religious group. Islamophobia is rampant. As a result of the terrorism acts on 9/11, hatred and fear of Muslims and disdain for Islam has been escalating for the past 14 years and has soared to new heights with the recent attacks in Paris and San Bernardino. Republican presidential front-runner Donald Trump, a branded and renowned New Yorker, has called for "a total and complete shutdown of Muslims entering the United States", a news story that has become viral. *See, e.g.*, https://www.washingtonpost.com/news/post-politics/ wp/2015/12/07/ donald-trump-calls-for-total-and-complete-shutdown-of-muslims- entering-the-united-states/?wpisrc=al_alert-national. Trump has coupled this message with his recent statements that thousands of Muslims in New Jersey cheered as they watched the World Trade Center collapse. His statements have become a rallying cry inciting public fear of Muslims and the desire to ostracize and marginalize followers of Islam.

     The trial, which concerns terrorism-related charges, is being tried in post-9/11 Manhattan within blocks of the World Trade Center site. In light of the recent terrorist attacks in San Bernardino and Paris, the daily barrage of publicity related to the attacks, and the public outcry against Muslims, attorney-conducted voir dire will substantially increase the likelihood that any hidden prejudices of prospective jurors will be uncovered, will allow the attorneys to exercise sensitive and intelligent peremptory challenges, and will assist the process designed to insure that an impartial jury is empaneled.

     Long ago, the Supreme Court observed that "[i]mpartiality is not a technical concep-

tion. It is a state of mind. For the ascertainment of this mental attitude of appropriate

15

indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula. *United States v. Wood,* 299 U.S. 123, 145–146 (1936). Like impartiality, bias, prejudice and preconceptions are mental states, making them *all* the more difficult to identify and assess when a prospective juror is not forthcoming in revealing these mental attitudes.

## Conclusion

Voir dire is a mutual search between lawyers and the court to determine whether a particular individual can insure integrity of the trial process in a given case. Honorable Donald P. Lay, Judge of the Eighth Circuit Court of Appeals, in his article entitled "In a Fair Adversary System, the Lawyer Should Conduct the Voir Dire of the Jury," stated:

> We would, as judges, have to ignore what we know as men to assume that only the law and the naked facts carry the burden of persuasion. Psychology governs human affairs even in the courtroom… Our system of justice is deprived of its fullest potential when the lawyer is denied the right to examine veniremen in an adversary setting.

In light of the charges in this case and the climate of paranoia and prejudice, permitting attorney-conducted voir dire is prudent and necessary.

For the foregoing reasons, it is respectfully requested that this Court allow counsel for each party to conduct limited voir dire in the above-entitled case.

Dated: December 9, 2015

Respectfully submitted,

*Bobbi C. Sternheim*
BOBBI C. STERNHEIM

# EXHIBIT A

## SAMPLING OF RECENT ANTI-MUSLIM PUBLICITY

Scott, Eugene. "Trump warns: 'Many more World Trade Centers.'" *CNN*, December 8, 2015. Accessed December 8, 2015.
http://www.cnn.com/2015/12/08/politics/donald-trump-ban-muslims/

Nagourney, Adam, Salman Masood and Michael S. Schmidt. "Killers Were Long Radicalized, F.B.I. Investigators Say." *New York Times*, December 7, 2015. Accessed December 8, 2015.
http://www.nytimes.com/2015/12/08/us/fbi-says-san-bernardino-assailants-were-radicalized.html?hp&action=click&pgtype=Homepage&clickSource=story-heading&module=a-lede-package-region&region=top-news&WT.nav=top-news

Baker, Peter and Eric Schmitt. "California Attack Has U.S. Rethinking Strategy on Homegrown Terror." *New York Times*, December 5, 2015. Accessed December 8, 2015.
http://www.nytimes.com/2015/12/06/us/politics/california-attack-has-us-rethinking-strategy-on-homegrown-terror.html?action=click&contentCollection=U.S.&module=RelatedCoverage&region=Marginalia&pgtype=article

Schmidt, Michael S. "U.S. Will Add a Third Level to Warnings of Terrorism." *New York Times*, December 7, 2015. Accessed December 8, 2015.
http://www.nytimes.com/2015/12/08/us/politics/us-will-add-a-third-level-to-warnings-of-terrorism.html?ref=politics

Steinbuch, Yaron. "Thousands deposited into California terrorist's account before massacre." *New York Post*, December 8, 2015. Accessed December 8, 2015.
http://nypost.com/2015/12/08/thousands-of-dollars-deposited-into-california-terrorists-account-before-massacre/

Schram, Jamle, Larry Celona and Joe Tacopino. "Muslim newlyweds slaughter co-workers who threw them a baby shower." *New York Post*, December 3, 2015. Accessed December 8, 2015.
http://nypost.com/2015/12/03/muslim-newlyweds-slaughter-coworkers-who-threw-them-a-baby-shower/

Brodsky, Adam. "Say what you want, but cops are still fighting terror." *New York Post*, December 7, 2015. Accessed December 8, 2015.
http://nypost.com/2015/12/07/say-what-you-want-but-cops-are-still-fighting-terror/

Schultz, Marisa. "Almost impossible to stop all terrorism: Homeland Security chair." *New York Post*, December 6, 2015. Accessed December 8, 2015.
http://nypost.com/2015/12/06/almost-impossible-to-stop-all-terrorism-homeland-security-chair/

Baker, Trent. "Former NYPD Commish Ray Kelly: 'We're Going To See More' Attacks Like San Bernardino." *Breibart News*, December 6, 2015. Accessed December 8, 2015.

http://www.breitbart.com/video/2015/12/06/former-nypd-commish-ray-kelly-were-going-to-see-more-attacks-like-san-bernardino/

Kumarl, Helen and Lorena Mongelli. "California killers' link to controversial New York mosque." *New York Post*, December 4, 2015. Accessed December 8, 2015. http://nypost.com/2015/12/04/california-killers-link-to-controversial-new-york-mosque/
"Stabbing suspect was trying to behead man." *CNN*, December 7, 2015. Accessed December 8, 2015. http://www.cnn.com/videos/world/2015/12/07/london-stabbing-attack-panel-tsr.cnn/video/playlists/top-news-videos/

Winton, Richard. "Report of man resembling Syed Farook at L.A. skyscraper prompts investigation." *Los Angeles Times*, December 8, 2011. Accessed on December 8, 2015. http://www.latimes.com/local/lanow/la-me-ln-in-wake-of-san-bernardino-authorities-probe-report-of-suspicion-man-at-l-a-skyscraper-20151207-story.html

Gye, Hugo. "Hate crimes against Muslims have more than tripled in the wake of the Paris terror attacks to more than 70 reported incidents a week in London." *Daily Mail*, December 4, 2015. Accessed December 8, 2015. http://www.dailymail.co.uk/news/article-3346045/Hate-crimes-against-Muslims-tripled-wake-Paris-attacks.html

O'Donnell, Noreen. "'A Frightening Time': U.S. Muslims Face Bigotry in Wake of Paris Attacks." *NBCNewYork.com*, November 24, 2015. Accessed December 8, 2015. http://www.nbcnewyork.com/news/national-international/Muslims-Face-Bigotry-in-Wake-of-Paris-Attacks-353170781.html

Semple, Kirk. "'I'm Frightened': After Attacks in Paris, New York Muslims Cope With A Backlash." *New York Times*, November 25, 2015. Accessed December 8, 2015. http://www.nytimes.com/2015/11/26/nyregion/im-frightened-after-paris-terrorist-attacks-new-york-city-muslims-cope-with-a-backlash.html

Izadi, Elahe. "Severed Pig's Head Thrown at Philadelphia Mosque Door." *Washington Post*, December 8, 2015. Accessed December 8, 2015. https://www.washingtonpost.com/news/acts-of-faith/wp/2015/12/08/severed-pigs-head-thrown-at-philadelphia-mosque-door/

Chalabi, Mona. "How anti-Muslim are Americans? Data points to extent of Islamophobia." *The Guardian*, December 8, 2015. Accessed December 8, 2015. http://www.theguardian.com/us-news/2015/dec/08/muslims-us-islam-islamophobia-data-polls

Burnett, Josh. "Deepening Anti-Islamic Mood in Texas Rivals Post-Sept. 11 Climate." *NPR*, December 8, 2011. Accessed December 8, 2015.

http://www.npr.org/2015/12/07/458811232/deepening-anti-islamic-mood-in-texas-rivals-post-sept-11-climate

Dart, Tom. "Anti-Islam group publishes addresses of Muslims and 'Muslim Sympathisers.'" *The Guardian*, November 25, 2015. Accessed December 8, 2015. http://www.theguardian.com/us-news/2015/nov/25/anti-muslim-group-publishes-names-texas

Zumer, Bryna. "Harford Muslims 'concerned' after rise in anti-Islam rhetoric." *Baltimore Sun*, December 1, 2015. Accessed December 8, 2015. http://www.baltimoresun.com/news/maryland/harford/abingdon/ph-ag-muslim-security-1202-20151201-story.html

Anderson, Jessica. "Muslim rights group seeks apology from Spirit Airlines over BWI incident." *Baltimore Sun*, November 18, 2015. Accessed December 8, 2015. http://www.baltimoresun.com/news/maryland/bs-md-ar-bwi-reaction-20151118-story.html

Whack, Errin Haines. "Arabic speaker briefly kept off flight after complaint." *Associate Press*, November 20, 2015. Accessed December 8, 2015. http://bigstory.ap.org/article/0fb35ed480104e328b81247914231529/arabic-speaker-briefly-kept-flight-after-complaint