UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

           - v. -                 :          12 Cr. 423 (AJN)

MINH QUANG PHAM,                  :
          a/k/a "Amin,"
                                  :
                Defendant.
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S NOTICE AND MOTION TO OFFER EVIDENCE PURSUANT TO RULE 404(B)


PREET BHARARA
United States Attorney
Southern District of New York
for the United States of America


Sean S. Buckley
Anna M. Skotko
Shane T. Stansbury

     Assistant United States Attorneys
     - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

DISCUSSION .......................................................................................................................... 6

I.    Evidence and Testimony Related to Uncharged Acts Is Admissible Both as Direct Evidence
of the Charged Crimes or, in the Alternative, Pursuant to Rule 404(b) ........................................... 7

    A.    Applicable Law .......................................................................................................... 7

    B.    Evidence of Uncharged Acts Related to Pham's Activities in Yemen and His
Subsequent Violation of U.K. Law Should be Admitted as Direct Evidence of the Charged
Crimes ......................................................................................................................... 11

    C.    In the Alternative, Evidence of these Uncharged Acts Should Be Admitted Pursuant to
Rule 404(b) .................................................................................................................. 14

    D.    The Probative Value of the Evidence of Uncharged Acts Is Not Substantially
Outweighed by Unfair Prejudice ........................................................................................... 17

CONCLUSION ....................................................................................................................... 18

## PRELIMINARY STATEMENT

By this notice and memorandum of law, the Government moves to offer evidence of uncharged acts, including uncharged crimes.    Specifically, the Government intends to offer at trial evidence and testimony regarding: (i) Pham's creation and use of a fraudulent visa to pass through checkpoints in Yemen; (ii) Pham's detention at a checkpoint in Yemen and efforts to bribe Yemeni government officials; and (iii) Pham's arrest in the United Kingdom for possession of a round of ammunition.

First, the events surrounding each of these uncharged acts are powerful direct evidence of Pham's efforts to join al Qa'ida in the Arabian Peninsula ("AQAP"), his subsequent membership in AQAP, his receipt of military training, and his possession and use of a firearm in furtherance of the crimes charged in the Indictment.    Among other things, the events surrounding these uncharged acts of deception and evasiveness while traveling in Yemen – which Pham committed in 2011 in furtherance of the charged substantive crimes and conspiracies thereto – demonstrate that Pham knowingly and intentionally sought to join, support, and receive training from AQAP. Similarly, his possession upon his arrival in the U.K. of a round of ammunition used in an AK-47 assault rifle, and his statements to U.K. law enforcement about AK-47 assault rifles, constitute powerful direct evidence of the military training that Pham received from AQAP while in Yemen, as well as his illegal possession of an automatic firearm in furtherance of the terrorism offenses charged in the Indictment.    As such, the uncharged acts sought to be introduced by the Government constitute direct evidence of Pham's commission of each of the crimes charged. Moreover, the acts arose out of the same transaction or series of transactions as the charged offenses, and are inextricably intertwined with the evidence regarding the charged offenses, such that they are necessary to complete the story of the crimes on trial.

In the alternative, this evidence should be admitted pursuant to Rule 404(b) of the Federal

Rules of Evidence because it is offered for a reason other than to show that Pham had a propensity to commit the crimes charged in the Indictment.   Specifically, the evidence relating to Pham's conduct while traveling in Yemen will be offered to show that Pham's travel to AQAP safehouses, his membership in AQAP, and his training in firearms were done with knowledge and intent and were not the result of a mistake, accident, or misunderstanding as to where he was traveling.   Moreover, such evidence demonstrates Pham's actual motivation for traveling to Yemen (*i.e.*, to join AQAP) as well as his planning and preparation for such an undertaking. Further, Pham's possession of the round of ammunition – which was a bullet for an AK-47 assault rifle – and his statements to U.K. law enforcement regarding the bullet and the nature of the firearm for which it was used – establish Pham's knowledge and intent in connection with his possession of an automatic firearm, including his familiarity with the firearm, and therefore establish the absence of any mistake or accident in his possession and use of an AK-47 assault rifle in furtherance of the crimes charged in the Indictment.

Finally, there is no identifiable unfair prejudice to Pham and, in any event, any such prejudice would be cured by a limiting instruction directing the jury not to consider the proffered evidence for an improper purpose.

## **BACKGROUND**

In the course of his Mirandized, post-arrest statement to the FBI, as well as in prior statements to U.K. law enforcement, Pham made a number of admissions regarding uncharged acts while he was in Yemen.   Specifically, Pham described how, prior to traveling to Yemen in December 2010, he made arrangements with a Yemen-based tour company (the "Tour Company") to obtain a tourist visa to participate in a two-week tour of Yemen with the Tour

Company.   *See* Exhibit 1 (02/26/2015 post-arrest statement) at 4.   Although Pham registered

for the tour, and in fact participated in the tour, Pham stated that he had done so as "a cover to

conceal the true purpose of Pham's travel to Yemen which, in reality, was to join al Qaeda and

for jihad."   *Id.*   The tour lasted approximately two weeks, and while Pham does not recall the

exact locations in Yemen that he visited during this two-week tour, he stated that he took many

photos during the tour to better establish his "cover" as a tourist in Yemen.   *See* Exhibit 1

(02/26/2015 post-arrest statement) at 5.

    After Pham had arrived in Yemen, Sami al Fadli ("al Fadli") – a co-conspirator who had

separately traveled to Yemen – informed Pham that he believed they could contact AQAP in

Eastern Yemen, specifically the province of Abyan.   *Id.* at 5.   Having learned this, Pham

contacted the Tour Company to see if the company could – following the conclusion of Pham's

two-week tour – arrange another tour for him to go east toward the Abyan province, which again

would serve as a cover story for Pham and get him a visa to pass through checkpoints.   *Id.*

The Tour Company, however, advised Pham that it could not arrange such a tour.   *Id.* at 5.

Indeed, when Pham advised the Tour Company of his intention to leave the two-week tour and

proceed eastward, the Tour Company objected and informed Pham that his visa did not permit

him to leave the tour or travel elsewhere in the country.

    Notwithstanding the Tour Company's objections, Pham left the tour group after

approximately two weeks, and proceeded to travel toward the Abyan province.   Because the

Tour Company had refused to issue a new visa for Pham, Pham made a fraudulent Yemeni visa

in order to pass through security checkpoints in Yemen.   *See* Exhibit 1 (02/26/2015 post-arrest

statement).   Pham did this by copying his original visa and making the changes himself, hoping

it would allow him to access areas of Yemen where AQAP was located.[1]   *Id.*

After leaving the tour, Pham traveled to Sana'a, Yemen, where al Fadli was waiting for him.   *Id.*   Pham and al Fadli then took a taxi from Sana'a towards Abyan.   *Id.*   During that trip, they encountered a Yemeni government checkpoint where Pham's fraudulent visa was scrutinized by the Yemeni authorities.   *Id.* at 6.   While at the checkpoint, the Yemeni authorities directed the taxi driver to park at the side of the road to await further instruction; the taxi driver, however, tried to outrun the Yemeni authorities and kept driving.   *Id.*   The Yemeni authorities pursued the taxi, and ultimately directed the taxi to return the checkpoint.   *Id.* While detained at the checkpoint, Pham and al Fadli requested the taxi driver's assistance to get them released and provided the taxi driver with money to bribe the Yemeni authorities controlling the checkpoint.   *Id.*   While it was unclear to Pham whether the taxi driver actually bribed the Yemeni officials or kept the money for himself, Pham and al Fadli ultimately were permitted to leave the checkpoint and were directed by the Yemeni authorities to return to Sana'a.   *Id.*

Following their return to Sana'a, Pham and al Fadli worked to develop other plans to evade the Yemeni authorities and travel to AQAP-controlled regions of Yemen in the Abyan province.   *Id.* at 6.   Among other things, Pham and al Fadli discussed hiking through the mountains, traveling on a small bus disguised as Yemeni locals, and disguising themselves as a traveling husband and wife (which would require Pham to dress as a woman) in order to pass

---

[1] According to Pham, a representative of the Tour Company had informed Pham that his Yemeni visa was valid only for one month, and therefore Pham believed that after departing the tour, he had overstayed his visa.   Pham subsequently learned that his Yemeni visa in fact was valid for six months.

through security checkpoints without scrutiny.   *Id.* at 6-7.   Ultimately, using a combination of these deceptions, Pham and al Fadli successfully evaded Yemeni authorities and traveled to the Abyan province, where they contacted and ultimately joined AQAP.   *Id.*

Following his arrival at an AQAP safehouse, Pham was provided with, and instructed in how to use, an automatic AK-47 assault rifle.   In addition, during his time with AQAP, Pham assisted with the preparation of, and dissemination of, AQAP's propaganda magazine, *Inspire*. In July 2011, a now-deceased co-conspirator who was a United States citizen ("American CC-1") and a senior leader of AQAP, instructed Pham to return to the U.K. in order to, among other things, contact individuals in the U.K. who, like Pham, wanted to join al Qaeda.   *See* Exhibit 2 (02/27/2015 post-arrest statement).   After providing these instructions to Pham, American CC-1 made arrangements for Pham to travel outside of AQAP-controlled areas of Yemen to Hadramawt, Yemen.   *See* Exhibit 2 (02/27/2015 post-arrest statement) at 2-3. Following his arrival in Hadramawt, Pham was detained by Yemeni authorities because his visa had expired.   *Id.*   Arrangements were made for Pham's visa to be extended, after which Pham was transported to the Hadramawt airport and instructed to leave Yemen.   *Id.*

On July 27, 2011, upon his return to the U.K., Pham initially was detained at Heathrow International Airport by U.K. law enforcement pursuant to U.K. terrorism laws.   As part of that initial detention, Pham agreed to be interviewed by U.K. law enforcement officers, and he consented to a search of his belongings.   *See* Exhibit 3 (07/27/2011 port-stop interview).   In the course of that interview, Pham admitted, among other things, to leaving the Yemeni tour arranged for by the Tour Company, traveling around Yemen, and overstaying his visa.   *Id.*

In searching Pham's belongings, U.K. law enforcement found a round of ammunition in

5

the rucksack that Pham had been carrying.   When Pham was informed of the recovery of the

bullet, he admitted that the bullet was his and claimed that it "was a gift," and that he had

forgotten that it was in his rucksack prior to traveling.   *See* Exhibit 4 (07/27/2011 port-stop

interview supplemental statement).   Thereafter, U.K. law enforcement formally arrested Pham

for his unlawful possession of a dangerous article on an aircraft in violation of U.K. law.   Pham

was then transported to a U.K. police station, where he was detained overnight.

The following morning, on July 28, 2011, Pham was interviewed by U.K. law

enforcement with regard to his possession of the live round of ammunition.   *See generally*

Exhibit 5 (07/28/2011 interview).   In the course of that interview Pham made several

admissions regarding the bullet that are relevant to the charges in the Indictment.   For example,

Pham stated:

> I believe what you found is a bullet . . . . Yeah, AK bullet, it's
> green with a green cap with a black tip and this was a gift given to
> me by my friend's uncle when I was in Yemen, it was given to me
> as a gift but (inaudible) I think came back, I know it came back but
> you know just, cultural thing . . . .

*Id.* at 6.   Thus, Pham not only admitted that the round of ammunition belonged to him, but

explained that it was a bullet for an AK-47 assault rifle and provided a detailed, accurate

description of the bullet's physical appearance.   In addition, Pham went on to state that "AK

stands for Automatic Kalashnikov," and further admitted that he has seen AK-47 ammunition

before.   *Id.* at 7.   Later in the interview, when shown a photograph of the bullet that had been

seized from his rucksack, Pham identified the bullet in the photograph as his bullet.   *Id.* at 16.

Later that same day, Pham was released on bail and ultimately received a caution for his

possession of the live round of ammunition.

6

## DISCUSSION

**I.    Evidence and Testimony Related to Uncharged Acts Is Admissible Both as Direct Evidence of the Charged Crimes or, in the Alternative, Pursuant to Rule 404(b)**

### A.    Applicable Law

Evidence of uncharged conduct, including uncharged criminal conduct, is admissible under at least two independent rationales.   *See United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).   First, such evidence may be admissible as direct, or intrinsic, evidence of the charged crimes.   *See United States* v. *Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992).   Second, evidence of uncharged conduct may be admitted as "other-acts' evidence where it is relevant for "any purpose" other than as evidence of a defendant's propensity to commit crimes.   Fed. R. Evid. 404(b); *see United States* v. *Curley*, 639 F.3d 50, 57 (2d. Cir. 2011).

Though each rationale constitutes an independent basis for admitting evidence of uncharged acts, the requirements for admission are essentially the same whether the evidence is considered direct evidence or Rule 404(b) other-acts evidence: so long as the evidence is relevant to a non-propensity purpose (which direct evidence is inherently), it should be admitted unless its probative value is substantially outweighed by the danger of unfair prejudice.   *See United States* v. *Hsu*, 669 F.3d 112, 118 (2d Cir. 2012).[2]

---

[2]    At least one Judge in this District has observed that focusing on whether the evidence in question is either direct evidence of the charged crime or Rule 404(b) "other act" evidence "exalts form over substance."   *United States* v. *Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004) (Leisure, J.).   The sole difference between the two approaches is that, if evidence is admitted as "other act" evidence under Rule 404(b), the Government must give notice to the defense and, upon request, the Court must give a limiting instruction cautioning the jury against making an improper inference of criminal propensity.   *See id.* (citing Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual § 404.02(11) (8th ed. 2002)).

### 1.    Evidence of Uncharged Conduct as Direct Evidence of the Crimes Charged

Evidence of uncharged conduct is admissible as direct evidence of the charged crimes—subject to the Rule 403 balancing test—so long as that evidence has any tendency to make any material fact more likely than it would be absent that evidence.   *See, e.g.*, *Hsu*, 669 F.3d at 118; *United States* v. *Guang*, 511 F.3d 110, 121-22 (2d. Cir. 2007); *Carboni*, 204 F.3d at 44; *United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *United States* v. *Langford*, 990 F.2d 65, 70 (2d Cir. 1993); *United States* v. *Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). "[E]vidence of criminal behavior may be admissible as direct evidence of the crime charged 'if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'"   *Hsu*, 669 F.3d at 118 (quoting *Carboni*, 204 F.3d at 44).

The admissibility of evidence of uncharged conduct as direct evidence is at its zenith in conspiracy cases.   *United States* v. *Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004) ("The Second Circuit has afforded significant leeway regarding [uncharged acts] evidence in conspiracy cases."); *accord United States* v. *Rodriguez*, 215 F.3d 110, 119 (1st Cir. 2000) ("Evidence of other criminal conduct has often been found specially relevant when it tends to prove one or more of the elements of the crime of conspiracy." (internal quotation marks omitted)).    This "special relevance" owes, in large part, to the need to prove the existence of the conspiracy, as well as the defendant's knowing and intentional participation in it.   *See Rodriguez*, 215 F.3d at 119 (noting that conspiracy proof must "overcome the possibility that a particular defendant's association with criminal co-conspirators was wholly innocent or that, if

8

he was with them at the scene of criminal activity, he was 'merely present,' without guilty knowledge or intent").

Accordingly, in conspiracy cases, evidence of uncharged conduct may be offered as direct evidence of, for example: "the existence of the alleged conspiracy as well as to show its background and history," *Langford*, 990 F.2d at 70, the relationship of mutual trust between co-conspirators, and the "understanding or intent with which certain acts were performed," *Coonan*, 938 F.2d at 1561.   *See also Guang*, 511 F.3d at 121 ("In a conspiracy case, other acts evidence is admissible as background information, to demonstrate the existence of a relationship of mutual trust, or to enable the jury to understand how the illegal relationship between the co-conspirators developed." (internal quotation marks omitted)).

In addition, "[e]vidence of uncharged acts is . . . admissible to demonstrate 'a pattern of conduct engaged in by defendant and others of which the crime charged was part.'"   *United States* v. *Mavashev*, 455 Fed. Appx. 107, 112 (2d Cir. 2012) (quoting *United States* v. *Papadakis*, 510 F.2d 287, 295 (2d Cir. 1975) (internal quotation marks omitted)); *see also United States* v. *Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (observing that a pattern of activity may be probative of the defendant's intent); *Curley*, 639 F.3d at 50 (same).

### 2.        Other Act Evidence Pursuant to Rule 404(b)

Rule 404(b) of the Federal Rules of Evidence prohibits the use of evidence of a crime or other act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."   Fed. R. Evid. 404(b); *see Hsu*, 669 F.3d at 118 ("In other words, evidence that a defendant committed crimes beyond those presented to the jury is not admissible to show that the defendant is a bad person who is therefore likely to be guilty of

9

the crimes charged."). Rule 404(b) simultaneously enumerates permissible uses of such

evidence, including (but not limited to): "proving motive, opportunity, intent, preparation, plan,

knowledge, identity, absence of mistake, or lack of accident." *Id.*

      "This Circuit follows the inclusionary approach, which admits all other act evidence that

does not serve the sole purpose of showing the defendant's bad character and that is neither

overly prejudicial under Rule 403 nor irrelevant under Rule 402." *Curley*, 639 F.3d at 56

(internal quotation marks omitted); *see also United States* v. *LaFlam*, 369 F.3d 153, 156 (2d Cir.

2004); *United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994). There are four relevant

considerations regarding the admission of other-act evidence offered pursuant to Rule 404(b).

*Huddleston* v. *United States*, 485 U.S. 681, 691-92 (1988); *Curley*, 639 F.3d at 56.

      First, the other-act evidence must be "offered for a proper purpose." *United States* v.

*McCallum*, 584 F.3d 471, 475 (2d Cir. 2009). A proper purpose is any purpose other than to

show the defendant's propensity to commit the offense. *See Curley*, 639 F.3d at 57; *United*

*States* v. *Pitre,* 960 F.2d 1112, 1118–19 (2d Cir. 1992).

      Second, the other-act evidence must be "relevant to a disputed issue." *McCallum*, 584

F.3d at 475. "[E]vidence is 'relevant' if it has 'any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable than it

would be without the evidence.'" *Gonzalez*, 110 F.3d at 941 (quoting Fed. R. Evid. 401); *see*

*also United States* v. *Schultz*, 333 F.3d 393, 416 (2d Cir. 2003). And relevant evidence of a

crime is not limited to "that which directly establishes an element of the crime." *Gonzalez*, 110

F.3d at 941. "To be relevant, evidence need only tend to prove the government's case, and

evidence that adds context and dimension to the government's proof of the charges can have that

10

tendency."   *Id.*; *United States v. Abu Jihaad*, 630 F.3d 102, 131-133 (2d Cir. 2010) ("To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt."); *Schultz*, 333 F.3d at 416 ("Nonconclusive evidence should still be admitted if it makes a proposition more probable than not." (internal quotation marks omitted)).

Third, the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice pursuant to Rule 403.   *McCallum*, 584 F.3d at 475.[3]   Evidence that is neither "more sensational" nor "disturbing" than the charged crimes will not be deemed unfairly prejudicial.   *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *accord Curley*, 639 F.3d at 59.

Fourth, when requested, the district court must give a limiting instruction to the jury that "the similar acts evidence is to be considered only for the proper purpose for which it was admitted."   *Huddleston*, 485 U.S. at 691-92; *see McCallum*, 584 F.3d at 475.

### B. Evidence of Uncharged Acts Related to Pham's Activities in Yemen and His Subsequent Violation of U.K. Law Should be Admitted as Direct Evidence of the Charged Crimes

#### 1. Evidence Regarding Pham's Falsification of His Yemeni Passport as well as His Attempts to Bribe and Evade Yemeni Law Enforcement Are Direct Evidence of the Charged Crimes

The falsification of his Yemeni visa, and his attempts to bribe and/or evade Yemeni authorities at a security checkpoint constitute direct evidence of Pham's provision of material support to AQAP as well as his participation in a conspiracy to provide material support to the foreign terrorist organization.   *See Rodriguez*, 215 F.3d at 119   ("Evidence of other criminal

---

[3]   All evidence of guilt is, of course, prejudicial, in that it disadvantages the defense.   But not all prejudice is unfair prejudice.   *See*, *e.g.*, *Costantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." (emphasis in original)).

conduct has been found 'specially relevant' when it tends to prove one or more of the elements of the crime of conspiracy.   In a conspiracy prosecution, it is essential for the government to prove the defendant's knowledge of and voluntary participation in the conspiracy.") (citations omitted); *Guang*, 511 F.3d at 121 ("In a conspiracy case, other acts evidence is admissible as background information, to demonstrate the existence of a relationship of mutual trust, or to enable the jury to understand how the illegal relationship between the co-conspirators developed.") (internal quotation marks omitted)).

Among other things, Pham is alleged to have provided, and conspired to provide, his person and his services to AQAP.   He could not have provided such support to AQAP were he not able to travel from Sana'a to the Abyan province, where he met with representatives of AQAP who ultimately transported him to the AQAP safehouses.   While in the Abyan province, Pham joined AQAP and received training in firearms and explosives, as well as assisted in the preparation of terrorist propaganda, as alleged in the Indictment.   As such, evidence related to his travel to the Abyan province of Yemen to join AQAP "'arose out of the same transaction or series of transactions as the charged offense,'" are "'inextricably intertwined with the evidence regarding the charged offense,'" and are "'necessary to complete the story of the crime on trial.'" *Hsu*, 669 F.3d at 118 (quoting *Carboni*, 204 F.3d at 44).

Moreover, such evidence is direct evidence of Pham's knowing and willful participation in a conspiracy to provide material support to, and receive military training from, AQAP. Specifically, Pham's deceptive and unlawful actions in Yemen – including falsification of his visa, attempted bribery of Yemeni officials, and efforts to evade the Yemeni authorities – constitute direct proof that Pham traveled to Yemen for the criminal purpose of joining AQAP,

rather than for some innocent reason, such as founding a Muslim village or a desire to explore the countryside, as Pham had argued in connection with the U.K. extradition proceedings, and as we anticipate Pham will argue here.   Similarly, the acts Pham took in Yemen constitute direct evidence of Pham's intent and desire to travel to AQAP-controlled regions of Yemen in order to join AQAP, to provide his person and his services to AQAP, and receive military training from AQAP.   As such, these uncharged acts, which are part and parcel of the charged conduct, constitute powerful, direct evidence of essential elements of the counts One through Four of the Indictment.

### 2. Evidence and Testimony Related to Pham's Arrest for Possession of a Round of AK-47 Ammunition is Direct Evidence of the Charged Crimes

Pham's unlawful possession of a live round of ammunition on an aircraft, and his statements to U.K. law enforcement following his arrest, similarly constitute direct evidence of Pham's commission of the crimes charged in Counts Three, Four, and Five of the Indictment.[4] As an initial matter, the fact that Pham was found to be in possession of a live round of ammunition used in an AK-47 assault rifle is circumstantial evidence of the fact that, prior to his arrest, Pham had access to such weapons and ammunition.   Similarly, Pham's description of the bullet, subsequent identification of the bullet, and admission that the bullet belonged to him are probative of the fact that Pham knowingly possessed AK-47 ammunition.   Moreover, Pham's admissions that he knows that such ammunition is used in an automatic assault rifle, and that he

---

[4]  Because the Government will argue that Pham received the ammunition while serving as a member of, and providing material support to, AQAP, Pham's possession of the ammunition is also relevant to demonstrating Pham's commission of the crimes charged in Counts One and Two.

had seen such ammunition before, are probative of the fact that Pham not only conspired to receive military training, but did in fact receive military training prior to his arrest on July 27, 2011.

> **C.     In the Alternative, Evidence of these Uncharged Acts Should Be Admitted Pursuant to Rule 404(b)**

Even if evidence of Pham's uncharged acts while in Yemen and his subsequent arrest and statements regarding the round of ammunition were not direct evidence of the crimes with which Pham is charged, that evidence would be admissible pursuant to Rule 404(b).    It plainly is offered for a proper purpose, *i.e.*, a purpose other than to show Pham's propensity to commit the offense.    *See Curley*, 639 F.3d at 57.    The evidence is offered to show Pham's knowing and willful participation in the charged conspiracies as well as to establish his motive and intent in traveling to Yemen.    As such, this evidence is "relevant to a disputed issue."    *McCallum*, 584 F.3d at 475.    It helps to show not only that Pham intended to travel to prohibited regions of Yemen in order to join AQAP, receive military training, and carry and possess a firearm, but it also shows that his activities in this regard were not the result of a mistake or a failure to comprehend reality.    *See Gonzalez*, 110 F.3d at 941 (relevant evidence of a crime is not limited to "that which directly establishes an element of the crime."; "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."); *Abu Jihaad*, 630 F.3d at 131-133 ("To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt."); *Schultz*, 333 F.3d at 416 ("Nonconclusive evidence should still be admitted if it makes a proposition more probable than not." (internal quotation marks omitted)).

14

### 1.    Evidence of Pham's Uncharged Acts in Yemen Shows Motive, Intent, Preparation, Plan, Knowledge, and Absence of Mistake

Evidence of his creation of a fraudulent visa and the steps he took to evade Yemeni authorities – including offering to bribe the checkpoint officers – demonstrates, among other things, Pham's preparation, planning, intent, motive, and absence of mistake in joining AQAP. To the extent that Pham argues that he did not travel to Yemen for the purpose of AQAP and did not associate with AQAP for the purpose of committing the crimes charged.    Indeed, in light of the evidence, it is unlikely that Pham could offer any defense other than his lack of the requisite intent to commit the crimes charged.

In light of Pham's likely defense – *i.e.*, that he traveled to Yemen for a legitimate purpose (*e.g.*, for tourism, or to help establish a Muslim village) and/or associated with AQAP members only as the result of impaired decision-making or without full knowledge of the nature of the organization or as a result of his impaired decision-making ability – the proffered evidence is highly relevant to demonstrating Pham's culpable intent.    Among other things, the extreme deceptive measures taken by Pham – including attempting to arrange for a tour as a "cover" for his travel, the preparation of a falsified Yemeni visa, the attempt to bribe Yemeni officials, and the subsequent plans hatched by Pham and al Fadli to evade Yemeni law enforcement in order to travel to prohibited, AQAP-controlled regions of Yemen – establish that Pham's intent and motive for traveling to Yemen was to join AQAP (rather than a trip inspired by touristic or other lawful interests), and the extensive measures he took in preparation for that travel and in planning to join AQAP.    Similarly, the additional measures he took to be able to travel through Yemen to AQAP safehouses demonstrate Pham's knowingly joining the conspiracy to provide

material support to, and receive military training from, AQAP, as well as his absence of mistake in winding up as a resident at AQAP safehouses and a participant in AQAP's goals and objectives.

Accordingly, the evidence of these other uncharged crimes is not offered to demonstrate that Pham had a propensity to commit crimes more generally, and therefore was more likely to have committed the charged crimes.   Rather, it is properly offered as direct evidence of the charged crimes or, in the alternative, as evidence of Pham's motive, preparation, planning, knowledge, intent, and absence of mistake pursuant to Rule 404(b).

> **2.    Evidence and Testimony Regarding Pham's Unlawful Possession of a Live Round of Ammunition on an Airplane Shows Intent, Knowledge, and Absence of Mistake, and Lack of Accident**

In addition, the fact of Pham's unlawful possession of the round of ammunition properly is admitted pursuant to Rule 404(b) to demonstrate knowledge and absence of mistake.   Among other things, Pham's unlawful possession of a round of ammunition after leaving Yemen, and his statements about it being used in an automatic assault rifle, demonstrate that Pham knew that he possessed and carried an automatic firearm in furtherance of the crimes charged in the proposed Indictment, and did not mistakenly carry or use such firearm believing it either to be anything other than an automatic firearm.   Further, the fact that he continued to possess the round of ammunition following his departure from the AQAP-controlled safehouses can be offered to show Pham's intent, as it reveals that Pham looked positively upon his time with AQAP and the training he received there, and was not ashamed, disturbed, or otherwise regretted having joined AQAP or received military training from AQAP.

As such, evidence of Pham's arrest for possession of a dangerous article is offered for

permissible purposes either as direct evidence of his participation in the charged crimes or as Rule 404(b) evidence to demonstrate Pham's knowledge, intent, and lack of mistake.

**D.      The Probative Value of the Evidence of Uncharged Acts Is Not Substantially Outweighed by Unfair Prejudice**

The probative value of this evidence is not substantially outweighed by its potential for unfair prejudice pursuant to Rule 403.    Evidence that Pham falsified his passport, sought to bribe and evade Yemeni law enforcement, and/or was arrested for carrying a live round of ammunition on an airplane is hardly "more sensational" or "disturbing" than the crimes with which he is charged.    *Roldan-Zapata*, 916 F.2d at 804.    Moreover, in the event the Court determines that such evidence should be admitted only pursuant to Rule 404(b) – rather than as

17

direct evidence of the charged crimes – whatever prejudice might conceivably be suffered by

Pham by virtue of the introduction of this evidence can readily be cured by a limiting instruction.

## <u>CONCLUSION</u>

Accordingly, for the foregoing reasons, the Government respectfully submits that the

Court should permit the Government to offer evidence of uncharged acts as direct evidence of

the charged offenses or, in the alternative, pursuant to Rule 404(b).


Dated:          New York, New York
                December 9, 2015

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney


                              By:__/s/ Sean S. Buckley_____
                                    Sean S. Buckley
                                    Anna M. Skotko
                                    Shane T. Stansbury
                                    Assistant United States Attorneys
                                    (212) 637-2261/1591/2641