UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| - v. - : | 12 Cr. 423 (AJN) |
| MINH QUANG PHAM, :<br>    a/k/a "Amin," | |
| : | |
| Defendant. | |
| : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN ANONYMOUS JURY AND OTHER RELATED PROTECTIVE MEASURES

                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York

Sean S. Buckley
Anna M. Skotko
Shane T. Stansbury
      Assistant United States Attorneys
      *- Of Counsel -*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

DISCUSSION ................................................................................................................................ 2

   I. Each of the Relevant Factors Weigh in Favor of the Empanelment of an Anonymous Jury Here ................................................................................................................................ 2

      A.  Applicable Law ................................................................................................................ 2

      B.  Discussion ........................................................................................................................ 4

          1.   Nature and Seriousness of the Charges ....................................................... 5

          2.   Corruption of the Judicial Process ............................................................... 7

          3.   Pretrial Publicity ........................................................................................... 8

   II. Jury Anonymity Will Not Interfere with the Conduct of a Thorough and Searching *Voir Dire* ........................................................................................................................ 10

CONCLUSION ............................................................................................................................ 13

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in support of its motion for an anonymous jury and an order directing that (1) all prospective jurors on the *voir dire* panel, as well as the jurors and alternate jurors who are ultimately selected for the petit jury, not reveal their names, addresses, or places of employment; (2) the jurors be kept together during recesses and that the United States Marshals Service takes the jurors to, or provide them with, lunch as a group each day throughout the pendency of the trial; and (3) at the beginning and end of each trial day, the jurors be transported together by the United States Marshals Service to and from the courthouse to an undisclosed central location or locations, at which the jurors can assemble from, or leave for, their respective residences.

Anonymous juries employing these three precautions have been used in several prominent terrorism cases tried in this District, including two recent terrorism trials that were conducted over the course of the past two years. *See*, *e.g.*, *United States* v. *Fawwaz*, (S7) 98 Cr. 1023 (LAK) (S.D.N.Y. 2015); *United States* v. *Abu Ghayth*, (S14) 98 Cr. 1023 (LAK) (S.D.N.Y. 2014). Indeed, this District has a long history of successfully employing anonymous juries and related protections in terrorism-related trials, and has demonstrated time and again that these measures are appropriate in terrorism cases and do not infringe upon the defendant's due process rights or otherwise impact the ability of the anonymous jury to render a fair verdict consistent with the evidence. These trials include two other trials – in addition to the *Fawwaz* trial referenced above – arising out of al Qaeda's 1998 bombings of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, *United States* v. *Ghailani*, (S10) 98 Cr. 1023 (LAK) (S.D.N.Y. 2010); *United States* v. *Bin Laden*, (S7) 98 Cr. 1023 (LBS) (S.D.N.Y. 2001); the trial of attorney Lynne Stewart and two others for various crimes arising from their contacts with Sheikh Omar Abdel Rahman, *United States* v. *Stewart*, 02 Cr. 395 (JGK)); three trials arising out

of Indictment 93 Cr. 180 (KTD), two of which related to the 1993 bombing of the World Trade Center (*United States* v. *Salameh* and *United States* v. *Yousef*), and the other of which concerned a plot to bomb American airliners flying out of Southeast Asia (*United States* v. *Yousef*); and the trial of Sheikh Omar Abdel Rahman's seditious conspiracy to wage war against the United States, which included a plot to bomb various places in New York City, *United States* v. *Abdel Rahman*, 93 Cr. 181 (MBM).[1]  *But see United States* v. *Mustafa*, 04 Cr. 356 (KBF) (denying government motion for an anonymous jury).

Indeed, in light of this long history of the effective use of the requested safeguards, the Government does not believe that it is necessary to sequester the jury completely.[2]

## DISCUSSION

**I.    Each of the Relevant Factors Weighs in Favor of the Empanelment of an Anonymous Jury Here**

**A.    Applicable Law**

The Second Circuit has repeatedly upheld the use of anonymous juries where a court takes reasonable precautions to minimize any adverse effect on the jurors' opinion of a defendant by, for example, conducting a thorough *voir dire* to uncover any potential bias and giving the

---

[1] Although the Second Circuit has published decisions affirming the convictions resulting from the three trials arising out of 93 Cr. 180 (KTD), those resulting from the seditious conspiracy trial of Abdel Rahman and others, 93 Cr. 181 (MBM), and that resulting from the conviction in Ghailani, (S10) 98 Cr. 1023 (LAK), none of those defendants challenged on appeal the fact that his trial jury was anonymous.  *United States* v. *Ghailani*, 733 F.3d 29 (2d Cir. 2013); *United States* v. *Yousef*, 327 F.3d 56 (2d Cir. 2003); *United States* v. *Abdel Rahman*, 189 F.3d 88 (2d Cir. 1999); *United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998).

[2] Similar methods of safeguarding the jury were proposed and used in several other cases tried in this District.  *E.g.*, *United States* v. *Gotti*, 08 Cr. 1220 (PKC); *United States* v. *Gotti*, 04 Cr. 690 (SAS); *United States* v. *Scala*, (S1) 04 Cr. 70 (LAK); *United States* v. *Gotti*, 02 Cr. 743 (RCC); *United States* v. *Quinones*, 00 Cr. 761 (JSR); *United States* v. *Gallo*, 99 Cr. 1199 (LMM); *United States* v. *Guzman*, 97 Cr. 786 (SAS); *United States* v. *Liborio Bellomo*, 96 Cr. 430 (LAK); *United States* v. *Muyet*, (S2) 95 Cr. 941 (PKL); *United States* v. *Ocasio*, 95 Cr. 942 (DAB); *United States* v. *Felipe*, (S16) 94 Cr. 395 (JSM).

jury a plausible and non-prejudicial reason for jury anonymity.  *United States* v. *Stewart*, 590 F.3d 93, 124 (2d Cir. 2009) ("[T]he use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a voir dire designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." (internal quotation marks omitted)); *United States* v. *Quinones*, 511 F.3d 289, 295-97 (2d Cir. 2007); *Unites States* v. *Aulicino*, 44 F.3d 1102, 1116 (2d Cir. 1995); *United States* v. *Wong*, 40 F.3d 1347, 1376 (2d Cir. 1994); *United States* v. *Thai*, 29 F.3d 785, 800-01 (2d Cir. 1994); *United States* v. *Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991); *United States* v. *Vario*, 943 F.2d 236, 239 (2d Cir. 1991); *United States* v. *Tutino*, 883 F.2d 1125, 1132 (2d Cir. 1989); *United States* v. *Barnes*, 604 F.2d 121, 133-43 (2d Cir. 1979).

The case law in this Circuit has identified three factors that should be considered in determining whether empaneling an anonymous jury is appropriate.  *See United States* v. *Tomero*, 486 F. Supp. 2d 320, 322 (S.D.N.Y. 2007):

- **first**, the nature and seriousness of the charges, *Stewart*, 590 F.3d at 124-25 (using an anonymous jury is appropriate where, *inter alia*, "the charges against the defendants . . . included a terrorist conspiracy to murder"); *Vario*, 943 F.2d at 241 (using an anonymous jury is appropriate where the "trial evidence will depict a pattern of violence by the defendants and [their] associates such as would cause a juror to reasonably fear for his own safety");

- **second**, the potential threat of corruption of the judicial process, *Stewart*, 590 F.3d at 124-25 (considering "the reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety"); *United States* v. *Scala*, 405 F. Supp. 2d 450, 452-53 (S.D.N.Y. 2005) (considering the possibility that the jurors, "absent anonymity, would fear reprisals"); and

- **third**, the expectation of publicity and media coverage, *Stewart*, 590 F.3d at 125 (considering "the widespread pretrial publicity about the case"); *Tomero*, 486 F. Supp. 2d. at 323 (weighing the fact that the case "has been covered extensively in the press," and predicting further press coverage).

Importantly, the Second Circuit has repeatedly upheld the use of jury-protection measures based upon the reasonable fears of jurors of threats of violence or retaliation, without an assessment of whether those fears are certain or even likely to be realized.  *E.g.*, *Stewart*, 590 F.3d at 125 (considering "the reasonable likelihood that the pervasive issue of terrorism would raise in the juror's minds a fear for their individual safety"); *United States* v. *Thomas*, 757 F.2d 1359, 1364 (2d Cir. 1985); *Barnes*, 604 F.2d at 141-42; *Vario*, 943 F.2d 239.  The consideration of a jury's reasonable fear is relevant to both the first factor (nature and seriousness of the charges) as well as the second factor (threat to judicial process).  *See Scala*, 405 F. Supp. 2d at 452-53 (with respect to the first factor, observing that "a jury, unless shielded, well could fear malevolent action by defendants accused of these crimes"; and with respect to the second factor, observing that demonstrated violence and jury tampering "raises a substantial risk that the jurors, absent anonymity, would fear reprisal").

The Second Circuit's opinion in *Barnes* is instructive here.  There, the Court of Appeals upheld the empaneling of an anonymous jury and specifically rejected the argument that the law requires jurors to disclose their identities because

> [t]his . . . is not the law—and should not be. If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If the anonymous juror feels less pressure as a result of anonymity . . . this is as it should be—a factor contributing to his impartiality.

604 F.2d at 140-41 (internal quotation marks omitted).

### B. Discussion

In this case, all three relevant factors weigh in favor of empaneling an anonymous jury.

1.     **Nature and Seriousness of the Charges**

The Indictment charges the defendant with a variety of crimes, including conspiracy to provide, and the actual provision of, material support to the foreign terrorist organization, al Qaeda in the Arabian Peninsula ("AQAP"), in violation of Title 18, United States Code, Section 2339B.  These charges are among the most serious terrorism charges that can be brought today, particularly because AQAP has publicly and unambiguously sworn allegiance to al Qaeda's leadership in Afghanistan and allied itself with the group's anti-American and murderous goals. Moreover, AQAP's leadership has publicly claimed responsibility – using, among other things, its propaganda magazine, *Inspire*, which is the very publication for which the evidence will show that Pham provided material and significant contributions during his time in Yemen – for plots to murder U.S. nationals and commit terrorist attacks against U.S. interests, including but not limited to the 2009 Christmas-day bomb plot, in which an AQAP operative sought to detonate an explosive device on a civilian airplane traveling to Detroit, Michigan.  AQAP similarly has taken responsibility for the thwarted October 2010 parcel-bomb plot that followed within months of the Christmas-day bomb plot, in which AQAP attempted to detonate explosive devices within the holds of commercial airliners.  *See*, *e.g.*, Exhibit A (November 2010 *Inspire* Magazine Special Edition).

This factor weighs particularly heavily here, and amply supports the empanelment of an anonymous jury.  This is so because AQAP has specifically called on its followers to conduct attacks against not only American interests abroad, but civilians in particular.  For example, in May 2010, in the wake of the November 2009 massacre at the U.S. military base in Fort Hood, Texas, AQAP's media arm distributed an "exclusive interview" with Anwar Aulaqi, a U.S.-born, senior leader of AQAP.  *See* Exhibit B (draft transcript of 05/23/2010 interview).  In that interview, Aulaqi urged his followers to kill American civilians, and specifically called upon all

5

Muslims in the U.S. army to follow in the steps of the Fort Hood shooter.  *Id.*  In that same interview, Aulaqi admitted that the individual involved in the 2009 Christmas-day bomb plot was one of his students and further stated that he "really support[s] what he has done," *i.e.*, the attempted murder of hundreds of innocent civilians on a U.S.-bound airplane.  Similarly, AQAP's propaganda magazine, *Inspire*, repeatedly has published articles instructing people how to construct improvised explosive devices using household materials, *see*, *e.g.*, Exhibit C at 33 (article entitled "Make a bomb in the kitchen of your Mom"); how to conduct a guerilla-style attack in a civilian area, *see*, *e.g.*, Exhibit D at 40 (article entitled "Charlie Hebdo: Military Analysis")); and praising the Boston bombers as individuals who "have revived the glory and honor of this Ummah in times of humiliation," *see* Exhibit D at 35 (article entitled "Remembering Boston").  As such, Pham is alleged to have conspired not only with a foreign terrorist organization, but with a foreign terrorist organization that has pointedly encouraged its followers to conduct attacks against civilians.

More recently, AQAP has taken responsibility for coordinating attacks in other foreign countries, including the January 2015 terrorist attacks in Paris against the French publication *Charlie Hebdo*, which resulted in the murder of numerous individuals.  *See* Exhibit D (September 2015 issue of *Inspire* Magazine underscoring AQAP's responsibility for the attacks and encouraging similar attacks in other Western nations).  Then, on December 20, 2015, AQAP released a video of an almost 20-minute speech by its current emir, in which the leader of AQAP explains that the "real enemy is America," and directs his followers to strike at its head.[3]

AQAP's stated desire to kill U.S. civilians is particularly relevant here.  The evidence at trial will show that Pham traveled to Yemen, where he engaged directly with high-ranking

---

[3] The Government has not yet prepared, but will prepare, a draft, English-language translation of the video, which it will provide to the Court and defense counsel upon completion.

6

members of AQAP, including Anwar Aulaqi. That evidence will also show that Pham received military training not only in the use of firearms, but also was trained in the construction of explosive devices. Specifically, the evidence will show that Pham trained directly with Anwar Aulaqi in how to create a lethal explosive device using household chemicals, and that Aulaqi directed Pham to detonate such explosive device at the "arrivals" section of London's Heathrow Airport following Pham's return to the United Kingdom. The evidence will also show that Pham was directly involved in the preparation and publication of AQAP's *Inspire* magazine, which, as described above, is one of the principal means through which AQAP claims responsibility for its terrorist acts and exhorts its followers to conduct terrorist attacks within the United States and other Western countries. Finally, as part of its evidence, the Government will show that Pham and other members of AQAP carried firearms in furtherance of each of the aforementioned crimes.

As such, the nature of the charges weighs heavily in favor of empaneling an anonymous jury. Both the seriousness of the crimes charged and the nature of the charges are likely to raise in the minds of at least some jurors a reasonable fear for their own safety. This is particularly so today, given the November 2015 attacks in Paris and the December 2015 attacks in San Bernardino, California. That reasonable fear warrants the empaneling of an anonymous jury and the institution of the proposed, related protective measures. *See Stewart*, 590 F.3d at 125; *see also Thai*, 29 F.3d at 801; *Thomas*, 757 F.2d at 1364; *Barnes*, 604 F.2d at 141; *United States* v. *Gambino*, 809 F. Supp. 1061, 1067 (S.D.N.Y. 1992).

### 2. Corruption of the Judicial Process

The members of the conspiracy charged in the Indictment, *i.e.*, other members of AQAP, have unequivocally demonstrated, through words and actions, that they pose a threat to the judicial process. As noted above, as recently as three days ago – on December 20, 2015 – the

7

current leader of AQAP re-affirmed that killing Americans is one of their core goals. Moreover, the recent attacks in Paris and San Bernardino have shown that members of terrorist organizations, including AQAP, are capable of inspiring others to sow death, fear, and destruction, well outside of the physical territory they control, even here in the United States. When the recency of such attacks is considered against other, similar historical attacks (*e.g.*, the shootings at Fort Hood), they give rise to significant concern for individual safety.

If jurors feel that they "may be subjected to violence or death at the hands of a defendant or his friends," such fears may well influence their ability to be "as free and impartial as the Constitution requires." *Barnes*, 604 F.2d at 141. The proposed jury-anonymity measures – including anonymous empanelment, collective lunches, and neutral-site pick-up and drop-off – will reduce pressures borne of fear, and accordingly will better enable jurors to fulfill their duty of impartiality.

### 3. Pretrial Publicity

While, to date, this case has not attracted the type of public attention and scrutiny that many other prior terrorism trials had attracted, because of recent events, we expect that this case likely will garner substantial media attention. Specifically, this trial will be the first terrorism trial in this District since the tragic November 2015 attacks in Paris and the December 2015 attacks in San Bernardino. As a result, the recency and gravity of the terrorist attacks in Paris and California very likely will result in greater media interest in the trial of this matter. Indeed, in his December 9 motion for attorney-conducted *voir dire*, the defendant appended an impressive list of recent publications regarding terrorist attacks in the United States and abroad. *See* Exhibit E (12/09/2015 Def. Exh. A). Accordingly, it is quite likely that this trial of an operative of a foreign terrorist organization, AQAP, that has demonstrated its mission to kill American civilians, will garner substantial media attention.

8

In addition to the anticipated public interest, this case already has received some media attention, both in the United Kingdom and here in the United States. For example, the international news media has covered many parts of the pretrial process, including the defendant's extradition[4] and arraignment,[5] among other subjects.

As such, the expectation of publicity at trial weighs in favor of anonymity to avoid the jurors' exposure "to inappropriate contacts that could compromise the trial." *Paccione*, 949 F.2d at 1193; *see also Stewart*, 590 F.3d at 125; *Thai*, 29 F.3d at 801; *Vario*, 943 F.2d at 240; *Tutino*, 883 F.2d at 1132; *United States* v. *Persico*, 832 F.2d 705, 717 (2d Cir. 1987); *Barnes*, 604 F.2d at 141. Juror anonymity is an effective remedial measure to prevent possible prejudice and inappropriate contact by the press and others.[6] Moreover, potential jurors will be more willing to

---

[4] *E.g.*, Duncan Gardham, "Britain extradites London man to US over Al-Qaeda terror charges," *The Telegraph*, Mar. 4, 2015, *available at* http://www.telegraph.co.uk/news/uknews/terrorism-in-the-uk/11448456/Britain-extradites-London-man-to-US-over-Al-Qaeda-terror-charges.html; Rich Calder, "Vietnamese al Qaeda propagandist extradited from UK to face US terror charges," *New York Post*, Mar. 3, 2015, *available at* http://nypost.com/2015/03/03/vietnamese-man-extradited-from-uk-to-face-us-terror-charges/; Timur Moon, "London Web Designer 'Al-Qaida Propaganda Expert,'" *International Business Times*, June 9, 2013, *available at* http://www.ibtimes.co.uk/minh-quang-pham-qaeda-yemen-476493.

[5] *E.g.*, Stephen Rex Brown, "Minh Quang Pham, Vietnamese national accused of training with Al Qaeda in Yemen, pleads not guilty," *New York Daily News*, Mar. 4, 2015, *available at* http://www.nydailynews.com/new-york/nyc-crime/alleged-member-al-qaeda-yemen-pleads-not-guilty-article-1.2137167; CBS-New York/AP, "Vietnamese Man Pleads Not Guilty To Terrorism Charges In New York," Mar. 4. 2015, *available at* http://newyork.cbslocal.com/2015/03/04/vietnamese-man-pleads-not-guilty-to-terrorism-charges-in-new-york/; Jon Swaine, "London man accused of aiding al-Qaida faces life sentence in US after extradition," *The Guardian*, Mar. 3, 2015, *available at* http://www.theguardian.com/us-news/2015/mar/03/london-man-al-qaida-extradited-new-york-faces-life-sentence.

[6] Where media coverage potentially threatens the fairness of a trial, remedial measures must be taken to prevent the prejudice. *Sheppard* v. *Maxwell*, 384 U.S. 333, 363 (1966). "The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." *Id.* at 363. "[T]he trial court has a responsibility to the public as well as

9

serve if they are confident that they and their families will not be subjected to unnecessary personal scrutiny.

To avoid jurors' exposure to inappropriate contacts that would compromise their impartiality and to alleviate their concerns that they or their families might be subject to media scrutiny should their identities be revealed, use of an anonymous jury and related protective measures is appropriate. *See Stewart*, 590 F.3d at 125; *Persico*, 832 F.2d at 717; *Barnes*, 604 F.2d at 141.

## II. Jury Anonymity Will Not Interfere with the Conduct of a Thorough and Searching *Voir Dire*

Although proceeding with an anonymous jury will result in the jurors' names and certain other personally identifying information not being disclosed, the jurors' anonymity will not prevent the parties from participating meaningfully in selecting a jury. Rather, through the use of a thorough *voir dire* process conducted by the Court, the parties will be provided with ample information about the background and possible bias of the potential jurors. *See*, *e.g.*, *Thai*, 29 F.3d at 801; *Paccione*, 949 F.2d at 1192; *Vario*, 943 F.2d at 241-42; *Tutino*, 883 F.2d at 1133.

The Court of course has substantial discretion in controlling and limiting the *voir dire* process.[7] *Rosales-Lopez* v. *United States*, 451 U.S. 182, 189 (1981); *United States* v. *Click*, 807

---

to the defendant to maintain the integrity of the criminal process." *United States* v. *Shiomos*, 864 F.2d 16, 18 (3d Cir. 1988); *see also United States* v. *Marrone*, 502 F. Supp. 983, 1003 (E.D. Pa. 1980) ("[T]he public, as well as the accused, has a substantial interest in having guilt or innocence decided by a jury free from prejudicial influences.").

[7] By separate memorandum of today's date, the Government is opposing the defendant's request to permit attorney-conducted *voir dire*. As described above, and in further detail in that memorandum, the Government recognizes the parties' interests in a thorough and searching *voir dire*. Notwithstanding that, it is the Government's position that the processes implemented by the Court to ensure that the *voir dire* is sufficiently detailed in this case – including but not limited to directing the parties to provide proposed *voir dire* questions and examinations of jurors nearly two months prior to the commencement of jury selection – and therefore does not require or merit an unusual deviation from long-accepted practice in this District. Accordingly, the Government respectfully submits that *voir dire* should be conducted by the Court alone, so long

F.2d 847, 850 (9th Cir. 1987); *United States* v. *Steel*, 759 F.2d 706, 711 (9th Cir. 1985); *Barnes*, 604 F.2d at 137. A full *voir dire* may be conducted about subjects other than the juror's name, address, and employer's name, and the parties and counsel will have an unrestricted opportunity to observe the jurors during the *voir dire* process. *E.g.*, *Barnes*, 604 F.2d at 142-43. Where jury anonymity is warranted, the Second Circuit has found that a defendant's rights are protected by the trial court's conduct of "a voir dire designed to uncover any bias as to the issues or the defendants." *Stewart*, 590 F.3d at 124 (internal quotation marks omitted).

Furthermore, the Second Circuit has concluded that the danger that the anonymous procedure would cast unfair aspersions on a defendant is substantially minimized where the trial judge gives the jurors a plausible and non-prejudicial reason for not disclosing their identities or taking other security measures. *Stewart*, 590 F.3d at 124; *see also* Thai, 29 F.3d at 801 (district court instructed that "[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in the Federal Court. Anonymity will ward off curiosity that might infringe on juror's privacy . . . ."); *Paccione*, 949 F.2d at 1193 (anonymity explained in terms of protection against pressures from the media).

Thus, to avoid any possible prejudice to any defendant, the Government requests that the Court instruct the jury consistent with the instruction given in *United States* v. *Ghailani*, (S10) 98 Cr. 1023 (LAK):

> Finally, I want to explain to you that your privacy can and will be preserved, even in a case like this that may get a certain amount of publicity. Some of you may have heard or read about jurors being sequestered, put into hotel rooms and so forth. We do not intend to sequester the jury in this case. Those of you who serve on the jury will go home every night, however the names and addresses and identifying information about jurors, including things like where they work, will not be disclosed to anyone other

---

as the parties are permitted an opportunity – outside the presence of the jury – to propose orally supplemental *voir dire* questions following the Court's initial *voir dire*.

> than a single chief jury clerk, the person who is responsible for paying the members of the jury for their service. That's to assure that the privacy of jurors is preserved and that none of you is contacted by the press or by anyone else who may want to talk about the case.
>
> As you're going to learn in a few minutes, the questionnaires that you will fill out this morning will not have your names on them. Each of you has or will have a number assigned to you. You'll put that number on every page of the questionnaire. You won't put your name there. The jur[or]s in this case will be known to the lawyers, the witnesses, the parties and even to me only by your number.
>
> Now, selecting an anonymous jury in this way is not unusual. It's been done in many cases in this and other federal courts. Anonymity will deter curiosity and protect the privacy of the jurors. In addition, once the jury is selected in this case, the jurors will be picked up every morning by a deputy . . . United States marshal[] at one or more convenient meeting places around the city or elsewhere and driven to the courthouse. While the jury is in the courthouse, it will remain with the marshals and the jury will take coffee breaks and meals together. The jury will be provided with a light breakfast, coffee and other refreshments and lunch every day.
>
> In the evenings, the jurors will be driven from the courthouse by the marshals to one or more convenient dropoff locations from which the jurors will make their own ways home. The locations of the morning meeting places and the evening dropoff points will not be available to the public. It is possible that they will change from time to time during the course of the trial.

(Transcript at 4-5.)

## CONCLUSION

For all of the foregoing reasons, the Government's motion for an anonymous jury and related protective measures should be granted.

Dated: New York, New York
December 23, 2015

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   /s/

Sean S. Buckley
Anna M. Skotko
Shane T. Stansbury
Assistant United States Attorneys
212-637-2261 / 1591 / 2641