# LAW OFFICES OF BOBBI C. STERNHEIM

212-243-1100 • Main
917-306-6666 • Cell
888-587-4737 • Fax

33 West 19th Street - 4th Floor
New York, New York 10011
bc@sternheimlaw.com

May 2, 2016

**SUBMISSION UNDER SEAL[1]**
Honorable Alison J. Nathan
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

Re: *United States v. Minh Quang Pham*
12 Cr. 423 (AJN)

Dear Judge Nathan:

This letter is submitted in reply to the Government's Sentencing Memorandum. It addresses various aspects of the government's submission but is not exhaustive in its overall opposition to the government's position. As stated in Minh Quang Pham's main submission, dated April 22, 2016, imposition of a 30-year sentence is sufficient to comply with the sentencing goals set forth in 18 U.S.C. § 3553(a).

**Pham's Role is Minor, if not Minimal, in Comparison with Other Co-Conspirators**

The government takes issue with our contention that Pham's involvement was minor or even minimal. There can be no credible dispute that his role was limited. We urge the Court to contrast Pham's participation with that of other co-conspirators, such as CW-1.

Upon information and belief, CW-1 is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ From 2007/2008, ▓▓▓▓▓▓ was an al Shabaab fighter. By 2009, he had risen to be a senior battleground commander in charge of hundreds of al Shabaab fighters in Somalia. In that

---

[1] Due to sensitive contents herein, the protective order and Security Administrative Measures in place, this reply is submitted under seal.
[2] The government's heading "Pham Concedes that the Guidelines Call for a Sentence of 50 Years' Imprisonment" (Govt. Sent. Mem. at 17) is misleading. The guidelines are advisory; they no longer command nor demand what sentence must be imposed. The Court has discretion to impose any sentence below a stipulated guideline range so long as it does not go below any statutory

capacity, he was sent to Yemen by senior al Shabaab leaders to meet with members of AQAP and received military, explosives and weapons training, as well as topography training, from AQAP in order to assist al Shabaab. In addition, he facilitated the purchase of military grade weapons by al Shabaab from AQAP.

███████ entered a guilty plea, pursuant to a cooperation agreement, to all nine counts of Indictment ██████████ charging criminal activity spanning 2007 until his arrest in April 2011. He allocuted to the following crimes: conspiracy to provide material support and providing material support to al Shabaab, using and carrying a weapon in connection therewith, and causing the death of at least one person; conspiracy to provide material support and providing material support to AQAP and using and carrying a weapon in connection with therewith; conspiracy to receive and receipt of military-type training from al Shabaab and AQAP; and teaching and demonstrating the making and use explosive, destructive devises and weapons of mass destruction.

Clearly, Pham's involvement was significantly less that ██████ in duration, participation, responsibility, and seniority. The Court has discretion to factor a defendant's discreet involvement even when a plea agreement does not include a guideline adjustment for role in the offense. Based on Pham's limited involvement, a variance is warranted.

**Pham Disputes Statements Made By CW-1**

Pham contests certain allegations made by CW-1 ████████, as recited in the Presentence Report (PSR) and restated in the Government's Sentencing Memorandum (Govt. Sent. Mem.). Pham admits he met ██████ in Yemen and the two spoke at two different safe houses. Pham admits that upon entering the safe house he had a weapon but once inside the safe house he neither used nor carried any weapon. Whether ██████ observed Pham enter a safe house, he did so without Pham's awareness. Pham disputes the hyperbole of ████████ alleged assertions that he "interacted extensively" with Pham and that Pham carried a weapon "through almost all of his interactions" with ██████ (PSR ¶¶ 32, 24; Govt. Sent. Mem. at 6, 7). Pham admits speaking with ██████ but flatly denies that he told ██████ he would "martyr" himself for AQAP (PSR ¶ 35; Govt. Sent. Mem. at 6).

LAW OFFICES OF BOBBI C. STERNHEIM

Upon information and belief, ███ was captured on April 19, 2011. U.S officials confirmed that ███ was held on a U.S. Naval ship for over two months and was subjected to interrogation by military and civilian officials. Following this period of interrogation, it has been reported that ███ was afforded a four-day break during which the Red Cross was permitted to visit him. Thereafter, interrogation resumed, and FBI officials claim he was read his *Miranda* rights. This stage of the interrogation is said to have lasted an additional seven days.

Had Pham elected to proceed to trial, motion practice would have challenged the reliability of ███ testimony due to the unorthodox method of his capture, detention and interrogation before his entry into the American criminal justice system. We would have litigated whether evidence derived from ███ for use against Pham was obtained from ███ through use of torture or inhuman and degrading treatment. Given the nature of his capture, along with the location, it is highly likely that ███ was, in effect, held in *incommunicado* detention for more than two months aboard a U.S. Navy warship. While U.S. officials have asserted that ███ was interrogated in accordance with the U.S. military field manual on the questioning of suspects, the manual itself has raised a number of areas of concern. *See, e.g.,* ACLU 2011 letter to Robert S. Mueller, III, Director of the FBI, calling into question whether the FBI is adhering to its own policy prohibiting coercive techniques.

This is not the forum to delve deeply into questionable interrogation techniques employed with ███ and, more importantly, we are not seeking a *Fatico* hearing. Nonetheless, we urge the Court not to credit ███ information. There is reason to believe that it may be unreliable and the product of coerced interrogation. There is reason to believe that whatever ███ alleged to have stated during his surreptitious interrogation, he was required to adopt in order to obtain a cooperation agreement. There is a real issue that the circumstance and conditions of ███ detention, whether or not in violation of international standards and concerns for human rights (*e.g.,* United Nations Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment; Convention for the Protections of All Persons from Enforced Disappearance of December 2006), compromised the reliability of the information that the government has proffered to the Court.

3

Pham has entered a guilty plea, *inter alia,* to possession of a weapon and receipt of military-type training. He accepts responsibility for his possession and use of that weapon in connection with receiving training. Government assertions based on information provided by ▓▓▓▓▓▓ while contested, are not critical to the sentence to be imposed: Pham does not dispute that he brought a weapon into the safe houses where he met ▓▓▓▓▓▓

**Pham Never Intended to Carry Out Any "Plot"**

The government claims "Pham ultimately did not have the opportunity to carry out his most destructive plot." (Govt Sent Mem. at 25). As discussed in Pham's main sentencing submission, Pham never intended to pursue any such plot or engage in any physical violence.

The government seeks to suggest that Pham would have carried out the ruse had he had the opportunity to do so. Indeed, the opportunity existed- for the six-month period between Pham's return to the United Kingdom and his detention - but the intention, incentive and inclination did not exist. If, as the government urges the Court to believe, Pham was so devoted to al-Aulaqi, he had the opportunity to carry out the "most destructive plot" after al -Aulaqi's death-by-drone in September 2011, while Pham was at liberty in London. Pham took no such action. The government's assertions are as hollow as Pham's statements to al-Aulaqi.

**Reports of Pham's Post –Arrest Statements Contain Inaccuracies**

Counsel acknowledges the misstatement regarding when Pham initially proffered at the U.S. Attorney's Office. It did occur approximately three weeks after Pham's presentment and appointment of counsel. During that interval, however, Pham had no contact whatsoever with counsel. Pham met briefly with his first appointed counsel in the Marshal's cellblock on the day of presentment; the next time Pham saw counsel was when Pham arrived in the U.S. Attorney's Office for the proffer. Counsel did not counsel or prepare Pham for the proffer process.

The proffer process differs from the post-arrest interrogation of Pham, conducted en route to the United States from England and continued during the three days Pham was sequestered in a hotel room in New York without counsel. We do not dispute that Pham

received *Miranda* warnings and spoke with the agents over a four-day period. However, we take issue with the fact that Pham was not prepared by counsel for his meeting with the government for a formal proffer session and that he lacked a critical understanding of what it means to enter into a cooperation agreement, including the requirement to testify in open court and the risks that poses to the cooperator and the cooperator's family.

The interrogation process engaged in by U.S. law enforcement differs from practices of U.K. law enforcement, of which Pham had some familiarity. In the U.K., interrogation is tape recorded, eliminating disputes regarding what was actually said. This practice is not standard practice in the U.S., even where, as here, interrogation occurred under non-exigent circumstances. In the U.K., the individual who is interrogated has an opportunity to hear the recording and compare it with a written transcript; the tape recording is the standard for measuring accuracy. In the U.S., a cooperator's statements are hand-written by an agent, and then typewritten into a report; neither version is subject to review or approval by the cooperator.

Typed reports of Pham's statements were provided as Rule 16 discovery. Pham was given electronic discovery in a laptop provided by the government to the MCC. By email, dated May 11, 2015, MCC Legal confirmed that it received the laptop on May 7, 2015 and anticipated providing it to Pham later that week. Once received, Pham had access to the discovery on the laptop.

Post-arrest statements that are incomplete, inaccurate or both do not, in and of themselves, provide a basis for suppression when obtained voluntarily. Pham does not dispute that he waived *Miranda* and appeared with counsel at the proffer sessions. It is folly to suggest that the government would seriously entertain an informal challenge to the notes of their agents. At best, this would have been an issue to be raised at trial, with deference favoring law enforcement.

**Present and Future Conditions of Incarceration Constitute Additional Punishment**

The government does not, and cannot, dispute that Pham is detained under the strictest pretrial separation and security measures. He is detained in MCC's SHU 10-South under Security Administrative Measures (SAM). That neither Pham nor defense counsel took formal issue with the conditions of confinement at the MCC or application of SAMs

ignores the realities of the administrative and legal processes in these circumstances. Sure, Pham could have filed endless "cop outs" contesting the conditions of his confinement. My experience in similar matters confirms that it would have amounted to wasted efforts, as would have motion practice on this issue.

The serious nature of the charges against Pham is the very reason for his being housed in 10-South; concerns for national security are the basis for imposition of SAMs. Indeed, even the fact that Pham was a model inmate in general population while detained in the U.K. would have no bearing on the Bureau of Prisons' decisions on how to detain an extradited defendant charged with terrorism. My experience in these matters confirms that even if Pham's conditions and restriction of detention were brought to the attention of the Court, deference would be given to the BOP and the government.

The issue of Pham's pretrial detention and likely post-sentence incarceration is now squarely before the Court. There are sufficient reasons for the Court to take into consideration the highly restrictive and punitive conditions of Pham's present and future confinement.

**A 30-Year Sentence Satisfies Need for Deterrence and Promotes Respect for the Law**

The government's claim that the Probation Department's recommendation is "based principally on the very serious nature the offense" (Govt. Sent. Mem. at 19) ignores the fact that unless the government provides information to support a downward departure from the guidelines (*i.e.,* pursuant to a cooperation agreement), the practice of the Probation Department is to recommend a guidelines sentence.

Neither the plea agreement nor the PSR contemplates § 3553 facts pertaining to Pham's personal characteristics. In that regard, the plea agreement is unilateral in favor of the government. To assume that plea agreements are a "bargain" ignores the realities of the process. Typically, a plea agreement is a "take it or leave it" proposal, often requiring the defendant to negotiate against himself. Rarely is a defendant entitled to argue for a downward departure "carve out." The process places a heavy burden on the defense to get a "carve out" in the first instance and then to counter the government's opposition at sentence. In lieu of a departure, the agreement permits a variance by permitting the parties to "seek a sentence outside the Stipulated Guideline Sentence based on factors to be

6

considered in imposing sentence pursuant to Tile 18, United States Code, Section 3553(a)." *See* Plea Agreement at 5.  As discussed in our main submission, Pham seeks a variance from the guidelines and the circumstances of this case warrant a variance for numerous reasons.

A sentence that does not taking into consideration a defendant's personal characteristics and role in the offense in addition to the unique circumstances of the case undermines respect for the law.  Further, the deterrence effect is that defendants would be reluctant to enter into guilty pleas and defense counsel would be hesitant to recommend pre-trial dispositions, the consequences of which would significantly pressure the resources of the criminal justice system. Without the opportunity for a variance from the advisory guidelines, trials would drastically outnumber pretrial dispositions; as a consequence, the federal criminal justice system would come to a crashing halt.

Pham does not dispute that the plea agreement exposes him to a 50-year sentence (30-year mandatory minimum plus 20-year statutory maximum)[2] but the plea agreement neither contemplates nor requires the imposition of that sentence, which is tantamount to a life sentence for a man in his 30's.  The 50 years is a starting point; it need not, and in this case should not, be the ending point.

The Court need not impose a 50-year sentence to "deter Pham from returning to his criminal conduct." *Id.* at 27.  The past four-and-a-half years of detention have been sufficient to accomplish that goal.  A sentence of 30 years is more than sufficient to accomplish individual and societal deterrence.

## Conclusion

The combination of Minh Quang Pham's curiosity and naiveté coupled with his Vietnamese (non-Arabic-like) features made his an ideal candidate for grooming by al-Alauqi and other AQAP members.  We do not dispute that Pham walked himself into the situation he finds himself in today.  But we stress that upon realizing the mistakes that he

---

[2] The government's heading "Pham Concedes that the Guidelines Call for a Sentence of 50 Years' Imprisonment" (Govt. Sent. Mem. at 17) is misleading. The guidelines are advisory; they no longer command nor demand what sentence must be imposed. The Court has discretion to impose any sentence below a stipulated guideline range so long as it does not go below any statutory mandatory minimum, which does not apply with regard to Counts Two and Three.

7

had made and the predicament that that he had gotten himself into, he tried to extricate himself from al-Aulaqi, AQAP and Yemen. Pham did not commit any acts of physical violence; he did not personally injure anyone and he did not take any violent action that al-Aulaqi wanted him to engage in. He has accepted responsibility for his misconduct. He voluntarily provided valuable information to law enforcement. He admitted his criminal conduct during his allocution before the Court, during his presentence interview with Probation and in his personal statement to the Court.

This 33-year-old father of two young children will spend a minimum of 30 years in a maximum-security prison. He will be permitted minimal telephone contact with his children, wife, parents and siblings, all resident in in London, and international calls that will be permitted will be expensive. It is likely that his family will not be able to visit Pham while he is imprisoned in America. It is likely that he will never again see his parents alive. It is likely that his children will neither recognize nor feel connected to their father, should they be reunited one day.

As a condition of the guilty plea, the government required that Pham agree to voluntary removal back to the U.K., despite the fact that his U.K. citizenship has been revoked. Upon information and belief, Vietnam will not honor the citizenship of this Vietnamese-born man who fled the country within a month of his birth, a person without any ties to Vietnam. If, upon completion of his sentence, he is deemed "state-less" with no place to go, he risks being detained indefinitely.

The Court has the discretion to impose a reasonable sentence that takes into account personal circumstances of Minh Quang Pham, his age, his extraordinary acceptance of responsibility and post-offense rehabilitation, his limited involvement in the crimes to which he pleaded guilty, the lack of any violence personally committed by him, the harsh conditions of detention and future incarceration, the likelihood that he may not regain his U.K. citizenship and may never be permitted to return home, and the chance that he may never see him family again.

A variance from the advisory Guidelines is warranted because a Guidelines sentence paints only a partial picture of Pham's character and the need for punishment and deterrence in this case. An appropriate punishment must consider a full picture of Pham's character, including his positive attributes as a father, husband, son, brother, friend and

8

individual, his educational background and artistic talent, and his potential for further employment and peaceful re-entry as a law-abiding member of society.

Weighed through the lens of the §3553(a) factors, the overall combination of circumstances and mitigating factors justifies a sentence of no more than 30 years, a sentence that is more than sufficient to meet the purposes of sentencing codified in §3553(a)(2).

We thank you for your consideration of this and the previous submission in their entirety.

                    Respectfully submitted,

                    *Bobbi C. Sternheim*

                    BOBBI C. STERNHEIM

cc: Government Counsel

9