UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

       - v. -                              :          12 Cr. 423 (AJN)

MINH QUANG PHAM,                            :
      a/k/a "Amin,"
                                          :

                       Defendant.
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S SENTENCING MEMORANDUM**

'

                                     PREET BHARARA
                                     United States Attorney
                                     Southern District of New York
                                     for the United States of America

Sean S. Buckley
Anna M. Skotko
Shane T. Stansbury

Assistant United States Attorneys
       - Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 1

    A.    Al Qa'ida in the Arabian Peninsula ............................................................... 1

    B.    Pham's Offense Conduct ................................................................................ 5

        1.    Pham's December 2010 Travel to Yemen to Join AQAP .................... 5

        2.    Pham's Work in Yemen with AQAP and Its Senior Leadership .................. 6

        3.    Pham's Return to the United Kingdom and the Forensic Analysis of His Computer ... 10

    C.    Pham's Indictment and Extradition to the United States ............................... 13

    D.    Pham's Post-Arrest Statements .................................................................... 14

    E.    Pham's Guilty Pleas ..................................................................................... 16

DISCUSSION ....................................................................................................................... 16

I.    The Undisputed Guidelines Sentencing Range Is 50 Years' Imprisonment ....................... 16

    A.    Applicable Law .............................................................................................. 16

    B.    Pham Concedes that the Guidelines Call for a Sentence of 50 Years' Imprisonment .......................................................................................... 17

    C.    Following a Detailed Analysis of the Undisputed Facts in the Presentence Report, the Probation Office Recommends a Guidelines Sentence ........................... 19

II.    Each of the Statutory Sentencing Factors Supports the Imposition of a Guidelines Sentence .............................................................................................................. 19

    A.    Applicable Law .............................................................................................. 19

**TABLE OF CONTENTS**
**(Cont'd)**

B.  The Nature and Seriousness of Pham's Crimes and the Need for Just    Punishment Necessitate a Guidelines Sentence ............................................................... 21

C.  A Guidelines Sentence Will Serve the Purpose of Deterrence and Will Promote Respect for the Law.................................................................................................... 26

D.  A Guidelines Sentence Is Appropriate to Protect the Public from Further Crimes of Pham ......................................................................................................................... 34

E.  Imposing a Guidelines Sentence, with Application of the Terrorism Enhancement, Would Advance the Goals of Section 3553(a) ............................................................. 35

F.  A Guidelines Sentence Would Not Create Unwarranted Sentencing    Disparities ...... 40

   1.  A Guidelines Sentence Will Avoid Creating Unwarranted Nationwide Disparities..... 40

   2.  The Cases Cited by the Defendant Do Not Support a Different Result ....................... 43

   3.  Pham's Citation to the "Average for Terrorism-Related Charges and Cases" Is Misleading and Does Not Support a Below-Guidelines Sentence Here ....................... 47

G.  The Conditions of Confinement Do Not Warrant a Reduction in Pham's Sentence .... 48

CONCLUSION.................................................................................................................... 53

# PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of the defendant, Minh Quang Pham, a/k/a "Amin," scheduled for May 4, 2016.   For the reasons discussed below, the Government submits that a total sentence of 50 years, as provided by the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), would be sufficient, but not greater than necessary, to comply with the purposes set forth in Title 18, United States Code, Section 3553(a)(2).   *See* 18 U.S.C. § 3553(a).

# BACKGROUND

## A.   Al Qa'ida in the Arabian Peninsula

Al Qa'ida in the Arabian Peninsula ("AQAP") is a militant Islamist organization, based primarily in Yemen, that was designated a Foreign Terrorist Organization ("FTO") by the United States Secretary of State on January 19, 2010.   *See* PSR ¶ 19.[1]   Until around May 2015, AQAP was led by Abu Basir al-Wahishi ("al-Wahishi"), who served as Usama Bin Laden's bodyguard and secretary in Afghanistan.   *Id*.   When U.S. military forces entered Afghanistan in 2001, al-Wahishi escaped to Iran and was arrested there.    In 2006, al-Wahishi and 22 other prominent al Qa'ida members escaped from a Yemeni prison, and established an al Qa'ida affiliate in Yemen.   *Id*.   In 2009, al-Wahishi spearheaded the merger of the Saudi and Yemeni branches of al Qa'ida into the entity known as AQAP.   *Id*.   In July 2011, al-Wahishi, on behalf of AQAP, officially pledged allegiance to al Qa'ida and recognized Ayman al-Zawahiri—Usama Bin Laden's successor as the head of al Qa'ida—as the new global leader of jihad.   *Id*.

Over the past few years, AQAP has claimed responsibility for a some of the most alarming and deadly terrorist attacks against the United States and other Western countries.   For

---

[1]   Citations to "PSR" are references to the Probation Office's Presentence Investigation Report and its accompanying sentencing recommendation, dated March 31, 2016.

example, AQAP claimed responsibility for the attempted 2009 Christmas Day bombing by Umar Farouk Abdulmutallab of a passenger plane flying from Europe to Detroit.   *See* PSR ¶ 20. AQAP also claimed responsibility for an October 2010 plot to send explosives-laden packages to the United States on cargo flights.   *Id*.   More recently, AQAP claimed responsibility for the January 2015 massacre in Paris, France at the office of the magazine *Charlie Hebdo*, which had published cartoons of the Prophet Mohammed.   The attack killed eleven people and injured eleven others.   *Id*.

One of AQAP's most prominent and outspoken members was the American-born, extremist Islamic preacher Anwar al-Aulaqi.[2]   *See* PSR ¶ 21.   In or about 2004, al-Aulaqi became a recruiter and propagandist for al Qa'ida and AQAP.   *Id*.   In or about 2009, he was promoted to a senior position within AQAP, and specifically was placed in charge of both AQAP's propaganda division as well as its so-called "external operations" division—the division responsible for the planning and execution of terrorist attacks outside of Yemen, including attacks against the United States and other Western countries.   *Id*.   Al-Aulaqi was also known to be the AQAP leader in charge of the operations of English-speaking AQAP members, among other things.   *Id*. ¶ 21, n.1.   Al-Aulaqi was killed in Yemen in September 2011.   *Id*. ¶ 21, n.2.

During his time with AQAP, al-Aulaqi was known to be among the most vocal and effective proponents of attacks against the United States and Western interests.   He repeatedly called upon his followers to engage in jihad, or holy war, against the United States.   For example, in a public statement released to CNN in March 2010, al-Aulaqi called upon all

---

[2]   Al-Aulaqi is referenced in the Indictment at paragraph 3(d) as "American CC-2."

Muslims to wage holy war against the United States.  *See* PSR ¶ 21.   In or about September 2011, in a warning to U.S. citizens about travel-related threats arising from the death of al-Aulaqi, public documents issued by the U.S. Department of State described al-Aulaqi as AQAP's external operations leader, who had played a key role in advancing terrorist plots against the United States.  *Id*. ¶ 21, n.1.   In a white paper authorizing the use of lethal force against al-Aulaqi, which subsequently was released to the public, the Department of Justice observed that "al-Aulaqi is a leader of AQAP whose activities in Yemen pose a continued and imminent threat of violence to United States persons and interests," and that "al-Aulaqi has been involved, through his operational and leadership roles within AQAP, in an abortive attack within the United States and continues to plot attacks intended to kill Americans from his base of operations in Yemen."  *Id.* ¶ 21, n.2 (internal quotation marks omitted).

AQAP has proven adept at using the Internet to recruit American nationals and others in the West, and to popularize its message.  *See* PSR ¶ 22.   Through AQAP's media wing—*al-Malahem Media*—AQAP publishes an online magazine called *Inspire*.  The first issue of *Inspire* was published in July 2010.  *Id*.   The second edition of *Inspire,* published in October 2010, included a feature article entitled "I Am Proud to be a Traitor to America," written by Samir Khan.[3]  *Id*.   Khan, like al-Aulaqi, was a U.S. citizen who became an influential member of AQAP.  *Id*.   He worked on AQAP's media operations and had primary responsibility for editing and publishing *Inspire* magazine.  *Id*.   Khan was also killed in Yemen in September 2011.  *Id*. ¶ 22, n.3.

AQAP uses *Inspire* magazine not only as a recruitment and propaganda tool, but also as

---

[3]  Samir Khan is referenced in the Indictment at paragraph 3(c) as "American CC-1."

an operational tool by encouraging its supporters to engage in terrorist attacks against the United States and other Western countries. *See* PSR ¶ 23. In furtherance of that goal, AQAP has published articles praising so-called "lone-wolf" style attacks, as well as articles providing detailed instructions on how to conduct a terror attack using household or commercially available materials. *Id*. For example, the first issue of *Inspire*, which was published in July 2010, contained an article entitled "How to Make a Bomb in the Kitchen of Your Mom." *Id*. The article provided explicit instructions on how would-be violent jihadists could use materials commonly found in a household kitchen to create an improvised explosive device; it included, among other things, the chemical ingredients necessary to make an explosive charge and suggestions on how to increase its lethality—*e.g.*, by constructing the bomb inside of a pressure cooker. *Id*. Dzkokhar Tsarnaev—the recently convicted "Boston bomber" responsible for detonating two home-made bombs made from pressure cookers near the finish line of the Boston Marathon in April 2013, killing three spectators and maiming 260 other people—told the FBI that he and his brother learned how to create the pressure cooker bombs from *Inspire* magazine. *Id*.

AQAP remains a grave threat to the United States and other Western countries. For example, in February 2014, AQAP released a video entitled "Drops of Rain," which depicted a large gathering of AQAP members operating openly in Yemen while their leader threatened the United States. *See* PSR ¶ 24. In August 2015, AQAP released another statement calling on its followers worldwide to engage in lone-wolf style attacks against the United States and other Western countries. *Id*. In January 2016, AQAP released another video threatening the United States. *Id*.

4

**B.      Pham's Offense Conduct**

**1.      Pham's December 2010 Travel to Yemen to Join AQAP**

In December 2010, in the United Kingdom, Pham informed his wife—who was eight months pregnant at the time—that he was departing on an impromptu trip to Ireland.   In actuality, Pham planned to travel to Yemen to join AQAP.   *See* PSR ¶¶ 25-26, 45.   Pham had taken the couple's cash savings and made arrangements through a travel agency ("the Travel Agency") to travel to Yemen.   *Id.* ¶ 25.   Pham also had purchased a laptop computer and a camera, and had lied to his employer by telling him that he was traveling on holiday for a month. *Id.* ¶ 45.

Pham disguised his true motive for entering Yemen—to join AQAP—by booking a two-week tour of Yemen through the Travel Agency.   *See* PSR ¶¶ 26, 27, 45.   Pham originally planned to travel with an individual named Sami al Fadli ("al Fadli"), and the two sought tourist visas as a "cover" for their plan to join AQAP.   *Id.* ¶ 26.   Al Fadli ultimately made his own arrangements to travel to Yemen.   *Id.*   He and Pham would later reunite in Yemen en route to AQAP's base of operations.   *Id.* ¶ 30.

Al Fadli informed Pham that he (al Fadli) believed that they could make contact with AQAP in Eastern Yemen, specifically the province of Abyan.   *See* PSR ¶ 27.   Pham contacted the Travel Agency to see if the company could arrange another tour for him (Pham) to go east toward the Abyan province, following the conclusion of Pham's two-week tour.   This again would serve as a cover story for Pham and get him a visa to pass through checkpoints.   *Id.*

After learning from the Travel Agency that the additional tour could not be arranged, Pham informed the Travel Agency that he intended to leave his two-week tour and travel on his

own through Yemen.   *See* PSR ¶ 28.   The Travel Agency objected to Pham's proposal and informed him that his visa did not permit him to leave the tour or travel elsewhere in the country. *Id*.   Ignoring the Travel Agency's objections, Pham left the tour group (which he had been with for approximately two weeks) and proceeded to travel toward the Abyan province.   *Id*. ¶¶ 29, 35 n.5.   Because the Travel Agency had refused to issue a new visa for Pham, Pham created a fraudulent Yemeni visa in order to pass through security checkpoints in Yemen.   *Id*. ¶ 29. Pham traveled to Sana'a, Yemen, where he met up with al Fadli, and the two then traveled to Eastern Yemen.   They ultimately arrived in the Abyan Province, where they joined AQAP and were taken to an AQAP safehouse.   *Id*. ¶ 30; *see also* Def. Ex. A at 10 ("I do admit that I have made an oath of allegiance to AQAP through a local Ameer in ABYAN (JAN 2011).").

### 2.      Pham's Work in Yemen with AQAP and Its Senior Leadership

After leaving the tour group and joining AQAP at the safehouse, Pham and al Fadli proceeded to receive training from AQAP.   *See* PSR ¶ 30.   Pham later recounted his experience to another individual in Yemen who interacted extensively with Pham in several AQAP safehouses in March and April 2011.   *Id*. ¶ 32.   That individual later became a cooperating witness for the United States ("CW-1").[4]   *Id*.

Pham told CW-1 that he (Pham) had traveled to Yemen in order to join AQAP, to wage jihad on behalf of AQAP, and to martyr himself for AQAP's cause.   *See* PSR ¶ 35.   Pham described how he had lied to his family about his travel destination, and how he had left his pregnant wife behind in the United Kingdom.   *Id*.   Pham further described how he initially

---

[4]  Prior to Pham's arrest in the United Kingdom on the instant charges, CW-1 identified a photograph of Pham shown to him by law enforcement, and knew Pham as "Amin" (the Muslim name Pham assumed once in Yemen).

traveled with a tour group in Yemen for approximately two weeks, after which time Pham met up with another individual from the United Kingdom and traveled to an AQAP safehouse.   *Id*. Pham told CW-1 that he had sworn *bayat*—an Islamic oath of allegiance—to AQAP in the presence of an AQAP commander in Yemen.   *Id*.

Pham also informed CW-1 that he (Pham) had received training in Yemen from AQAP in the use of a Kalashnikov assault rifle.   *See* PSR ¶ 34.   Indeed, when CW-1 first met Pham at an AQAP safehouse in Yemen, in or about March 2011, Pham was carrying a Kalashnikov assault rifle and a pouch of ammunition.   *Id*.   CW-1 observed Pham carrying the assault rifle throughout almost all of his interactions with Pham in Yemen.   *Id*.

During his time with AQAP in Yemen, Pham came to know and work with Samir Khan, the U.S. citizen and influential AQAP member responsible for editing and publishing *Inspire* magazine.   *See* PSR ¶¶ 36-37, 45; *supra* p.3.   Pham, who has college degrees in both graphic design and animation, received training in the various types of software used for *Inspire* magazine and worked closely with Khan, contributing to the magazine in numerous ways.   *Id*. ¶¶ 36, 45, 75, 83.   For example, Pham used graphic design software to edit videos and photos that would be used as propaganda in *Inspire* magazine.   *Id*. ¶ 45.   Pham also recorded television programs for Khan that Khan might find useful for *Inspire*.   *See* Exhibit 1-B (02/27/2015 interview) at 4.   Pham even offered his camera to be used for the taking of numerous photos used for *Inspire*.   *Id*.

Pham also posed in photographs that accompanied *Inspire* magazine's articles that spread AQAP's murderous message and provided instructions to its followers.   Among those were a series of photographs in which Pham's hands were shown assembling and disassembling an

automatic rifle.   *See* PSR ¶ 45; Exhibit 1-B (02/27/2015 interview) at 4; Exhibit 2 (*Inspire* Magazine, Issue 5 (Spring 2011)) at 24-25.   The photographs accompanied an *Inspire* article providing readers with instructions on disassembling and cleaning a Kalashnikov assault rifle. *Id*.   In another photograph, accompanying an article entitled "Why Did I Choose Al Qaeda?," which was written by Anwar al-Aulaqi, Pham and three other men were shown wielding automatic Kalashnikov assault rifles.   *See* Exhibit 1-B (02/27/2015 interview) at 5; Exhibit 2 (*Inspire* Magazine, Issue 5 (Spring 2011)) at 62.   In addition to holding the assault rifle, Pham was shown in the photograph with ammunition pouches that contained magazines with the ammunition for the automatic Kalashnikov assault rifle that he was holding.   *Id*.

CW-1 observed Pham working closely with Khan, whom CW-1 knew to be responsible for editing and publishing *Inspire*.   *See* PSR ¶ 36.   For example, CW-1 recalled seeing Pham using a laptop computer to work on *Inspire*, and the two of them discussed Pham's training in graphic design and photography.   Pham told CW-1 that he had a camera with him in Yemen and that he had taken a number of photographs, and informed CW-1 that he (Pham) was working on *Inspire* with Khan.   *Id*.

CW-1 also witnessed Pham interacting personally with al-Aulaqi, the senior AQAP leader who oversaw AQAP propaganda and external terrorist operations.   *See* PSR ¶¶ 21, 36. Both Khan and al-Aulaqi were vocal about the significance of Pham's contributions to AQAP, and made their views known to CW-1.   Indeed, CW-1 first had learned about Pham in electronic correspondence with Khan, who told CW-1 that Pham had come to Yemen from the United Kingdom as a "foreign fighter."   PSR ¶ 33.   Later, while spending time at AQAP safehouses, CW-1 spoke with Khan and al-Aulaqi specifically about Pham, and understood from

them that Pham was providing valuable assistance to Khan in connection with the production and editing of *Inspire*.   *Id.* ¶ 37.   Al-Aulaqi told CW-1 that he (al-Aulaqi) was very pleased to receive Pham because Pham's skills with the computer, photography, and video would be of great benefit to AQAP.   *Id.*   Khan also told CW-1 that Pham was very good at this work and was better than Khan at graphic design.   *Id.*   On at least one occasion, CW-1 observed Khan in possession of a black camera, which Khan said belonged to Pham; Khan told CW-1 that the camera took very good pictures and was very expensive.   *Id.*

For security reasons, and at the direction of al-Aulaqi, Pham used great caution in Yemen during his very limited communication with outsiders.   He drafted e-mails and saved them on a USB thumb drive, and then provided the thumb drive (along with the password and other information for his e-mail account) to other members of AQAP who were tasked with sending the message on Pham's behalf.   *See* PSR ¶ 45; Exhibit. 1-B (02/27/2015 interview) at 6.   In one communication to his wife, dated April 17, 2011 (*i.e.*, while Pham was in Yemen at an AQAP safehouse), Pham stated the following, among other things: "Due to the nature of work I won't be able to read your emails until sometime inshaAllah but do keep sending them. . . .Never lose hope for you are a wife of a soldier of Allah and a Soldier of Allah is on a guided path." Exhibit 3 (04/17/2011 email).

At some point prior to his return to the United Kingdom in July 2011, Pham had discussions with al-Aulaqi about returning to the United Kingdom to find and make contact with individuals who, like Pham, wanted to travel to Yemen to join AQAP.   *See* Exhibit 1-B (02/27/2015 interview) at 7; Exhibit 1-C (02/28/2015 interview) at 4.   Eventually, al-Aulaqi advised Pham to return to the United Kingdom for this purpose, and provided Pham with a large

quantity of currency in Euro and U.S. dollar denominations.  *See* PSR ¶ 45; Exhibit 1-B (02/27/2015 interview) at 7-8; Exhibit 1-C (02/28/2015 interview) at 4.   Al-Aulaqi also provided Pham with a telephone number and an email address that Pham was to use to contact al-Aulaqi upon his return to the United Kingdom.  *See* PSR ¶ 45.   The email address was supposed to be used by people that Pham identified who were interested in joining AQAP, so that they could contact al-Aulaqi to coordinate their travel to Yemen.  *Id*.   In addition, Pham provided his laptop computer to al-Aulaqi, and al-Aulaqi provided Pham with a new "clean" laptop to take with him when he returned to the United Kingdom so that Pham would not have any issues if authorities searched his computer.  *Id*.

In or about June 2011, prior to his departure from Yemen, Pham approached al-Aulaqi about conducting a suicide attack whereby he would "sacrifice" himself on behalf of AQAP. *See* PSR ¶ 45.   Specifically, Pham agreed to conduct a bombing at Heathrow International Airport.  *Id*.   Al-Aulaqi instructed him to target the Arrivals section, with a specific focus on the area where flights arrived from the United States or Israel.  *Id*.   Pham planned to construct an explosive device and conceal it in a backpack.  *Id*.   In connection with that terrorist plot, Pham received training from AQAP, including from al-Aulaqi on how to build an explosive device using readily available household chemicals and other materials.  *See id*.   Al-Aulaqi specifically instructed Pham to tape bolts around the explosive device to act as shrapnel.  *Id*.

### 3.    Pham's Return to the United Kingdom and the Forensic Analysis of His Computer

On July 27, 2011, Pham returned to the United Kingdom.   Upon his arrival at London's Heathrow International Airport, United Kingdom authorities detained, questioned, and searched Pham.   In the course of his interviews with United Kingdom law enforcement officers, Pham

admitted, among other things, that he had traveled to Yemen; that he toured with a company while in Yemen; and that he left the tour and traveled around Yemen.   *See* PSR ¶ 39; *see also* Exhibit 4-A (07/27/2011 U.K. interview).   However, when questioned about what he did after he left the Yemeni tour, Pham stated that he had visited some villages and spoke generally about some of the local villagers he met; he specifically omitted the extensive time he had spent with AQAP.   *See* Exhibit 4-A (07/27/2011 U.K. interview) at 5-7.   And when asked why he had returned to the United Kingdom, Pham told authorities that his visa had expired and that he had to hurry home to sort paperwork and pay bills.   *Id*. at 8.   Pham also lied about where he had gotten the substantial amount of cash (7,000 Euros) that was seized from him by the U.K. authorities upon his arrival at Heathrow.   *Id*.; Exhibit 5 (photographs of cash seizure); *see also* Def. Ex. A at 10.

During the July 2011 port stop, U.K. authorities recovered, among other things, a live round of 7.62 caliber armor-piercing ammunition, which is the type of ammunition used in a Kalashnikov assault rifle.[5]   *See* Exhibit 6 (photograph of bullet).   When asked in one of the interviews about his possession of the ammunition, Pham confirmed that the round of ammunition belonged to him, and provided details about it, including its physical appearance and the fact that he knew it to be used in an AK-47 assault rifle.   Pham also claimed that he received the ammunition as a gift from a friend during his time in Yemen, and that he had brought it back as a souvenir.   *See* Exhibit 4-B (07/28/2011 U.K. interview) at 6.[6]   Pham also told the U.K.

---

[5]   As noted above, Pham told CW-1 that he had received training from AQAP in the use of a Kalashnikov assault rifle, and CW-1 regularly observed Pham carrying a Kalashnikov assault rifle while in Yemen.

[6]   The page citations for Exhibit 4-B reference the pagination in the original.

authorities that he had only held an AK-47 once, when he was allowed to hold one by a police officer in Yemen.   Pham explained that he did so out of curiosity, and that the officer allowed him to hold the gun because Pham was a tourist.   *Id*. at 13-14.

Pham's camera and electronic media were also seized and the contents were imaged. Forensic analyses of Pham's electronic media, and also of CW-1's electronic media, confirmed, among other things, that (1) Pham possessed over sixty files in common with those found in a folder called "AAA New" on CW-1's computer; (2) the same electronic storage device had been inserted into Pham's laptop computer and CW-1's computer, and (3) a USB device found in Pham's possession following his return to the United Kingdom had been plugged into CW-1's computer in the past.   *See* PSR ¶ 43.   Separately, CW-1 had informed law enforcement that he had personally exchanged various electronic documents with Pham, including various pieces of jihadist literature, which CW-1 saved on his (CW-1's) laptop computer under the file name "AAA New."   *Id*. ¶ 38.

Pham was released by the UK authorities and received a caution for his possession of the live round of ammunition.

On or about December 22, 2011, the United Kingdom authorities arrested Pham pursuant to their authorities under United Kingdom immigration law.   At the time of his arrest, the U.K. authorities searched Pham's residence and several other locations and vehicles that they had identified as being used by Pham.   In the course of those searches, the U.K. authorities recovered several pieces of electronic media.   Among other things, a forensic analysis of Pham's electronic media showed that he was accessing speeches and writings of Anwar al-Aulaqi as late as December 2011—months after Pham's return to the United Kingdom.   *See*

PSR ¶ 44; *see also* Exhibit 7 (U.K. forensic report). Furthermore, a search of Pham's email accounts pursuant to a court-authorized warrant showed that Pham exchanged an email with someone in Yemen after his return to the United Kingdom.   *Id.* ¶  44.

**C.    Pham's Indictment and Extradition to the United States**

Pham remained detained in U.K. immigration custody from his arrest until May 24, 2012. During that detention, Pham was the subject of U.K. immigration proceedings in which the U.K. government sought to revoke Pham's citizenship and deport him to his native Vietnam.   In the course of those proceedings, on May 24, 2012, a Grand Jury sitting in this District returned a true bill on Indictment 12 Cr. 423 (AJN) (the "Indictment").   The Indictment charged Pham in five counts:   (1) conspiracy to provide material support to AQAP, in violation of Title 18, United States Code, Section 2339B ("Count One"); (2) providing and attempting to provide material support to AQAP, in violation of Title 18, United States Code, Section 2339B ("Count Two"); (3) conspiracy to receive military-type training from AQAP, in violation of Title 18, United States Code, Section 371 ("Count Three"); (4) receipt of military-type training from AQAP, in violation of Title 18, United States Code, Section 2339D ("Count Four"); and (5) possessing, carrying, and using an automatic firearm in relation to crimes of violence, in violation of Title 18, United States Code, Sections 924(c) ("Count Five").

An arrest warrant was issued based upon the Indictment, and a request made to the United Kingdom to provisionally arrest Pham pending extradition to the United States to answer the charges in the Indictment.   Shortly thereafter, but still in May 2012, Pham was re-arrested by U.K. authorities pursuant to a provisional arrest warrant and ordered detained pending his extradition to the United States.

On or about February 26, 2015, after exhausting his appeals of the United Kingdom court's extradition order, Pham was extradited from the United Kingdom to the United States to face the charges in the Indictment.

**D.    Pham's Post-Arrest Statements**

Following Pham's extradition, agents of the Federal Bureau of Investigation ("FBI") conducted a series of Mirandized interviews of Pham. *See generally* Exhibits 1-A-D (FBI reports of Pham post-arrest interviews).   During those interviews, after being advised of and waiving his *Miranda* rights, Pham stated the following, in substance and in part, among other things:

- Pham converted to Islam in 2004 and became increasingly radicalized by the lectures of leaders like al-Aulaqi and Imran Hossein. Pham became attracted to the idea of fighting, using a weapon such as an automatic Kalashnikov assault rifle (AK-47), and martyrdom.   Pham hid his changing beliefs from his wife because he was not sure she would agree with his views on jihad.   Pham conducted increasing amounts of research on where he should travel to join a jihadist training camp in an Islamic state.

- Pham's friend "Sami" (*i.e.*, al Fadli), who was originally from Yemen, had common goals and planned to travel to Yemen to join AQAP.   Pham decided that he would join Sami on the trip to Yemen to join AQAP.

- Pham arranged his travel though a tour company to conceal the true purpose of his travel to Yemen, which was to join AQAP and wage jihad.   To further conceal his intent, Pham purchased a camera and a laptop computer and told his employer that he was going on holiday for a month.   Pham told his family that he was going to Ireland.

- In 2010, Pham traveled to Yemen to join AQAP.   While Pham initially traveled with the tour company around Yemen as part of his cover, he eventually separated from the tour group and made a fraudulent visa to pass through the checkpoints.   While traveling with Sami to meet up with AQAP members, Pham also dressed as a woman to avoid scrutiny.

- While in Yemen, Pham assisted Samir Khan, *see supra* pp. 3, 6-8, with work in the media department of AQAP.

- Khan gave Pham a laptop and instructed Pham to work on graphic design projects for AQAP.  Khan also trained Pham how to use a specific graphic design software program for editing videos and pictures that would be used as propaganda in AQAP's *Inspire* magazine, *see supra* pp. 3-4.

- Pham himself appeared in photographs that were used in *Inspire* magazine, including photographs in which Pham is holding and assembling a Kalashnikov rifle.  *See*, *e.g.*, Exhibit 2 (photos from *Inspire*).  While in Yemen, Pham edited some of the photographs using digital software before they appeared in *Inspire*.

- Anwar al-Aulaqi, *see supra* pp. 2-3, was the head of *Inspire* magazine, and the head of external operations for AQAP (*i.e.*, attacks on Westerners in other countries outside of Yemen).   Pham personally met and spoke with al-Aulaqi.

- While in Yemen, Pham drafted an email message to his wife.  *See* Exhibit 3 (04/17/2011 email).   Pham gave the message, along with the username and password to his email account, to a member of AQAP who was tasked to send the message on Pham's behalf.   The use of another person to send the message was done at the direction of al-Aulaqi for security reasons.

- Pham brought a laptop computer with him to Yemen, which Pham gave to al-Aulaqi prior to his departure from Yemen.   Al-Aulaqi gave Pham a new, "clean" laptop to take with him when he returned to the United Kingdom to ensure that Pham would not have any issues if authorities searched his computer.

- At some point prior to mid-June 2011, Pham approached al-Aulaqi and offered to conduct a suicide attack and "sacrifice himself" on behalf of al Qa'ida upon his return to the United Kingdom.

- Pham was trained by AQAP members, including al-Aulaqi, on how to build an explosive device using readily available household chemicals and other materials.[7] Al-Aulaqi instructed Pham to tape bolts around the explosive device to act as shrapnel.

- Prior to his return to London, Pham agreed to conduct a suicide bombing at Heathrow International Airport on behalf of AQAP.   Al-Aulaqi instructed Pham to target the arrivals section of Heathrow International Airport—particularly arrivals from the United States or Israel.

- Pham planned to construct an explosive device and conceal it in a backpack.

---

[7]   Pham explained in detail the process for creating the explosive device, including the chemicals required, to the FBI agents.

- Al-Aulaqi gave Pham money, a telephone number, and an email address that Pham was to use to contact al-Aulaqi upon his return to the United Kingdom.   The email address that al-Aulaqi provided Pham in Yemen was supposed to be used by people that Pham identified who were interested in joining AQAP, so that they could contact al-Aulaqi to coordinate their travel to Yemen.

- Pham planned to use the money given to him by al-Aulaqi to rent a house in the United Kingdom to construct the explosive device and to purchase the chemicals and other material needed for the attack at Heathrow International Airport. Pham also agreed to identify others who would be interested in joining AQAP.

PSR ¶ 45.

### E.   Pham's Guilty Pleas

On January 8, 2016, Pham pled guilty before this Court, pursuant to a plea agreement with the Government (the "Plea Agreement"), to Counts Two, Three and Five of the Indictment. Following a thorough allocution that complied in all respects with the requirements of Rule 11, this Court found that Pham's pleas of guilty were knowing and voluntary and were supported by an adequate factual basis.   Accordingly, the Court accepted Pham's guilty pleas and adjudged Pham guilty of the crimes charged in Counts Two, Three, and Five.

## DISCUSSION

## I.   The Undisputed Guidelines Sentencing Range Is 50 Years' Imprisonment

### A.   Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).   Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.   543 U.S. at 264.   As the Supreme Court explained,

16

"a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

### B. Pham Concedes that the Guidelines Call for a Sentence of 50 Years' Imprisonment

In the Plea Agreement, the parties stipulated that, with respect to Count Two, the United States Sentencing Guidelines (the "U.S.S.G." or "Guidelines") adjusted offense level (prior to acceptance of responsibility) is 38.   The parties also agreed that the adjusted offense level (prior to acceptance of responsibility) for Count Three is 38.   The parties stipulated that, pursuant to U.S.S.G. § 3D1.2(b), because Counts Two and Three involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan, they are grouped together into a single Group and, pursuant to U.S.S.G. § 3D1.3(a), the offense level for the Group is the highest offense level of the counts in the Group.   Accordingly, the parties agreed that the offense level for the Group is 38.   The Plea Agreement does not include any adjustment under the Guidelines—whether upward or downwards—based upon Pham's role in the offenses of conviction.   Assuming Pham clearly demonstrates acceptance of responsibility prior to the imposition of sentence, the parties agreed that a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a) and an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), yielding a Guidelines offense level of 35 for Counts Two and Three.

With respect to Count Five, the parties agreed that pursuant to U.S.S.G. § 2K2.4(b), the Guideline sentence for Count Five is 30 years, which is the minimum term of imprisonment required by Title 18, United States Code, Section 924(c)(1)(B)(ii).   Pursuant to U.S.S.G.

§ 5G1.2(a), the thirty-year term of imprisonment required for Count Five shall be imposed independently of, and consecutive to, the terms of imprisonment imposed on Counts Two and Three.

Because Counts Two and Three are felonies that involved federal crimes of terrorism, pursuant to U.S.S.G. § 3A1.4(b), Pham's Criminal History Category is VI.   Accordingly, the parties stipulated that the appropriate Guidelines range for Counts Two and Three is 292 to 365 months' imprisonment.   With respect to Counts Two and Three only, and pursuant to U.S.S.G. § 5G1.2(d), the parties agreed that because the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment prescribed by the Guidelines, the sentence imposed on Counts Two and Three shall run consecutively.   The parties stipulated that, pursuant to U.S.S.G. § 5G1.1(a), because the combined statutorily authorized maximum sentence for Counts Two and Three is 240 months' imprisonment, which is less than the recommended Guidelines range, the statutorily authorized maximum sentence for Counts Two and Three is the applicable Guidelines sentence.   Accordingly, the parties stipulated that the recommended Guidelines sentence for Counts Two and Three is 240 months' imprisonment.

Pursuant to U.S.S.G. 5G1.2(a), the sentence for Count Five is to be imposed independently of, and consecutive to, the sentence imposed on Counts Two and Three. Accordingly, the parties stipulated that the Guidelines sentence for Counts Two, Three and Five is 50 years' (*i.e.*, 600 months) imprisonment (the "Stipulated Guidelines Sentence"), with a mandatory minimum term of 360 months' imprisonment.

C.    **Following a Detailed Analysis of the Undisputed Facts in the Presentence Report, the Probation Office Recommends a Guidelines Sentence**

In advance of Pham's sentencing, the United States Probation Office prepared the Presentence Report.  The Probation Office's Guidelines calculation and applicable Guidelines sentence of 50 years' imprisonment was identical to the Guidelines calculations and the Stipulated Guidelines Sentence contained in the Plea Agreement.  *See* PSR ¶¶ 49-68, 91.  In addition, the Probation Office prepared a detailed factual recitation of the underlying offense conduct, which neither party disputes.  *See* PSR ¶¶ 19-45. *id.* p.22 (indicating no objections received from either party).

After consideration of the foregoing, as well as the history and characteristics of the defendant, *see* PSR ¶¶ 72-88, the Probation Office recommended a Guidelines sentence of 50 years' imprisonment.  *See* PSR at pp. 23-25 (sentencing recommendation).  This recommendation was based principally on the very serious nature of the offense.  *Id.*

II.    **Each of the Statutory Sentencing Factors Supports the Imposition of a Guidelines Sentence**

A.    **Applicable Law**

After calculating the Guidelines, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among

defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50, n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349-50; *United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "cannot be called just 'another factor' in the statutory list, 18 U.S.C.

§ 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting *United States* v. *Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)).   To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."   *Gall*, 552 U.S. at 50.

### B.      The Nature and Seriousness of Pham's Crimes and the Need for Just Punishment Necessitate a Guidelines Sentence

For this defendant—who pledged himself to carrying out the murderous agenda of AQAP, an organization with the central and undisputed goal of terrorizing innocent civilians, and that has sought to attack the United States—the nature and seriousness of the offense, as well as the defendant's history and characteristics and the need for just punishment, strongly favor a Guidelines sentence.   Pham did not merely join and swear allegiance to AQAP.   He actively supported the organization and its most senior members—including two of its most notorious and vocal leaders—by offering his technical expertise, his language and artistic skills, and ultimately his life, to further the organization's murderous goals.

Pham's offense conduct did not involve an isolated incident.   Nor did it arise suddenly due to caprice or a momentary lapse in judgment.   Pham, who was 27 years old at the time, planned and plotted for months to leave the United Kingdom and join one of the most violent, anti-American organizations in existence.   Pham was so committed to his cause that he deceived and ultimately abandoned his family members—including his 8-month pregnant wife.   Lying to his employer and family about his destination, he pilfered the family's cash savings and traveled to Yemen without his family's knowledge.   Once in Yemen, Pham secretly and strategically made

21

his way from the guided tour group that had sponsored his travel to an AQAP safehouse where he would live and train with other AQAP members.   Pham was willing to take drastic measures to reach his destination, including disguising himself and falsifying his tourist visa.

In Yemen, Pham showed that his commitment to AQAP's deadly agenda was absolute, and that he was prepared to carry out its mission in numerous ways.   He swore an oath of allegiance to AQAP and offered to martyr himself for AQAP's cause.   *See* PSR ¶ 35.   He received military training—including training in the use of a Kalashnikov assault rifle, a weapon he would keep with him during his time in Yemen—so that he could wage violent jihad for AQAP.   And, ultimately, he used his English language and graphic design skills to contribute to the production of *Inspire* magazine—AQAP's most important English-language recruitment and propaganda tool.[8]   Pham proved himself to be an essential contributor to the then-nascent magazine's early success. Working closely with Samir Khan, who had ultimate responsibility for the magazine, Pham used his training in graphic design and photography, as well as his own equipment (including a high-end digital camera and laptop computer) to help professionalize the magazine's production. Pham took photographs for the magazine and even posed in photographs himself, including ones in which he posed in full jihadi gear with other terrorists, and in which he held and demonstrated how to assemble a Kalashnikov rifle.   In short, Pham committed himself to AQAP's recruitment, propaganda, and operational goals with all of the tools at his disposal.

---

[8]   The importance of *Inspire* magazine to expanding AQAP's reach and furthering its operational goals cannot be understated.   As noted by the Probation Office, AQAP uses the magazine not only to recruit individuals to join the organization, but also to encourage supporters to engage in terrorist attacks against the United States and other Western countries.   Indeed, as noted above, one of the individuals responsible for the April 2013 bombing of the Boston Marathon credited the magazine with providing the necessary instructions for assembling the bombs used in the massacre.   *See* PSR ¶ 23.

Pham's contributions to AQAP did not stop there.  Having gained the trust of AQAP's most senior members, including al-Aulaqi, who managed AQAP's external operations and the execution of terrorist attacks outside of Yemen, Pham approached al-Aulaqi to discuss ways in which he could sacrifice himself for AQAP, in the form of a suicide attack.  Pham ultimately agreed to detonate a bomb in the international arrivals area of London's Heathrow International Airport, with the goal of killing United States or Israeli citizens.   In preparation for the attack, Pham was trained by al-Aulaqi on how to construct a bomb using household chemicals. Al-Aulaqi also provided Pham with a large sum of money, in multiple currencies, a "clean" laptop computer, and multiple methods for contacting AQAP once Pham was back in London, including an e-mail address that could be used by people identified by Pham who were interested in joining AQAP.   Although Pham was arrested by the United Kingdom immigration authorities before he could physically harm anyone else, he unequivocally demonstrated, through his pledge to al-Aulaqi and his preparations, that there was no limit to his commitment to AQAP.

Pham was a proud and unabashed supporter of AQAP, a fact borne out in his communications.   For example, when emailing the wife he had left behind in the United Kingdom with his newborn child, Pham boasted that he was "a soldier of Allah" and on "a guided path." Exhibit 3.   Pham also recounted that he was "in the best of hands" and "going through test [*sic*] but [his] responsibilities are much more and so will be [his] sacrifice inshaAllah."   *Id.*   There was no shame or regret in his message.   There was only pride and a plan to continue with his work for AQAP.  Pham's correspondence after he returned to London equally demonstrated a lack of remorse for his decision to travel to Yemen and join AQAP, and demonstrated that Pham looked fondly upon his time in Yemen.  *See*, *e.g.*, Exhibit 8 (9/26/11 IM Chat).

23

The defense seeks to characterize Pham's conduct as "minor" or even "minimal," as those terms are understood in the context of U.S.S.G. § 3B1.2 of the Sentencing Guidelines, *see* Def. Mem. at 8-9, but that argument has no traction on the facts of this case.   As a preliminary matter, Pham's position is contradicted by the position he previously took when he entered his guilty plea. Although Pham relies on the language in U.S.S.G. § 3B1.2 to support his position for a variance, Def. Mem. at 8, he previously stipulated in the Plea Agreement that the appropriate Guidelines offense level for Counts Two and Three was 35, and that the appropriate offense level for Count Five was 30, in both cases without the benefit of a role adjustment.   In light of that prior acknowledgement, Pham's contention that his role was "minor," or even "minimal," and therefore supportive of a variance, holds no water.

In any event, although Pham did not play a leadership role, his role in the offense was a significant one.   That fact is evidenced not only by the myriad ways in which he contributed to AQAP—as described above and in the Presentence Investigation Report—but by the level of trust extended to him by AQAP's most senior members.   Through his dedication, technical expertise, and networking, Pham quickly gained access to AQAP's inner circle, and he had multiple, personal meetings with Samir Khan and Anwar al-Aulaqi, two senior leaders of AQAP charged with, among other things, propagation of AQAP's message of hate, terror, and recruitment. It was precisely because of his unique qualifications and his dedication to the organization that he was embraced by both men, and allowed to worked side-by-side with Khan on the publication of *Inspire*.   Indeed, both Khan and al-Aulaqi commented on the value of the assistance Pham provided in connection with the production and editing of the magazine.   *See* PSR ¶ 37.   Khan even noted that Pham was better than he was at graphic design.   *Id*.   With

24

his proven track record and unwavering dedication, Pham was eventually trusted by al-Aulaqi—one of AQAP's most prominent and influential leaders—to recruit others to AQAP and ultimately engage in a deadly terrorist operation in the United Kingdom.   In sum, Pham's level of access within one of the world's most notorious terrorist organizations, and the degree of responsibility he was given, speaks volumes about his role in carrying out AQAP's agenda.

Pham's reliance on *United States* v. *Warsame*, 651 F. Supp. 2d 978 (2009), to support a variance in light of his role is unpersuasive.   *See* Def. Mem. at 8-9.   Unlike Pham, the defendant in that case pleaded guilty to just one count of material support to a foreign terrorist organization under 18 U.S.C. § 2339B.   His conduct consisted primarily of traveling to Afghanistan in early 2000 to train with al-Qai'da, attending lectures by Usama bin Laden, and continuing to keep in contact with al-Qai'da after he returned to Canada and moved to the United States.   The court noted the considerable ambiguity about the defendant's goals, noting that there were "many possible interpretations of the nature of [the defendant]'s activities in Afghanistan and his reasons for returning to the West," and further observed that there was "very little that suggests he was especially useful to al Qaeda."   651 F.Supp.2d at 981.   Notably, in that case, even the Government agreed that a variance was appropriate.   *Id*. at 981.

Here, there was no ambiguity about Pham's intentions, which were evident from the moment he pledged allegiance to AQAP and offered to martyr himself in furtherance of AQAP's murderous goals.   Nor can there be any doubt about Pham's value to AQAP:   Pham was embraced by AQAP's senior leadership as a result of his valuable contributions to the organization—contributions that were recognized by al-Aulaqi himself.   To be sure, Pham ultimately did not have the opportunity to carry out his most destructive plot, but by the time he

25

left Yemen his role could not have been clearer:  at a time when AQAP was devoted to terrorizing and attacking the United States and its citizens, Pham was a trusted and dedicated soldier for AQAP with a proven track record of carrying out the organization's goals.   In short, given his level of access, his dedication to AQAP's murderous agenda, and his contributions to that agenda, there was nothing "minor" about Pham's role in the offense.   *Cf. United States* v. *Ravelo*, 370 F.3d 266, 269–70 (2d Cir. 2004) (finding, in the context of U.S.S.G. § 3B1.2, that a mitigating role adjustment is dependent on such case-specific factors as "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise") (internal quotation marks omitted).

### C.    A Guidelines Sentence Will Serve the Purpose of Deterrence and Will Promote Respect for the Law

A Guidelines sentence is necessary in this case because it will "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and "promote respect for the law," *id*. § 3553(a)(2)(A).   Indeed, the need for deterrence here is paramount.   Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult for those convicted of it. *See United States* v. *Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").   As Second Circuit Judge John M. Walker has stated, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."   *United States* v. *Stewart*, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring).   In this case, there is an overwhelming demand for both individual and general deterrence.

As for individual deterrence, a Guidelines sentence of 50 years' imprisonment, as recommended by the Probation Office, would deter Pham from returning to his criminal conduct. *See*, *e.g.*, PSR at p. 24 (sentencing recommendation).   Notably, Pham now maintains that he had renounced his allegiance to AQAP following his return to the United Kingdom.   *See* Def. Mem. at 19, Def. Ex. A.   For example, Pham claims that, although he had "conversations with Aulaqi" regarding the plot to detonate an explosive device at Heathrow International Airport, he nevertheless "had no intention whatsoever of carrying out any violence."   Def. Mem. at 2. Similarly, Pham contends that following his return to the United Kingdom in 2011, he "ha[d] renounced AQAP and any association with it."   Def. Mem. at 19.   The evidence in this case provides little reason to believe that is true.   Pham was a committed member of AQAP until the time he was arrested, and his communications following his return to the United Kingdom in July 2011, as well as the disturbing literature found on his laptop at the time of his arrest, belie his current claims.

As an initial matter, Pham's Mirandized post-arrest statements make clear that Pham had been tasked by AQAP to perform two critical functions upon his return to the United Kingdom. First, Anwar al-Aulaqi personally tasked Pham with recruiting "like minded jihadists who wanted to travel to Yemen to join al-Qaeda and fight."   Exhibit 1-C (02/28/2015 Interview) at 4.   To that end, Pham was provided with a large quantity of cash, and instructed to contact al-Aulaqi upon his return.   *Id.* at 4-5.   Second, Pham agreed with al-Aulaqi to carry out an attack against United States or Israeli citizens arriving at Heathrow International Airport.   *See* Exhibit 1-D (03/01/2015 interview).   Specifically, Pham described how he volunteered to "sacrifice himself" on behalf of AQAP upon his return to the United Kingdom.   *Id.* at 1.

Thereafter, Pham admitted to receiving training from al-Aulaqi in the use of household chemicals to create a lethal explosive device, and further described how al-Aulaqi instructed Pham to build such a device following his return to the United Kingdom and to detonate it at the arrivals section of Heathrow International Airport.   *Id.* at 2-3.

Recognizing the severity of such actions, and the potentially devastating impact they could have at sentencing, Pham now attempts to minimize the significance of his acceptance of those taskings.[9]   With respect to the first tasking, Pham now contends that he had become disillusioned with AQAP and sought to disassociate himself from AQAP even prior to his return to the United Kingdom.   *See*, *e.g.*, Def. Ex. A at 12 ("Having recognized the erroneous views of AQAP, I have chosen to disassociate myself from their organization."); Def. Ex. B. at 1.   With respect to the second tasking, Pham claims that it was something that he "never intended to do," and that he "had to accept a foreign operation" in order to be able to leave Yemen.   Def. Ex. B. at 1; *see also* Def. Mem. at 2 (describing Pham's plotting with al-Aulaqi as "a ruse so Pham would be allowed to leave the safe house and Yemen to return home to his family in London and obtain medical treatment for a severe case of scabies.").

---

[9]  Hoping to distance himself further from his detailed post-arrest statements, Pham contends that he "only receive[d] the FBI statements around couple months after my interviews," and that it was only then that he "realized that they have omitted possibly 30-40% of what I've said." Def. Ex. B. at 1.   That statement is as untrue as it is self-serving.   First, Pham's counsel was provided with complete copies of his post-arrest statements on March 18, 2015, the date of Pham's first proffer session with the Government and approximately three weeks after his arrest. At that time, the attorneys for the Government and the agents afforded defense counsel and Pham the opportunity to review those documents in private for a substantial period of time.   Second, prior to Pham's submission to the Court, Pham never has represented to the Government—in the course of a proffer, through counsel, a motion, or otherwise—that he believed the reports of his post-arrest statements to be incomplete, inaccurate, or both.

There is no reason to find these claims to be credible.   The record in this case is replete with instances in which Pham lied—to his family, to his friends, and to the authorities, both in the U.K. and the United States.   Indeed, in his own submission to the Court, he admits that he repeatedly has concealed the truth, but now asks the Court to take him at his word.   Some examples of Pham's propensity to prevaricate when it serves his interests include:

- Pham lied to his family and his wife about his intentions to travel to Yemen to join AQAP;

- Pham lied to the Tour Company both as to the reasons for his travel to Yemen as well as the reasons for his decision to leave the tour;

- Pham lied to the U.K. authorities at Heathrow International Airport, and in subsequent interviews, about, among other things, his activities in Yemen, his ties to AQAP, his experience with AK-47s in Yemen, as well as the provenance of the cash that was seized from him upon his arrival, *see* Def. Ex. A at 10;

- Pham lied to the FBI about receiving weapons training from AQAP, *compare* Exhibit 1-A (02/26/2015 interview) at 11 (describing how Pham stated that he did not receive weapons training, however weapons were readily available) *with* Def. Mem. at 8 ("[Pham] received some military-type training involving use of a Kalashnikov rifle");

- Pham lied to the FBI when he denied that he had sworn an oath of allegiance to AQAP, *compare* Exhibit 1-A (02/26/2015 interview) at 11 ("Pham never pledged a loyalty oath or bayat to al-Qaeda or any emir.   Pham said he never made the formal pledge of loyalty . . .") *with* Def. Ex. A at 10 ("I do admit that I have made an oath of allegiance to AQAP through a local Ameer in ABYAN (JAN 2011)."); and

- Pham initially lied to the FBI about being tasked by Anwar al-Aulaqi to conduct operations on behalf of AQAP, *compare* Exhibit 1-C (02/28/2015 interview) *with* Exhibit 1-D (03/01/2015 interview).

Given this extensive history of lies, which Pham readily admits were told because he feared the consequences if he told the truth, it would defy logic now to believe Pham's self-serving, self-entitled "explanation" of his post-arrest statements.   Indeed, the motivations that Pham

29

proffered for his prior lies, *see*, *e.g.*, Def. Ex. A at 10 ("The reason that I was untruthful when I was interrogated at the Heathrow Airport is because I was afraid of the consequences, such as being arrested, imprison, extradited to the US, and tortured, I wanted to return home to my family . . ."), are present in equal, if not greater, measure in connection with his sentencing. Accordingly, the Government respectfully submits that this Court should reject Pham's self-serving, unsworn, and unsubstantiated statements submitted in an eleventh-hour effort to mitigate the seriousness of his actions.   The self-serving nature, and transparent fallacy, of this claimed "about face" in his thinking can only be underscored by statements Pham made to CW-1—when he believed CW-1 to be an ally in his cause and he had no reason to believe such statements ever would be conveyed to the authorities—regarding his desire to "martyr" himself in furtherance of AQAP's goals.   *See* PSR ¶ 35.

Putting aside Pham's utter lack of credibility, there is significant and compelling evidence to the contrary.   As an initial matter, Pham admitted that approximately one month after his return to the United Kingdom he placed a telephone call to Anwar al-Aulaqi to confirm that he had arrived safely in the United Kingdom.   *See* Exhibit 1-C (02/28/2015 Interview) at 5. An individual who had become disillusioned with AQAP, al-Aulaqi, or either of their agendas, certainly would not reach out to al-Aulaqi—a senior leader within AQAP with direct responsibility for its external operations, *see* PSR ¶ 21 & nn.1, 2—more than a month after he had "escaped" from their influence.   Pham also described to the FBI how, following his return to the United Kingdom, he downloaded an issue of *Inspire* magazine at an Internet café located far away from his home.   *See* Exhibit 1-B (02/27/2015 interview) at 10.   Not only was this action consistent with the instructions al-Aulaqi had given Pham in connection with the

Heathrow bomb plot, *see* Exhibit 1-D (03/01/2015 interview) at 2 (describing how "the instructions to create the explosives and device he was to make were published in *Inspire* and, if he had forgotten the steps, he could have referred to that edition of *Inspire* for reference), but it also establishes that Pham maintained his jihadist, pro-AQAP mindset following his return to the U.K.

In a similar vein, throughout his post-arrest interviews and his two, very limited proffers with the Government, [10] the defendant visibly teared up when discussing al-Aulaqi, and repeatedly referred to him with the honorific title "Sheikh."   Indeed, Pham's post-arrest statements to the FBI—which occurred more than three years after Pham's claimed disavowal of al-Aulaqi and AQAP—contain other instances in which Pham continued to refer to al-Aulaqi with great respect.   *See*, *e.g.*, Exhibit 1-A (02/26/2015 interview) at 10 ("Pham was surprised to

---

[10]   Pham's representation of his attempts to proffer with the Government—which occurred more than two weeks after counsel had been appointed, not "[i]mmediately following appointment of defense counsel," as he contends—are inaccurate. Pham claims that his "proffers reveal an extraordinary acceptance of responsibility and provided information that the government considered valuable," and that the "government wanted to continue speaking with Pham, assumedly toward reaching a cooperation agreement."   Def. Mem. at 2.   The first two proffers with Pham were extremely limited in both duration and scope.   Indeed, the first proffer was terminated by the Government because of concerns that Pham was not being forthcoming. Following discussions with then defense counsel, the parties agreed to allow defense counsel to confer with Pham and that the parties would reconvene the following day.   The second day of proffers proved to be no more fruitful than the first, and the proffer quickly was terminated after it became clear that Pham was not interested in telling the truth (*e.g.*, Pham claimed that when he traveled to Yemen in December 2010—more than nine years after the September 11 attacks in the United States—Pham was unaware of al Qaeda's murderous agenda).   The information provided by Pham in the two proffers was inaccurate, readily disprovable by evidence extrinsic to Pham's own prior statements, and in no way exhibited "an acceptance of responsibility" or constituted information that the Government "considered valuable."   Following the appointment of new counsel, the undersigned reiterated that the Government would be interested in proffering the defendant again so long as he was forthcoming and truthful.   The defendant, as is his right, declined to proffer with the Government.

see Aulaqi and described meeting Aulaqi as an amazing feeling").Even today, Pham continues to refer to al-Aulaqi using the title "Imam," which is an honorific title reserved for religious scholars or leaders.  *See generally* Def. Ex. A (referring repeatedly to al-Aulaqi as "Imam Anwar").

Further evidence that Pham did not make a clean break from AQAP or Anwar al-Aulaqi can be seen in Pham's email correspondence, which was obtained pursuant to judicially authorized search warrants.  For example, in one exchange with a U.K.-based associate on September 26, 2011—nearly three months after his return to the United Kingdom—Pham stated that his time in Yemen "was a great experience!!!"  Exhibit 8 (09/26/2011 IM Chat).  In the course of that same exchange, Pham stated that during his time in Yemen he "learnt a lot of things" and that he "met a lot of people."  *Id.*  Indeed, even after his arrest in late December 2011, individuals from Yemen attempted to contact him.  For example, on January 22, 2012, Pham received an email from an IP address which traces back to Yemen, in which the author asked Pham if he was "ready to travel around."

Similarly, evidence seized from Pham's apartment at the time of his arrest in December 2011 belies his claim that he disagreed with AQAP or al-Aulaqi.  For example, forensic analyses conducted on Pham's laptop revealed that he had been reviewing jihadist literature—including texts authored by Abdullah Azzam (a mentor of Usama Bin Laden, among other things) and Anwar al-Aulaqi himself—for months after his return to the United Kingdom.  For example, the analysis recovered remnants of a file that had been accessed as late as December 17, 2011 (*i.e.*, 4 days prior to his arrest).  *See* Exhibit 7 (UK forensic report) at 18; *see also id.* at 29-33 (describing other data recovered from the computer that relates to al-Aulaqi,

al Malahem Media, or both).   According to the metadata recovered, the file was entitled "Guidance.txt," and further indicated that this "Guidance.txt" file was associated with "Sheikh Anwar al-Awlaqi in collaboration with al Malahem Media"—which is the AQAP media wing that is responsible for the creation and distribution of *Inspire* magazine.   *Id.*   Similarly, analysis of another computer recovered from Pham's residence also revealed several pieces of well-known jihadist literature, including three other files, entitled "i6.pdf," "i7.pdf," and "lcontent.txt," which the metadata indicated were associated with "Sheikh Anwar al-Awlaqi in collaboration with al Malahem Media."   *Id.* at 27.   Each of those files had been last accessed by Pham on October 18, 2011, November 18, 2011, and November 20, 2011, respectively—several months after he had returned to the United Kingdom and lied to U.K. authorities about the true purpose of his trip to Yemen, and about two months after he admitted to calling al-Aulaqi to confirm he had arrived safely in the U.K.   Taken together, these are hardly the actions of a man who has abandoned his commitment to jihad and terrorism.

Pham, who is still only 33 years old, remains a young man, capable of resuming support for acts of physical violence.   Moreover, the characteristics that made him an attractive operative to AQAP (*e.g.*, fluency in English, dedication to violent jihad, computer skills, ties to Western countries) will remain with him for the rest of his life.   The role that Pham fulfilled, and was tasked to fulfill, for AQAP was not one that required youthful energy or physical strength, but rather intellect, cleverness, and the ability to recruit like-minded individuals. These characteristics are unlikely to decline significantly, if at all, over time.   Indeed, the fact of his conviction and imprisonment likely will serve in many respects to bolster Pham's *bona fides* as a recruiter of others to wage violent jihad.

As for general deterrence, it is essential for our country's national security that other young men and women be deterred from engaging in similar conduct. A Guidelines sentence is more likely to deter future generations of young people who are exposed to hateful extremist teaching from engaging in acts of terrorism against innocents. General deterrence is particularly important in today's environment, where so many young men and women, including Americans, are gravitating toward purported "spiritual leaders" on the Internet and choosing to travel to Syria, Yemen, and other areas of conflict to satisfy their interest in waging jihad. Those who are considering devoting their lives to terrorism, violence and death must be shown that, when they are caught, they will be prosecuted and sent to prison for a significant period of time.

For all these reasons, society's interest in effective deterrence also calls for a Guidelines sentence.

### D.   A Guidelines Sentence Is Appropriate to Protect the Public from Further Crimes of Pham

For many of the same reasons, a Guidelines sentence in this case is necessary "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(2)(C). As noted above, Pham not only swore allegiance to AQAP, but he took affirmative steps to carry out its agenda in ways ranging from the preparation of powerful and dangerous recruitment material to volunteering to kill innocent civilians in the name of AQAP. AQAP is a violent terrorist organization that has pledged itself to attacking U.S. citizens and U.S. interests. As the Probation Office correctly notes, "AQAP has claimed responsibility for a series of attempted terrorist attacks against the United States and other Western countries, including a plot against a passenger airliner flying to the U.S. from Europe; [a] plot to send explosives-laden packages to

34

the United States on cargo flights; and the January 2015 massacre in Paris, France."   PSR at p. 24 (sentencing recommendation); *see also id.* ¶ 24 ("AQAP remains a serious threat to the United States and other Western countries.").   Indeed, as recently as this past January, AQAP publicly and unambiguously has threatened the United States.   As such, AQAP and its followers represent one of the most significant terrorism threats to the United States and its citizens.   And Pham has demonstrated himself to be an able and dedicated follower of AQAP, who was willing to abandon his family and friends, including his unborn child, to "martyr" himself for AQAP's cause, and who was willing to engage in one of the most blatant and egregious attacks against innocent civilians simply by virtue of their affiliation with the United States and Israel.

As noted above, Pham is still only 33 years old, and remains of an age where he could engage in similar acts upon his release.   As a result, a term of incarceration in accordance with the recommended Guidelines sentencing range is necessary to protect the public from the defendant as well as those whom he would seek to recruit to further AQAP's murderous goals. Accordingly, a Guidelines sentence will protect the public from additional crimes by this defendant.

**E.      Imposing a Guidelines Sentence, with Application of the Terrorism Enhancement, Would Advance the Goals of Section 3553(a)**

Pham argues that the terrorism enhancement at U.S.S.G. § 3A1.4 overstates his criminal history, and the Court therefore should impose a sentence far below the Guidelines.   The application of U.S.S.G. § 3A1.4(a) does not overstate the seriousness of Pham's criminal conduct.   In 1994, Congress mandated that the Sentencing Commission provide for a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes

receive punishment commensurate with the extraordinary nature of their conduct. *See Stewart*, 590 F.3d at 172 (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting "terrorism enhancement" at U.S.S.G. § 3A1.4 reflects Congress's intent that defendants convicted of terrorism offenses serve sentences appropriate to their uniquely dangerous crimes. As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement 'could not be clearer': It reflects Congress' and the Commission's policy judgment 'that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.'

*Id.* at 172-73 (quoting *Meskini,* 319 F.3d at 91-92).

The enhancement appropriately assesses the seriousness of the offense in this case. As noted, Pham, among other things, swore an oath of allegiance to AQAP in which he pledged himself to wage jihad and, if necessary, martyr himself on behalf of AQAP; received military training, including training in the use of an automatic rifle (a Kalashnikov) as well as the use of explosives; assisted in the preparation and publication of AQAP's primary English-language propaganda and recruiting publication; and agreed to conduct a suicide bombing attack against U.S. and Israeli nationals. This conduct falls squarely within the kind of dangerous activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement. To vary downward to the extent requested by the defense would thwart Congress's intent to ensure that acts of terrorism are severely punished and disregard the nature of the defendant's conduct.

Further, the enhancement's impact on Pham's applicable Criminal History Category does not "substantially over-represent the seriousness of Pham's criminal history," as the defense contends.   Def. Mem. at 6.   Rather, the effect of the enhancement on the applicable Criminal History Category reflects the Sentencing Commission's assessment of the need for deterrence and likelihood of recidivism in terrorist offenses—an assessment the Second Circuit has endorsed.  *See Stewart*, 590 F.3d at 143 (citing *Meskini*, 319 F.3d at 92).  *See also United States* v. *Lindh*, 227 F. Supp. 2d 565, 571 (E.D. Va. 2002) ("Although the defendant has no prior criminal record, he is appropriately categorized in Criminal History Category VI, rather than I, pursuant to USSG § 3A1.4.").

The defense contends that the rationale behind U.S.S.G. § 3A1.4(b), such as the likelihood of recidivism in terrorism cases, "simply does not apply" in this case, but offers no justification for rejecting the Commission's assessment.   Nor are the cases cited by the defendant helpful to his argument.   In *Meskini*, the Second Circuit *rejected* the defendant's argument that, although § 3A1.4(b) applied to his case, he should have been subject to a downward departure.   The Court concluded that, although the district court had discretion to depart downward under U.S.S.G. § 4A1.3(b) in "exceptional cases," the defendant's circumstances did not present such a case.   319 F.3d at 92.   Indeed, the Court explicitly rejected the essence of Pham's argument here—that § 3A1.4(b) is unfair to defendants without a criminal history—and confirmed that the Sentencing Commission had a "rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because *even terrorists with no prior criminal behavior* are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."   *Id*. (emphasis

37

added).

Nor is Pham's reliance on *United States* v. *Aref*, No. 04 Cr. 402, 2007 WL 804814 (N.D.N.Y. March 14, 2007), persuasive.   That case arose out of a law enforcement sting operation in which a confidential informant represented that he was importing a surface-to-air missile ("SAM") into the United States (which the informant represented would be used by a terrorist organization).   The defendant agreed to a money laundering scheme whereby the informant proposed a scheme to provide proceeds from the importation of the SAM to the defendant who would, in turn, provide checks written to the informant's business and keep $5,000 for himself.   *United States* v. *Aref*, No. 04 Cr. 402, 2007 WL 603508, at \*2-\*3 (N.D.N.Y. Feb. 22, 2007).   The court granted a downward departure, finding exceptional circumstances, including the defendant's compelling personal characteristics and the fact that the defendant, a resident of the United States, had never previously engaged in criminal activity. *Aref*, 2007 WL 804814, at \*3.   Notably, in sentencing the defendant, the court also noted that there was no evidence that the defendant "actively sought out some way to aid a terrorist crime," but rather "the crimes were presented to him," and that the defendant proceeded with the crimes out of greed—not an ideological desire to commit acts of terrorism."   *Id*. at \*7.

Those facts stand in stark contrast to those presented here.   No crime was presented to Pham.   Rather, he affirmatively sought out an opportunity to join in AQAP's murderous agenda, and was sufficiently motivated by that agenda to travel from United Kingdom to Yemen, leaving behind his family—including his pregnant wife—with almost no warning.   Once in Yemen, Pham took an oath of allegiance and pledged himself to wage jihad on behalf of AQAP, an oath he took serious enough to help in the recruitment of other AQAP members, become

trained in the use of weapons and explosives and, ultimately, to sacrifice himself in a murderous

attack in the United Kingdom.   In other words, unlike the defendant in *Aref*, Pham was in fact

motivated by an "ideological desire" and has exhibited precisely the characteristics that led to the

Sentencing Commission's enactment of U.S.S.G. § 3A1.4(b).   *See Meskini*, 319 F.3d at 92

(listing the likelihood of recidivism, the difficulty of rehabilitation, and the need for

incapacitation as justifications for U.S.S.G. § 3A1.4(b)).

Finally, *United States* v. *Benkahla*, 501 F. Supp. 2d 748 (E.D. Va. 2007), is also easily

distinguished.   Unlike Pham, the defendant there was convicted of neither a violent crime nor

direct involvement in terrorist activity; rather, he was convicted of obstruction of justice and

making false statements (albeit in connection with an investigation relating to terrorism, which is

why the terrorism enhancement technically applied). *See* 501 F. Supp. 2d at 751 ("Defendant's

offenses neither directly 'involved' nor were 'intended to promote' a federal crime of

terrorism."); *see also id*. at 759 (stating that the defendant "is not a terrorist").   And

there—unlike here, for the reasons discussed above—the court found that there was "no reason

to believe [the defendant] would ever commit another crime after his release from

imprisonment." *Id*. at 759; *see also id.* (finding that the defendant's "likelihood of ever

committing another crime is infinitesimal").[11]

---

[11]   The defense, citing *Benkahla*, also argues that a variance is warranted because the
Guidelines range exceeds the statutory maximum.   (Def. Mem. at 7-8).   That argument is
misplaced.   As discussed above, the terrorism enhancement is appropriately applied here, and
the Guidelines appropriately capture the defendant's conduct.   If anything, Pham benefits from
the application of the statutory maximum as to Counts Two and Three, given that his Guidelines
range would otherwise be significantly higher.

**F.      A Guidelines Sentence Would Not Create Unwarranted Sentencing Disparities**

The need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), strongly supports the imposition of a Guidelines sentence of 50 years' imprisonment in this case.   In order to avoid such disparities, Pham should receive the agreed-upon, recommended Guidelines range with respect to Counts Two and Three of the Indictment, *i.e.*, 240 months.   *See* PSR ¶ 91. Then, this Court—consistent with congressional intent, statutory requirements, the Guidelines, and the Probation Office's recommendation—should impose the 30-year mandatory minimum sentence required for Count Five to be served consecutively to the 240-month sentence for Counts Two and Three.   For all the reasons set forth above, a 50-year total sentence is commensurate with Pham's criminal conduct—including his separate conviction for possessing, carrying, and using an automatic firearm in furtherance of the crimes of violence set forth in Counts Two and Three—as it would properly reflect the seriousness of the conduct at issue, and therefore such a term of incarceration would not create unwarranted sentencing disparities.

**1.      A Guidelines Sentence Will Avoid Creating Unwarranted Nationwide Disparities**

As an initial matter, the uncontested Guidelines sentencing range here is 50 years.   As the Court of Appeals has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors." *Rattoballi*, 452 F.3d at 131 (2d Cir. 2006) (internal citations and quotation marks omitted); *cf. Fernandez*, 443 F.3d at 28 (2d Cir. 2006) (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences" (quoting

*Rubenstein*, 403 F.3d at 98-99)). "[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 50. Indeed, it is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).

As to nationwide disparities, while a sentence approaching or in excess of 50 years is never routine, sentences of 50 years or more are regularly imposed in federal courts in cases where the defendant knowingly and willfully associates himself with foreign terrorist organizations—like al Qaeda and AQAP—which have dedicated themselves to murdering U.S. citizens and attacking U.S. interests.   Indeed, courts both within this District and outside of this District have imposed sentences of life imprisonment on such individuals even when the defendant's own actions did not lead directly to the deaths of any U.S. citizens.   *See, e.g.*, *United States* v. *Mustafa*, 04 Cr. 356 (KBF) (S.D.N.Y.) (life sentence for London-based preacher arising out of convictions relating to hostage-taking in Yemen (which resulted in deaths of non-U.S. tourists during a rescue operation) and material support to al Qaeda); *United States* v. *Kassir*, S2 04 Cr. 356 (JFK) (S.D.N.Y.) (sentencing the defendant to multiple terms of life in prison for attempting to establish a jihad training camp and for distributing bomb-making manuals); *United States* v. *Abu Ghayth*, 98 Cr. 1023 (LAK) (S.D.N.Y. 2015) (life sentence for al Qaeda spokesperson convicted of material support and conspiracy to kill Americans); *United States* v. *Jabarah*, 02 Cr. 1560 (BSJ) (S.D.N.Y.) (life imprisonment upon a guilty plea to conspiring to bomb U.S. Embassies in Singapore and the Philippines); *United States* v. *Abu Baker, et al.*, 04 Cr. 00240 (JAS) (N.D.Tx.) (sentencing two defendants to 65 years' imprisonment for convictions that included 18 U.S.C. § 2339B); *see also United States* v.

41

*Abdulmutallab*, 10 Cr. 2005 (NGE) (E.D. Mich. 2012) (sentencing AQAP member to multiple life sentences, after guilty pleas, for attempted bombing of U.S.-bound flight on December 25, 2009); *United States* v. *Faisal Shahzad*, 10 Cr. 541 (MGC) (S.D.N.Y. 2010) (life imprisonment after guilty pleas for attempted bombing in Times Square, New York); *United States* v. *Reid*, 02-10013-WGY (D. Mass. 2003) (three life sentences upon a guilty plea to attempting to destroy with explosives an in-flight commercial aircraft).

Moreover, with respect to Counts Two and Three, the material support and military-type training counts, it is important to note that sentencing courts routinely sentence defendants charged with similar crimes to the statutory maximum or more.   *See*, *e.g.*, *United States* v. *Aswat*, S2 04 Cr. 356 (KBF) (S.D.N.Y.) (stacking 18 U.S.C. § 2339B and 18 U.S.C. § 371 in order to sentence defendant to statutory maximum 20 years' imprisonment); *United States* v. *Sherifi*, 09 Cr. 00216 (FL) (E.D.N.C.) (sentencing defendant to statutory maximum 15 years' imprisonment on material support count, to be followed by mandatory minimum 5 year and 25 year sentences, as part of a total 45-year sentence); *United States* v. *Shah, et al.*, 05 Cr. 673 (LAP) (S.D.N.Y.) (Shah, statutory-maximum 15 years; Sabir, 25 years; Brent, statutory-maximum 15 years); *United States* v. *Hashmi*, 06 Cr. 442 (LAP) (S.D.N.Y.) (statutory maximum 15-year sentence for violation of 18 U.S.C. § 2339B); *United States* v. *Hassan*, 09 Cr. 216 (FL) )(E.D.N.C.) (statutory maximum 15 years' imprisonment for violation of 18 U.S.C. § 2339A); *United States* v. *Bujol*, 10 Cr. 0368 (DH) (S.D.Tx.) (sentencing defendant to a total of 240 months' imprisonment by stacking statutory maximum penalties for 18 U.S.C. § 2339B and 18 U.S.C. § 1028A).   Indeed, some of the cases cited by the defense regarding this particular Section 3553(a) factor, *see* Def. Mem. 12-18, stacked counts in order to impose the statutory

maximum for violations of the material support statues.   *See*, *e.g.*, *United States* v. *Faris*, 03 Cr. 00189 (LMB) (E.D. Va.) (court imposed statutory maximum on both 18 U.S.C. § 371 and 18 U.S.C. § 2339B, and ordered that the sentences be served consecutively, resulting in a 20-year sentence); *United States* v. *Hayat*, 05 Cr. 00240 (GEB) (E.D.Ca.) (imposing maximum 15-year sentence for violation of 18 U.S.C. § 2339B as well as maximum 3-year sentence for each of three counts of 18 U.S.C. § 1001, and ordering that the sentences for all four counts be served consecutively, for a total of 288 months' imprisonment).

Thus, considering the conduct underlying Counts Two and Three separate and apart from the conduct that gives rise to the minimum 30-year mandatory consecutive sentence—as it should under the statute and the Guidelines—it becomes clear that a sentence at or near the statutory maximum for those two counts of conviction is necessary to avoid creating an unwarranted sentencing disparity between the sentences imposed for Pham's crimes and those of similarly situated defendants who have been found guilty of those crimes.

### 2.   The Cases Cited by the Defendant Do Not Support a Different Result

In addressing this sentencing factor, the defendant cites a litany of cases, which he contends establish that a sentence in excess of the 30-year mandatory minimum for Count Five "would be grossly disproportionate."   Def. Mem. at 11.   In so arguing, Pham improperly is citing to the sentences imposed in those cases to argue for a variance from the recommended Guidelines sentencing range by including the mandatory minimum 30-year consecutive sentence in the calculation for the Guidelines range for the underlying offenses.   That is contrary both to the statute and the Guidelines, and therefore should be rejected.

43

If the Court were to adopt the defendant's reasoning, imposing the sentence at the mandatory minimum of 30 years would create the very sentencing disparities that Section 3443(a) proscribes. This is so because the defendant's argument is tantamount to requesting a sentence of less than time-served (approximately 4 years) on his convictions for material support and conspiracy to receive military-type training. Specifically, in order to sentence Pham to the 30 years he seeks in his submission, the Court effectively would have to order that the defendant be sentenced to one day on each of Counts Two and Three, to be served concurrently. *See* PSR ¶ 96 (indicating that the defendant is ineligible for probation on Counts Two and Three). That request seeks a variance far below even the greatest variance in the series of cases that Pham cites. With two exceptions, each of those cases is distinguishable by the simple fact that they do not involve charges that required a mandatory, consecutive sentence.[12] And none of the cases cited by Pham involved a defendant who was convicted of possessing, carrying, or using an automatic firearm in furtherance of a crime of violence, which, as the Court is aware, requires that the mandatory minimum sentence of 30 years (with a maximum of life) be imposed

---

[12] In two of the cases cited by Pham, three defendants were convicted of crimes that required mandatory minimum, consecutive sentences. *See United States* v. *Uzair Paracha*, 03 Cr. 01197 (SHS) (S.D.N.Y.) (in addition to multiple counts of material support, defendant was convicted of 18 U.S.C. § 1028A, which required a consecutive sentence of at least 5 years. Judge Stein imposed 25 years for the 1028A conviction, and ordered that 15 years of that sentence be served consecutively to the material support counts); *United States* v. *James, et al.*, 05 Cr. 00214 (CJC) (C.D.Ca.) (sentencing two defendants to five-year consecutive sentences for convictions for 18 U.S.C. § 924(c)). In *Paracha*, Judge Stein sentenced the defendant to the statutory maximum (180 months) for his convictions on the material support counts (although he declined to stack the counts), and then imposed 15 years to be served consecutively to those convictions. The two defendants in *James*, on the other hand, were not convicted of material support but rather seditious conspiracy.

consecutively to the sentences for the underlying crimes of violence (*i.e.* Counts Two and Three).

To the contrary, the cases cited by the defendant, *see* Def. Mem. at 12-18, establish that—even in the absence of a separate conviction for carrying, possessing, and using a firearm in furtherance of a crime of violence—terrorism offenses require the imposition of sentences at, or in excess of, the statutory maximum penalty prescribed by Title 18, United States Code, Section 2339B.[13]   *See generally* Exhibit 9 (summary chart of convictions and sentences cited in defense submission) and Exhibit 10 (compact disc containing underlying judgments and related documents for cases cited in defense submission).[14]   For example, of the 31 defendants referenced in Pham's submission who were charged with material support offenses, *i.e.*, 18 U.S.C. §§ 2339A and 2339B, 14 of those defendants received the statutory maximum sentence then available for material support.  *See* Exhibit 9.   Of the 17 remaining defendants who received sentences below the statutory maximum, seven of those defendants – including five members of the so-called "Lackawanna Six" – had entered into cooperation agreements with the Government.   *See id.*   And of the ten defendants who received sentences below the statutory maximum for material support without the benefit of a cooperation agreement, one defendant would have received the statutory maximum but had his sentence reduced to account for time-served in detention that the Court believed otherwise would not be credited by the Bureau

---

[13]   Exhibit 9, attached hereto, sets out details regarding the facts and sentences of the cases cited by the defense.

[14]   Exhibit 9 and 10 do not include reference to the two military detainees referenced in the defense submission.   *See* Def. Mem. at 12.   This is so because they were not subject to proceedings in Article III courts and therefore are not properly described as similarly situated to the defendant.

of Prisons.   *See Al-Marri*, 09 Cr. 10030 (MMM) (C.D. Ill.) (noting that 180 months was not sufficient, but nevertheless sentenced the defendant to 100 months for the reasons stated).   With respect to the remaining nine material support defendants who received sentences below the statutory maximum, six received sentences of 10 years or more, two received minor role adjustments under the Guidelines,[15] one defendant – who was 68 years old at the time –received a 60-month sentence,[16] and the last defendant received a 57-month sentence.[17]   *See* Exhibit 9.

With respect to the other 21 defendants in the cases cited by the defendant that did not involve material support charges, the results are no different.   *See generally* Exhibit 9. Specifically, eight of those defendants received sentences of 20 years or more, four defendants received sentences between 15 and 20 years, two received sentences between 10 and 15 years, and only seven received sentences of less than 10 years.   *See* Exhibit 9.   Of the defendants who received sentences of less than 10 years, those cases are readily distinguishable from the instant case.   For example, Mohamad Yousef Kourani, who received a sentence of 54 months, was convicted of a single count of 18 U.S.C. § 371, which carries a statutory maximum of 60 months.   *See United States* v. *Kourani*, 03 Cr. 81030 (RHC) (E.D.Mich.).   Another of the seven defendants who received a sentence of less than 10 years actually had all of the charges against him dismissed.   *See United States* v. *Al Saoub*, 02 Cr. 00399 (JO) (D.Or.).   In a similar vein, a third of the seven was convicted of money laundering only, and received a 36-month sentence.   *See United States* v. *Lewis*, 02 Cr. 00399 (JO) (D.Or.)

---

15   *See United States* v. *Shah, et al.*, 02 Cr. 02912 (S.D.Ca.) (sentencing Durrani and Ali to 57 months' imprisonment due to safety-valve relief and minor role adjustment).

16   *See United States* v. *Grecula*, 05 Cr. 00257 (KPE) (S.D.Tx.).

17   *See United States* v. *Makki*, 03 Cr. 80079 (GCS) (E.D. Mich.).

As such, the cases cited by the defendant do not support the defendant's position that a sentence of no incarceration, or even a sentence of one day, with respect to Counts Two and Three would be commensurate with the sentences imposed on similarly situated defendants.   To the contrary, the many cases cited by the defendant serve to underscore the need for a substantial sentence of imprisonment at or near the statutory maximum of Counts Two and Three to ensure nationwide consistency in sentencing.

### 3.   Pham's Citation to the "Average for Terrorism-Related Charges and Cases" Is Misleading and Does Not Support a Below-Guidelines Sentence Here

Pham's claim that "[c]onviction statistics indicate that a sentence above 30 years well exceeds the average for terrorism-related charges and cases," is inaccurate and misleading.   *See* Def. Mem. at 18.   To support that assertion, Pham cites a September 11, 2008 publication from New York University Law School entitled the *Terrorist Trial Report Card: September 11, 2008*. Notwithstanding the fact that the numbers in that publication are now dated by eight years, the Court should reject this proposition in its entirety.   As an initial matter, the defense provides no explanation as to how it calculated this "average sentence."   Indeed, it is impossible to quantify in years the length of incarceration for those individuals currently under life sentences who are still alive, and therefore this statistic is meaningless.   Moreover, this statistic very likely cuts against the defendant's argument.   This is so because, in the past, as well as more recently, the publisher of this annual report typically has quantified each life sentence as if it were a sentence of 30 years.   *See*, *e.g.*, *Terrorist Trial Report Card: September 11, 2001-September 11, 2011*, New York University School of Law Center on Law and Security, at 9, n.5; *Terrorist Trial Report Card: September 11, 2001-September 11, 2009*, New York University School of Law

47

Center on Law and Security, at 13 (chart entitled "Average Sentences").   If that is the figure

that was used to calculate the mean sentence for convictions during this time period, the average

sentences of 12.67, 14.75, 11.92, and 26 years, that defendant cites as relevant, very likely will

be higher.   In any event, because the report provides no insight on how those numbers were

calculated, and does not indicate the number of life sentences actually imposed anywhere in the

report itself, it is of no relevance to this sentencing.

### G.    The Conditions of Confinement Do Not Warrant a Reduction in Pham's Sentence

Against the conclusion that he should receive a Guidelines sentence, Pham contends that,

under Section 3553(a), his sentence should be reduced in light of his conditions of confinement.

*See* Def. Mem. at 9-10 (arguing for a variance based on conditions of detention and future

incarceration).[18]   The defendant, however, cites no binding authority that supports his claim that

his conditions of confinement warrant a downward variance at sentencing.[19]   This is not

---

[18]    Pham's reliance upon *United States* v. *Basciano*, 369 F. Supp. 2d 344 (E.D.N.Y. 2005), for
this proposition is misplaced.   Indeed, *Basciano* did not address the issue of sentencing at all,
let alone the weight that a sentencing court should afford to purportedly onerous conditions of
confinement.   To the contrary, *Basciano* involved a petition for *habeas corpus* in which the
defendant challenged the propriety of his pretrial detention in the Bureau of Prison's special
housing unit.   Pham, of course, is free to challenge the conditions of his confinement in
administrative proceedings within the BOP.   *See*, *e.g.*, *Atkinson* v. *Linaweaver*, No. 13 Civ.
2790 (JMF), 2013 WL 5477576, at *2-*3 (S.D.N.Y. Oct. 2, 2013).   Prior to his sentencing
submission, however, Pham never has complained (through counsel or otherwise) to the Bureau
of Prisons or the Government about his pretrial conditions being unreasonable or unduly
restrictive.   Nor has Pham sought any administrative remedy with the Bureau of Prisons.   *Id.*
As such, Pham's claim should be rejected by the Court on this basis as well.

[19]    The only case that Pham cites in support of this proposition is a memorandum opinion on
sentencing issued in the District of Minnesota, *see* Def. Mem. at 10 (citing *United States* v.
*Warsame*, 651 F. Supp. 2d 978 (2009)), in which Pham erroneously contends that the district
court departed downwardly based on the conditions of confinement.   As an initial matter, for
reasons previously discussed, the facts of that case, including the defendant's conduct, placed the

surprising as this argument is unavailing both with respect to the defendant's pretrial conditions of confinement as well as with respect to his speculation regarding his post-sentencing conditions of confinement.

In *United States* v. *Carty*, 264 F.3d 191 (2d Cir. 2001), the Court of Appeals held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures" under the Sentencing Guidelines.[20]   264 F.3d at 208; *see also*, *e.g.*, *United States* v. *Naranjo-Ramirez*, No. 93-4343-cr, 2010 WL 4723301, at *2, *4 (2d Cir. Nov. 23, 2010) (noting that sentencing judges are "under no *obligation* to depart from the Guidelines on the basis of [a defendant's] allegedly harsh pre-sentence confinement conditions," so long as they are "consider[ed]") (emphasis in original).   Following *Carty*, "the courts have granted relief generally where the conditions in question are extreme to an exceptional degree and their

---

defendant in a far different position than Pham.   *See supra* Section II.B.   Moreover, while the Government acknowledges that the district court in *Warsame* did consider the conditions of confinement as one of the bases for a downward variance, that case is readily distinguishable in other ways.   For example, the sentencing judge in *Warsame*, the Honorable John R. Tunheim, noted that the defendant had been held in pretrial detention— through little fault of his own—for more than five years prior to sentencing.   By contrast, at the time of sentencing, Pham will have been in pretrial detention at the MCC for just over 14 months.   In addition, Judge Tunheim noted that he "carefully considered the difficult conditions of Warsame's confinement," which had been "improved on several occasions at the urging of the Court."   651 F. Supp. 2d at 982. As noted *infra*, Pham never has complained of the conditions of his confinement, either to this Court or administratively to the Bureau of Prisons.   Finally, Judge Tunheim provided no specifics as to what conditions he found to be "significantly more onerous than the conditions faced by the ordinary pretrial detainee."   *Id.*   Thus, it is unclear whether he was referring to high-security conditions comparable to the SHU, or if he was referring to other "onerous" conditions (*e.g.*, over-crowding, poor fare, vermin, *etc.*).   Accordingly, to the extent that this opinion is offered as persuasive authority, there are not sufficient facts upon which to be able to determine how analogous—if at all—defendant Warsame conditions of confinement were to Pham's.

[20]   *Carty* involved a request for a downward departure under the Guidelines.

severity falls upon the defendant in some highly unique or disproportionate manner." *United States* v. *Mateo*, 299 F. Supp. 2d 201, 211 (S.D.N.Y. 2004) (Marrero, J.); *accord*, *e.g.*, *United States* v. *Torres-Teyer*, 322 F. Supp. 2d 359, 377-78 (S.D.N.Y. 2004 (Lynch, J.); *United States* v. *Green*, 04 Cr. 424-14 (RWS), 2006 WL 3478340, at *4 (S.D.N.Y. Dec. 1, 2006) (Sweet, J.).

The defendant first contends that he is entitled to a reduction in sentence because of his conditions of confinement at the Metropolitan Correctional Center ("MCC"), where he has been held in the segregated housing unit, commonly referred to as the "SHU." *See* Def. Mem. at 8-9. But these conditions cannot be characterized as "extreme to an exception degree," and there is no suggestion in the record that "their severity falls upon the defendant in some highly unique or disproportionate manner." *Carty*, 264 F.3d at 208. To the contrary, both the defendant and his counsel were provided with a detailed memorandum that set forth the bases for the Attorney General's decision to place the defendant under special administrative measures ("SAMs") as well as the controls under which the defendant would be placed pursuant to those measures. To date, the defendant has not taken issue with his conditions of confinement at the MCC or the fact that the defendant currently is subject to SAMs, either in this Court or through the BOP's administrative process.

In a similar vein, Pham argues that "[g]iven SAMs, Pham is likely to be designated to ADMAX, the supermax prison warehousing individuals convicted of terrorism-related offenses in solitary confinement." Def. Mem. at 10. To the extent the defendant's submission relies on what he expects the conditions of his confinement to be, these arguments are entirely speculative, premature, and inappropriate for the Court's consideration at sentencing. For example, the BOP will not designate a defendant to a particular institution until after entry of judgment, and as

50

such, there is no guarantee that the defendant will in fact be designated to the BOP's United States Penitentiary, Administrative Maximum located in Florence, Colorado ("ADX Florence"). In the event that the BOP determines, in its discretion, that the defendant should be incarcerated at the ADX Florence facility, and to the extent that the defendant believes that such designation is inappropriate, the defendant will be afforded with additional opportunities to challenge such designation through the BOP's administrative procedures.   Similarly, it is by no means certain that Pham will remain under SAMs for all or any part of his incarceration.   The controls implemented under the SAMs are in effect for one-year increments, and are subject to annual approval from the Attorney General.   *See* 28 C.F.R. § 501.   Indeed, based on recent experience in this District, it is not uncommon for SAMs restrictions to be removed and for SAMs inmates to be transferred to the general prison population.[21]

Finally, when the conditions of Pham's confinement—both current and speculative—are considered against the gravity of his crimes, it is clear that they do not warrant any variance from the Guidelines sentencing range.   Moreover, given that Pham never has complained about the conditions of his confinement, and that he has not challenged the propriety of the imposition of SAMs, Pham cannot contend that contend that the security measures that have been implemented are anything other than reasonable for a defendant in his particular circumstances.   As such, Pham cannot come close to satisfying *Carty*'s rigorous standard of establishing "their severity

---

[21]    In fact, the current SAMs applied to Pham are due to expire in May 2016, and currently the decision as to whether renew them is under review.

falls upon the defendant in some highly unique or disproportionate manner."   *Carty*, 264 F.3d at 208.[22]

\* \* \*

---

[22]   The defense submission also includes a "forensic psychological evaluation."   See Def. Ex. L.   The Court should not consider any of the conclusions in that report as mitigation that would support a downward variance here.   First, Dr. Kucharski concludes that "He does not in my opinion suffer from any mental disease or defect," that "[t]here are no psychiatric symptoms that would require attention at this time," and that " he does not meet any of the criteria for bipolar disorder."   Def. Ex. L at 4.   Those conclusions are in stark contrast to the claims Pham's defense team made in contesting his extradition, as well as the psychological report that the Probation Office cited in reporting on the defendant's psychological condition.   See PSR ¶ 81 ("As informed by defense counsel, while in prison in the UK, the defendant was diagnosed with Affective Disorder, not conclusive.").   To the extent that Dr. Kucharski is providing his "clinical impression," which is based upon a total of approximately five hours of interviews, see Def. Ex. L at 1, the Court should reject such testimony or give it no more weight than a lay opinion of a person who had met Pham for only five hours would be entitled.   The speculative conclusions that Dr. Kucharski draws in that regard are not based upon any scientific method, accepted technique, and are not proffered as an expert opinion.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence of 50 years' imprisonment—the Stipulated Guidelines Sentence—would be sufficient but not greater than necessary to comply with the legitimate purposes of sentencing.

Dated: New York, New York
       April 29, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                                 By: _____/s/_____
                                        Sean S. Buckley
                                        Anna M. Skotko
                                        Shane T. Stansbury
                                        Assistant United States Attorneys
                                        (212) 637-2261/1591/2641

cc: Bobbi C. Sternheim,  Esq. (by ECF)
    *Counsel for Minh Quang Pham*