# EXHIBIT 1

# E.R.

**CERTIFICATE ISSUED PURSUANT TO SECTION 70 OF THE EXTRADITION ACT 2003**

Under Section 70 of the Extradition Act 2003, the Secretary of State hereby certifies that the request from the United States, being a territory designated by the Extradition Act 2003 (Designation of Part 2 Territories) Order 2003 (SI 3334/2003 as amended) for the purposes of Part 2 of that Act, for the extradition of Minh Quang Pham, is valid and has been made in the approved way.

Date   24ᵗʰ August 2012

Signed

Secretary of State



# United States
# Department of Justice



Washington, D.C., _August 09_____, 20 _12_

**to whom these presents shall come, Greeting:**

I certify  That  _Jeffrey Cole_____ whose name is signed

accompanying paper, is now, and was at the time of signing the same,
late Director, Office of International Affairs, Criminal Division,

Department of Justice, Washington, D.C.

_____ duly commissioned and qualified.

witness, whereof, I, _Eric H. Holder, Jr._____

Attorney General of the United States,
have hereunto caused the Seal of the
Department of Justice to be affixed and
my name to be attested by the Director/
Deputy Director, Office of International
Affairs, Criminal Division, of the said
Department on the day and year first
above written.

**Attorney General**

By _____

Director/Deputy Director, Office of International Affairs,
Criminal Division

CRM-181
APR 98

9

## CERTIFICATION

I, Jeffrey Cole, Associate Director, Office of International Affairs, Criminal Division, United States Department of Justice, United States of America, do hereby certify that attached hereto and prepared in support of the United States request for the extradition of Minh Quang Pham from the United Kingdom is the original affidavit of Benjamin Naftalis, Assistant United States Attorney for the Southern District of New York, sworn to on August 7, 2012, before Michael H. Dolinger, United States Magistrate Judge, with exhibits.

True copies of the original documents are maintained in the official files of the United States Department of Justice in Washington, D.C.

8/9/202
Date

Jeffrey Cole
Associate Director
Office of International Affairs
Criminal Division
U.S. Department of Justice
Washington, D.C.

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :

     - v. -                                    :          12 Cr. 423

MINH QUANG PHAM,                            :
     a/k/a "Amin,"
                                 :

            Defendant.                    :

- - - - - - - - - - - - - - - - - -x

### AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION OF MINH QUANG PHAM

I, Benjamin Naftalis, being duly sworn, state that:

1.    I am a citizen of the United States of America and a resident of the State of New York.

2.    In May 2004, I received a Juris Doctor from Columbia University School of Law.  From November 2006 to the present, I have been employed by the United States Department of Justice as an Assistant United States Attorney for the Southern District of New York.  My duties are to prosecute persons charged with criminal violations of the laws of the United States.  During my practice as an Assistant United States Attorney, I have become knowledgeable about the criminal laws and procedures of the United States.

3.    In the course of my duties, I have become familiar with the charges and evidence in the case of United States v. Minh Quang Pham, 12 Cr. 423.

1

4. An investigation by the United States Attorney's Office for the Southern District of New York ("SDNY") and the Federal Bureau of Investigation ("FBI") revealed that Minh Quang Pham, a/k/a Van Minh Pham, a/k/a Mohammed Amin ("PHAM"), is associated with al Qa'ida in the Arabian Peninsula ("AQAP"), an organization that was publically designated by the United States Secretary of State as a Foreign Terrorist Organization on January 19, 2010. The investigation revealed that PHAM provided and attempted to provide material support and resources to AQAP, in violation of United States laws. Specifically, the investigation revealed that PHAM traveled from the United Kingdom to Yemen, where he swore "bayat," (i.e., an oath of loyalty) to AQAP. After joining AQAP, PHAM assisted in the preparation of AQAP's online propaganda publication, Inspire magazine. In addition, PHAM received military-type training from AQAP. Finally, while staying at various AQAP safehouses in Yemen, and in furtherance of the aforementioned activities, PHAM possessed, carried, and used a Kalashnikov assault rifle.

### SUMMARY OF THE FACTS OF THE CASE

5. PHAM, 29, was born in Vietnam and, at present, is a national of the United Kingdom.

6. The investigation revealed that in December 2010, PHAM informed his pregnant wife that he was departing on an impromptu trip to Ireland, but he traveled to Yemen, instead.

2

Specifically, the investigation revealed that PHAM departed the United Kingdom in late 2010 and returned to the United Kingdom in July 2011. Information obtained from a travel agency (the "Travel Agency") indicates that PHAM booked a trip to Yemen in or about October 2010. Further, a review of PHAM's travel documents revealed that he entered Yemen in December 2010, and exited Yemen in July 2011. Based on the investigation, it appears that PHAM remained in Yemen for the duration of the seven-month period from December 2010 until July 2011.

7.      While in Yemen, PHAM met a person who later became a United States cooperating witness ("CW-1").[1] CW-1 knows PHAM as "Amin," and met face-to-face with PHAM at several AQAP safehouses in Yemen over the course of several weeks in March and April 2011. CW-1 was shown an array of photographs, and positively identified a photograph of PHAM as the individual

---

[1]      CW-1 pled guilty in federal court in the United States to an Indictment charging CW-1 with, among other things, providing material support to foreign terrorist organizations, specifically AQAP and al Shabaab, in violation of Title 18, United States Code, Section 2339B. The guilty plea was entered pursuant to a cooperation agreement with the United States Attorney's Office for the Southern District of New York. CW-1 has not yet been sentenced. Information provided by CW-1 generally has proved to be highly reliable, in that it has been corroborated by independent evidence. CW-1 is currently cooperating with the United States on other investigations, and disclosing his identity in this request could hinder those investigations and endanger his family.

3

13

whom CW-1 knew as "Amin," and with whom CW-1 had interacted
extensively while at AQAP safehouses in Yemen.

8.    According to CW-1,[2] CW-1 first learned about PHAM in
email correspondence with a United States citizen, now deceased,
who was a prominent AQAP member ("American CC-1").  In an email,
American CC-1 told CW-1 that PHAM had come to Yemen from the
United Kingdom.  CW-1 first met PHAM at an AQAP safehouse in
Yemen in or about March 2011, where CW-1 observed PHAM carrying
a Kalashnikov assault rifle.  CW-1 stated that he observed PHAM
carrying the assault rifle throughout almost all of his
interactions with PHAM in Yemen.  In conversations with CW-1,
PHAM told CW-1 that he had been trained in the use of the
Kalashnikov assault rifle while in Yemen by AQAP.  Further, PHAM
told CW-1 that he (PHAM) had traveled to Yemen in order to join
AQAP, to wage jihad (i.e., holy war) on behalf of AQAP and to
martyr himself for AQAP's cause.  PHAM described how he had lied
to his family about where he was going, and how he had left his
pregnant wife behind in the United Kingdom.  PHAM further
described to CW-1 how PHAM initially traveled with a tour group
in Yemen for approximately two weeks, after which time PHAM met
up with another individual from the United Kingdom and traveled

---

[2]    All information in paragraphs 8 and 9 of the instant
affidavit is based on information supplied by CW-1.

14

to an AQAP safehouse.[3]  PHAM also told CW-1 that he (PHAM) had

sworn bayat in the presence of an AQAP commander prior to

leaving Yemen.

9.    CW-1 also witnessed PHAM's interactions with American

CC-1 and a second United States citizen ("American CC-2"), also

now deceased, who was also a prominent AQAP member.  CW-1

observed PHAM working closely with American CC-1, who was

responsible for editing and publishing Inspire magazine -- an

English-language publication used by AQAP to distribute

propaganda and recruit individuals from Western cultures to join

and/or support AQAP.  In addition, PHAM told CW-1 that PHAM was

working with American CC-1 and that he (PHAM) had spent time at

no fewer than three AQAP safehouses.  During CW-1's time at

these AQAP safehouses, CW-1 also spoke with American CC-1 and

American CC-2 about PHAM, and understood from them that PHAM was

providing valuable assistance to American CC-1 in connection

with the production and editing of Inspire magazine.

10.   On July 27, 2011, PHAM returned to the United Kingdom.

Upon his arrival at London's Heathrow International Airport,

United Kingdom authorities detained and searched PHAM..

Materials recovered from PHAM at the time of his initial

---

[3]     Information obtained by law enforcement authorities from
the Travel Agency confirms that PHAM did, indeed, travel with a
tour group in Yemen for about two weeks before setting off on
his own.

15

encounter with law enforcement corroborate CW-1's account of
CW-1's interactions with PHAM while the men were in Yemen.  For
example, CW-1 stated that, while in Yemen, CW-1 personally
exchanged various electronic documents with PHAM – and PHAM was
found in possession of various electronic media that contained
computer files forensically identical to those possessed by
CW-1.  In addition, CW-1 reported that PHAM almost always
carried a Kalashnikov in Yemen – and upon his arrival in the
United Kingdom from Yemen, PHAM was found to be in possession of
a live round of .762 caliber armor-piercing ammunition, which is
consistent with ammunition that is used in a Kalashnikov assault
rifle.  During questioning by United Kingdom authorities during
his detention at Heathrow, PHAM admitted that he traveled to
Yemen, that he lied to his family about his destination, and
that he toured with a company while in Yemen.

PROCEDURAL HISTORY OF THE CASE

The Charging Process

    11.  Under the federal law of the United States, a criminal
prosecution is commenced when a grand jury files an indictment.
A grand jury, though an arm of the court, is an independent body
composed of private citizens -- not less than 16 and not more
than 23 people --- whom the United States District Court selects
at random from the residents of the judicial district in which
the court resides.  The purpose of the grand jury is to review

6

evidence presented to it by United States law enforcement
authorities.  After independently reviewing this evidence, each
member of the grand jury must determine whether there is
probable cause to believe that a crime has been committed and
that a particular person committed that crime.  If at least 12
jurors find that the evidence they have reviewed provides
probable cause to believe that a particular person committed the
crime, the grand jury may return an indictment.  An indictment
is a formal written accusation that charges the particular
person, now a defendant, with a crime, identifies the specific
laws that the defendant is accused of violating, and specifies
the date and place where the charged crime occurred.

12.  The grand jury initiates the criminal prosecution when
it files the indictment with the United States District Court.
Thereafter, the clerk of the court, at the direction of a United
States District Judge or Magistrate Judge, normally issues a
warrant for the defendant's arrest.

13.  In addition to imprisonment and a criminal fine,
United States law provides for the seizure and forfeiture of the
defendant's property that was used to facilitate a crime, or
that constitutes the proceeds of a crime.  A criminal forfeiture
may be alleged in an indictment, along with the substantive
crimes.  Upon a showing of probable cause, a United States

7

District Court Judge or Magistrate Judge may issue a seizure
warrant for the seizure of the property.

14.   On May 24, 2012, a federal grand jury sitting in the
Southern District of New York returned an indictment (the
"Indictment") charging PHAM with criminal offenses against the
laws of the United States and filed the Indictment with the
United States District Court for the Southern District of New
York.  It is the practice of the United States District Court
for the Southern District of New York to retain the original
Indictment and file it with the records of the court. Therefore,
I have obtained a true and accurate copy of the Indictment from
the Clerk of the Court, and I attach it to this affidavit as
Exhibit A.

15.   On May 24, 2012, United States Magistrate Judge Ronald
L. Ellis signed a warrant for the arrest of PHAM for the
offenses charged in the Indictment.  It is the practice of the
United States District Court for the Southern District of New
York to retain the original arrest warrant and file it with the
records of the court. Therefore, I have obtained a true and
accurate copy of the arrest warrant from the Clerk of the Court,
and I attach it to this affidavit as Exhibit B.

The Charges and Pertinent Unites State Law

16.   The Indictment charges in five counts that Pham and
others committed the following offenses:

8

18



Count 1:   Conspiracy to provide material support to a
           foreign terrorist organization, in violation of
           Title 18, United States Code, Sections 2339B
           (a)(1),(d)(1)(C), (E) and (F), and 3238[4], which
           carries a maximum penalty of 15 years'
           imprisonment;

Count 2:   Providing and attempting to provide material
           support to a foreign terrorist organization, in
           violation of Title 18, United States Code,
           Sections 2339B(a)(1),(d)(1)(C), (E), and (F),
           3238, and 2, which carries a maximum penalty of
           15 years' imprisonment;

Count 3:   Conspiracy to receive military-type training from
           a foreign terrorist organization, in violation of
           Title 18, United States Code, Sections 371,
           2339D(a), (b)(3), (b)(5) and (b)(6), and 3238,
           which carries a maximum penalty of five years'
           imprisonment;

Count 4:   Receipt of military-type training from a foreign
           terrorist organization, in violation of Title 18,
           United States Code, Sections 2339D(a), (b)(3),
           (b)(5) and (b)(6), and 3238, which carries a
           penalty of ten years' imprisonment; and

Count 5:   Possessing, carrying, and using a firearm in
           relation to a crime of violence, in violation of
           Title 18, United States Code, Sections
           924(c)(1)(A), (B)(i), and (B)(ii), 3238, and 2,
           which carries a penalty of not less than 30
           years' imprisonment, and a maximum penalty of
           life imprisonment.

The Indictment also contains a forfeiture allegation.

    17.   The United States requests the extradition of Pham for

all of the offenses set forth above. Each count charges a

separate offense. Each offense is punishable under a statute

---

[4] Title 18, United States Code, Section 3238, specifies which
State or district in the United States has jurisdiction over a
prosecution where the offenses in question occurred outside the
jurisdiction of any particular State or district.

9

that (1) was the duly enacted law of the United States at the time that the offense was committed, (2) was the duly enacted law of the United States at the time that Indictment was filed, and (3) is currently in effect.  Each offense is punishable under United States law by one year or more imprisonment. Copies of the relevant statutes are attached to this affidavit as Exhibit C.

Count 1

18.   Count 1 charges PHAM with Conspiring to Provide Material Support to a Foreign Terrorist Organization, in violation of Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (E) and (F), and 3238.

19.   Under United States law, a conspiracy is an agreement to commit one or more criminal offenses.  The agreement on which the conspiracy is based need not be expressed in writing or in words, but may be simply a tacit understanding by two or more persons to do something illegal.  Conspirators enter into a partnership for a criminal purpose in which each member or participant becomes a partner or agent of every other member.  A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the identities of all the other members of the conspiracy.  If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees to it, joining in the plan, he is

10

20

guilty of conspiracy even though he did not participate before and may play only a minor part.  A conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership.

20.   The crime of conspiracy is an independent offense, separate and distinct from the commission of any specific "substantive crimes."  Consequently, a conspirator can be found guilty of the crime of conspiracy to commit an offense even where the substantive crime that was the purpose of the conspiracy is not committed.  The Congress of the United States has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful, because collective criminal planning poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

21.   To satisfy its burden of proof and convict PHAM on Count 1, the government, at trial, must prove each of the following essential elements beyond a reasonable doubt: (1) that two or more persons entered an agreement to commit the underlying offense, i.e., to provide material support to a foreign terrorist organization, i.e., AQAP; (2) that PHAM knowingly and willfully joined the conspiracy to commit the

11

21

underlying offense; (3) that PHAM knew either that AQAP had been designated as a terrorist organization by the United States government, that AQAP engaged in "terrorist activity", or that AQAP engaged in "terrorism".

22.   The government's evidence will establish that PHAM, traveled to Yemen where, in agreement with others, he joined AQAP and received military-type training; that he possessed and carried a firearm, _i.e._, an assault rifle as a member of AQAP while in Yemen; and that he worked with other AQAP members while in Yemen and provided assistance to a member in connection with the production and editing of AQAP's online propaganda publication, _Inspire_ magazine.

Count 2

23.   Count 2 charges PHAM with Providing or Attempting to Provide Material Support to a Foreign Terrorist Organization, in violation of Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (E), and (F), 3238, and 2.   Title 18, United States Code, Section 2, provides that a person who aids and abets the commission of a crime — in this instance providing or attempting to provide material support to a foreign terrorist organization — is as guilty as the person who actually performs the criminal act.

24.   To satisfy its burden of proof and convict PHAM on Count 2, the government, at trial, must prove each of the

12

22

following essential elements beyond a reasonable doubt: (1) that
PHAM provided or attempted to provide material support and
resources to AQAP, or aided and abetted another in providing
such support and resources; and (2) that PHAM knew either that
AQAP had been designated as a terrorist organization by the
United States government, that AQAP engaged in terrorist
activity, or that AQAP engaged in terrorism.

25.   The government's evidence will establish that PHAM,
traveled to Yemen where, in agreement with others, he joined
AQAP and received military-type training; that he possessed and
carried a firearm, i.e., an assault rifle as a member of AQAP
while in Yemen; and that he worked with other AQAP members while
in Yemen and provided assistance to a member in connection with
the production and editing of AQAP's online propaganda
publication, Inspire magazine.

Count 3

26.   Count 3 charges PHAM with Conspiracy to Receive
Military-type Training from a Foreign Terrorist Organization, in
violation of Title 18, United States Code, Sections 371,
2339D(a)(b)(3), (b)(5) and (b)(6), and 3238.

27.   To satisfy its burden of proof and convict PHAM on
Count 3, the government, at trial, must prove each of the
following essential elements beyond a reasonable doubt: (1) that
two or more persons entered an agreement to commit the

13

23

underlying offense, i.e., to receive military-type training from AQAP; (2) that PHAM knowingly and willfully joined the conspiracy to commit the underlying offense; (3) that PHAM knew either that AQAP had been designated as a terrorist organization by the United States government, that AQAP engaged in terrorist activity, or that AQAP engaged in terrorism; and (4) that at least one co-conspirator committed at least one overt act in furtherance of the conspiracy.  An overt act is any action taken to further the objective of the conspiracy, and need not itself be a criminal act.

28.   The government's evidence will establish that PHAM traveled to Yemen where he, in agreement with others, joined AQAP, took an oath of allegiance, and received military-type training, which included training in the use of an assault rifle; and that he possessed and carried an assault rifle as a member of AQAP while in Yemen in support of AQAP.

Count 4

29.   Count 4 charges PHAM with Receipt of Military-type Training from a Foreign Terrorist Organization, in violation of Title 18, United States Code, Sections 2339D(a), (b)(3), (b)(5) and (b)(6), and 3238.

30.   To satisfy its burden of proof and convict PHAM on Count 4, the government, at trial, must prove each of the following essential elements beyond a reasonable doubt: (1) that

14

PHAM received military-type training from a foreign terrorist organization, i.e., AQAP; and (2) that PHAM knew at the time either that AQAP had been designated as a terrorist organization by the United States government, that AQAP engaged in terrorist activity, or that AQAP engaged in terrorism.

31.    The government's evidence will establish that PHAM traveled to Yemen where he joined AQAP, took an oath of allegiance, and received military-type training, which included training on the use of an assault rifle; and that PHAM possessed and carried an assault rifle as a member of AQAP while in Yemen in support of AQAP.

Count 5

32.    Count 5 charges PHAM with Possessing, Carrying, and/or Using a Firearm During and in Relation to a Crime of Violence, or Aiding and Abetting Another in the Possession, Carrying, or Use of a Firearm, in violation of Title 18, United States Code, Sections 924(c)(1)(A), (B)(i), and (B)(ii), 3238, and 2.

33.    To satisfy its burden of proof and convict PHAM on Count 5, the government, at trial, must prove each of the following essential elements beyond a reasonable doubt: (1) that PHAM is guilty of at least one of the charges set forth in Counts 1 through 4 of the Indictment; (2) that PHAM carried a firearm during and in relation to the commission of, or possessed a firearm in furtherance of, one of the charged crimes

15

25

charged in Counts 1 through 4, or aided and abetted another in
carrying or possessing said firearm, in furtherance of one of
the crimes charged in Counts 1 through 4; and (3) that PHAM
acted knowingly and intentionally.  Under United States law, it
is a federal crime for anyone to use, carry or possess firearms
(including machine guns and destructive devices) in relation to
a "crime of violence."  The crimes charged in Counts 1 through 4
of the Indictment are crimes of violence under United States
federal law.

34.  The government's evidence will establish that PHAM
traveled to Yemen where he joined AQAP, took an oath of
allegiance, and received military-type training, which included
training on the use of an assault rifle; and that PHAM possessed
and carried an assault rifle as a member of AQAP while in Yemen,
while conspiring to provide and providing material support to
AQAP, and conspiring to receive and receiving military-type
training.

35.  The government will establish all of the elements set
forth above through the testimony of civilian, expert, and law
enforcement witnesses, and physical evidence.  Specifically, the
testimony of CW-1 will establish that PHAM traveled to Yemen in
2010, joined AQAP, took an oath of allegiance, stayed at various
AQAP safehouses, received military-type training in Yemen,
carried a particular firearm while there, and worked closely

16

26

with other members of AQAP, including providing assistance with
the production of a Inspire magazine.  The government will
introduce a forensic comparison of electronic evidence recovered
from PHAM and electronic evidence possessed by CW-1, to
corroborate CW-1's testimony.  The government will also
introduce the live round of ammunition found on PHAM's person
when he entered the United Kingdom in July 2011, travel records
pertaining to PHAM, PHAM's own admissions to British authorities
in July 2011, and various communications (including electronic
mail and other correspondence) in which PHAM discussed his
travel and whereabouts.  Finally, the United States will
introduce the contents of PHAM's electronic media, AQAP
publications (including Inspire magazine), and the testimony of
witnesses related to AQAP's terrorist agenda, in order to
demonstrate PHAM's understanding of AQAP and its mission.

Description of Fugitive

36.  PHAM was born on February 9, 1983, in Vietnam.  PHAM
entered the United Kingdom at age six and was granted British
citizenship in 1995.  PHAM's United Kingdom passport number is
300774896.  It was issued on August 22, 2001, with an expiration
date of August 22, 2011.  PHAM is described as an Asian male,
standing 5 feet, 7 inches tall.

37.  I have attached a photograph of PHAM to this affidavit
as Exhibit D.  This photograph was identified by CW-1 as the

17



person he/she knows as "Amin".

38.    I have also attached a copy of the fingerprints of PHAM to this affidavit as Exhibit E.  These fingerprints have been identified by a Deputy-Constable with an identification number of "2 21702", the officer who took them at the time of PHAM's arrest on July 27, 2011, in the United Kingdom when he re-entered.

Location of Fugitive

39.    PHAM was arrested by United Kingdom authorities on June 29, 2012, pursuant to a United States request for provisional arrest.  Based on information and belief, he remains in the custody of United Kingdom authorities pursuant to that arrest.

### CONCLUSION

40.    I have attached the following documents in support of this request for the extradition of PHAM:

A.    Exhibit A is a certified copy of the Indictment.

B.    Exhibit B is a certified copy of the arrest warrant. .

C.    Exhibit C is a copy of the pertinent sections of the following statutes and their penalties:

Title 18, United States Code, § 2339B
Title 18, United States Code, § 2339D
Title 18, United States Code, § 924(c)
Title 18, United States Code, § 371
Title 18, United States Code, § 2

D.    Exhibit D is a photograph of PHAM.

18

28

E.    Exhibit E are copies of the fingerprints of PHAM.

41.   I have thoroughly reviewed the government's evidence against PHAM and attest that this evidence indicates that PHAM is guilty of the offenses charged in the Indictment.

Executed this 7Th day of August, 2012, at New York City, New York, United States of America.

PREET BHARARA
United States Attorney

*Ben*

Benjamin Naftalis
Assistant United States Attorney



Signed and sworn to before me this 7th day of August, 2012, at New York, New York.

HON. MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

19