LAW OFFICES OF

# DRATEL & LEWIS

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK  10006
—
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: jdratel@dratellewis.com

JOSHUA L. DRATEL
LINDSAY A. LEWIS
—
AMY E. GREER

ACHARA AMY SCHRODER
*Paralegal*

**BY ECF**

May 1, 2024

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
Daniel P. Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Pham*,
        12 Cr. 423 (RMB)

Dear Judge Berman:

This letter is respectfully submitted on behalf of defendant Minh Quang Pham ("Pham"),[1] whom Bobbi C. Sternheim, Esq., and I represent in the above-entitled matter, and constitutes the sentencing submission on his behalf.  For the reasons set forth below – much of which was not yet available or presented to the sentencing Court in 2016 – it is respectfully submitted that Pham should be sentenced to a term of imprisonment considerably shorter than the 40-year term to which he was sentenced initially May 27, 2016, after his plea of guilty.

Conversely, as discussed below, the facts underlying the new charge added in the Superseding Information to which Pham pleaded guilty May 11, 2023, were fully set forth, explored, argued, and accounted for in the sentence initially imposed upon Pham.  Therefore, they should not in any way aggravate, or even provide a basis for the same sentence, for Pham

---

[1]  Throughout all proceedings, defendant Minh Quang Pham has been referred to as "Pham" by counsel and the Court, and this letter will conform with that convention.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 2 of 44

upon re-sentencing.[2]

In 2016, it was impossible for Judge Nathan to see into the future whether Pham's expressions of remorse and commitment to rehabilitation were genuine and/or enduring. The intervening eight years have established the authenticity and persistence of both. Pham has been a model inmate in a very harsh and isolated environment – the strictest in the federal prison system – and has achieved extraordinary accomplishments during that period, especially given the bleak and restrictive nature of his confinement.

As Pham writes in his letter to the Court (a copy of which is attached hereto as Exhibit 1), "I want to say that I am truly sorry for supporting Al-Qaida, I owe my apology to the American people, the British people and to humanity as a whole. What Al-Qaida have committed is crime against God and humanity, and I am truly regretful for playing any part." *Id.*, at ¶ 10.

Pham's letter to the Court demonstrates his maturation and rehabilitation, particularly in contrast with the letter he submitted in connection with his initial sentencing eight years ago. As he writes now, in addition to expressing his remorse and apologizing for his illegal conduct, he has "realized now that there are many safe and lawful ways to express myself without putting myself and others in danger. I do not believe Al-Qaida is ever capable of making any positive change, in fact they are scaring people from Islam and Muslims through their mindless and wicked attacks." *Id.*, at ¶ 9.

Thus, the Court, and the legal system as a whole, have an unusual opportunity to reevaluate the appropriate punishment for Pham in light of his performance during the 13 years of his incarceration (which began with his arrest in 2011 in the United Kingdom and subsequent extradition to the U.S.).

In that context, a review of a recently published book on the history of the parole system notes that the system's origins reflected the objective to "continually evaluate people in prison, to encourage their pro-social behavior." John J. Lennon, "Can the Parole Process Make Prison Sentences More Just?" *The New York Times Book Review* (November 6, 2023) ("*Lennon's Review*"), available at https://bit.ly/4a1Tlwm, reviewing Ben Austen, *Correction: Parole, Prison, and the Possibility of Change* (Flatiron Books: 2023) ("*Austen on Corrections and Parole*"). Pursuant to that model, a prisoner's release date would be set by a panel that would "look

---

[2] Technically, because Pham pleaded guilty to a Superseding Information, this is a *de novo* sentencing for Pham. However, for purposes of maintaining clarity, it will be referred to herein as a "re-sentencing," with the May 27, 2016, sentencing referred to as the "initial sentencing."

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 3 of 44

beyond the crime, and with dispassion assess an individual's growth in the intervening years."
*Id*.

Here, that re-examination is appropriate, and compels a much shorter prison sentence for Pham.  Accordingly, the reasons why such a sentence would be reasonable, and "sufficient but not greater than necessary" to achieve the objectives of sentencing set forth in 18 U.S.C. §3553(a)(2)(A)-(D) include:

(A)     Pham's consistent and persistent efforts at rehabilitation, which he has demonstrated throughout his 13 and one-half years of incarceration both in the United Kingdom (prior to extradition to the U.S.) and in the U.S. pretrial on the 10-South unit at the Metropolitan Correctional Center ("MCC") and after sentencing at the U.S. Bureau of Prisons's Administrative Maximum facility in Florence, Colorado ("ADX"), and which establish that a 40-year prison sentence, or anything approaching that, is now neither necessary nor appropriate;

(B)     Pham, a literal "boat" refugee from Vietnam, suffered through an extraordinarily traumatic and unstable childhood, and likely as a result of his parents' trauma, an abusive and difficult relationship with his father;

(C)     extended imprisonment would be harmful to Pham's mental health, particularly in light of the diagnosis by Bureau of Prisons ("BoP") psychologists that he suffers from Post-Traumatic Stress Disorder ("PTSD");

(D)     Pham has endured 25 months on MCC's 10-South and the past nine years at ADX, as well as the entire span of the Covid-19 pandemic, all of which constituted conditions of confinement that courts have recognized as mitigating factors at sentencing;

(E)     the offense conduct comprising Counts Five through Nine of the Superseding Indictment, which were added after the original Count Five was vacated, was presented to the Court, argued by the government, and included in the Court's initial sentencing determination, and therefore cannot serve as a basis to increase Pham's sentence;

(F)     Pham could remain in Immigration and Customs Enforcement ("ICE") custody for an extended period – even longer than for ordinary alien defendants due to circumstances peculiar to Pham, *i.e.*, he is "stateless" – following completion of his sentence;  and

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 4 of 44

    (G)    statistics available from the Judiciary Sentencing Information ("JSIN") and the U.S. Sentencing Commission's demonstrate that a sentence for Pham well below 40 years would avoid an unwarranted disparity between Pham's sentence and that of other similarly situated defendants.

    For the Court's convenience, and to avoid repetition, appended hereto as Exhibits are the sentencing submission (with Exhibits) on Pham's behalf filed April 22, 2016 (Exhibit 2), the government's April 29, 2016 sentencing submission for that initial sentencing (Exhibit 3), Pham's May 2, 2016, reply submission (Exhibit 4), as well as the transcript from Pham's initial May 27, 2016, sentencing proceeding (Exhibit 5).  Certain Exhibits (letters) that were redacted as part of Pham's initial sentencing submission (Exhibit 2 hereto) will be filed publicly in redacted form, but unredacted versions will be provided to the Court and the government.

## I.    *Procedural History and the Revised Pre-Sentence Report*

    Pham returns for re-sentencing after his conviction on Count Five of the 2014 Indictment (ECF # 3) was vacated in light of *United States v. Davis*, 588 U.S. 445, 139 S.Ct. 2319 (2019).  Absent that vacated Count, Pham was facing a maximum sentence of 25 years' imprisonment on the remaining counts to which he had pleaded guilty.

    However, the government subsequently reinstated the dismissed counts in the Indictment (Counts Two and Four), and, despite extradition limited to the initial charges, also charged Mr. Pham with additional counts, Counts Five through Nine, in violation of 18 U.S.C. §2332f(a)(2) (Conspiracy to Bomb a Place of Public Use) (new Count Five), 18 U.S.C. §2332f (Attempted Bombing of a Place of Public Use) (Count Six), 18 U.S.C. §2332a(a)(1) (Conspiracy to Use a Weapon of Mass Destruction) (Count Seven), 18 U.S.C. §2332a(a)(1) (Attempted Use of a Weapon of Mass Destruction) (Count Eight), and 18 U.S.C. §§924(c)(1)(A) and (c)(1)(B)(ii) (Use of a Destructive Device During and in Furtherance of a Crime of Violence) (Count Nine).

    Pham challenged the addition of those counts, but, in an April 1, 2022, Opinion & Order, the District Court denied his motion with the exception of Count Nine, which was dismissed. *See* ECF # 239.  Otherwise, the Revised Pre-Sentence Report ("Revised PSR") (ECF # 272) accurately sets forth the procedural chronology in the case.  *See* Revised PSR, at ¶ 23.

    Pursuant to a November 21, 2022, Plea Agreement, Pham ultimately pleaded guilty May 11, 2023, to all four Counts of a Superseding Information filed that day (ECF # 268).  Those offenses that cumulatively carry a maximum prison term of 50 years, without any minimum term

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 5 of 44

of imprisonment. *See* Plea Agreement, at 2.[3]

## II. *Pham's Initial Sentencing in May 2016*

The initial Plea Agreement to which Pham and the government agreed provided for a maximum sentence of 50 years' imprisonment. *See* Government's April 29, 2016, Sentencing Memo (ECF# 113) ("Gov't 2016 Memo"), at 16. The government argued for that sentence, *id.*, at 17-19, while defense counsel urged the Court to impose the 30-year mandatory minimum term.

However, Judge Nathan imposed a sentence of 40 years' imprisonment, concluding that analysis of the relevant sentencing factors "establish that Mr. Pham was a trusted, skilled, and for a time dedicated participant to AQAP, and I believe that aspects of that continued even after his departure from Yemen, and returned to the U.K. He agreed to engage in recruitment of others to AQAP, and he agreed to participate in a horrific and violent suicide bombing." Transcript, May 27, 2016 (ECF # 130) ("Sentencing Tr."), at 48.

The Court also pointed out that "[w]hatever his intentions were, it is the case that Mr. Pham *did not carry out acts of violence*. He provided material support to AQAP in the horrible ways that I earlier described, but he did so for a relatively short period of time, and he made these public statements renouncing AQAP and violent extremism. He pled guilty to his crimes." *Id.*, at 52 (emphasis added).

## II. *Application of the §3553(a) Factors to Pham Makes a Prison Sentence Far Shorter Than 40 Years Reasonable and Appropriate*

As discussed below, in applying to Pham both §3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), as well as the sentencing factors set forth in §3553(a)(1)-(7), it is respectfully submitted that given the particular circumstances presented by Pham, considered either independently or in combination, a sentence far shorter than the 40-year prison term imposed initially would be reasonable, appropriate, and "sufficient, but not greater than necessary" in accordance with §3553(a)(2)'s mandate, particularly since certain factors detailed below were not

---

[3] The restrictions on communications attendant to not only the Special Administrative Measures imposed on Pham, but also the Covid-19 pandemic interfered with ordinary and traditional attorney-client communications. Thus, while an offer communicated by the government ordinarily can be discussed with a client intensively over the course of a few days or a week, that was not possible in this instance, likely precluding a disposition that could have limited Pham's exposure to below what he faces pursuant to the Plea Agreement.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 6 of 44

necessarily factored into that sentence.

As the Supreme Court reiterated in 2022, information and developments subsequent to sentencing are certainly relevant to any re-sentencing. *See Concepcion v. United States*, 597 U.S. 481 (2022). *See also Pepper v. United States*, 562 U.S. 476, 495-96 (2011) (statute – 18 U.S.C. §3742(g)(2)) – precluding consideration, at re-sentencing, of post-sentence rehabilitation was invalid because it had the effect of making the Guidelines mandatory in "an entire set of cases"). Here, it is respectfully submitted that the developments and new information in this case should have a material effect on Pham's re-sentencing.

The broad discretion afforded district courts to determine a sentence (or re-sentence) also conforms with 18 U.S.C. §3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990); *United States v. Jones*, 531 F.3d 163, 172 n. 6 (2d Cir. 2008).

In fact, in *Pepper*, the Court cited §3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" 562 U.S. at 488, *quoting Wasman v. United States*, 468 U.S. 559, 564 (1984).

However, the initial sentence, as well as the Guidelines generally, can exert an "anchoring bias" effect on sentencing, explained by U.S. District Judge Mark W. Bennett (Northern District of Iowa) in a law review article as follows:

> judges' sentences are subconsciously anchored by the calculated Guidelines range. This Article offers a simple, modest, and practical solution that requires no change in existing law by the Supreme Court or Congress. It simply requires rearranging the numerical anchoring information in the presentence report and adding additional relevant numerical information to counteract the anchoring effect of the Guidelines. If federal district court judges are educated about the effect of cognitive anchoring and their own bias-based blind spots to it – their improved awareness can only enhance the fairness of sentencing.

Hon. Mark W. Bennett (United States District Judge, Northern District of Iowa), *Confronting Cognitive 'Anchoring Effect' and 'Blind Spot' Biases In Federal Sentencing: a Modest Solution*

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 7 of 44

*For Reforming a Fundamental Flaw*, 104 J. OF CRIMINAL LAW AND CRIMINOLOGY 3 (Fall 2014) (hereinafter "*Anchoring Effect*"), available at bit.ly/3CtqhPt.  *See also* Nancy Gertner, *Judicial Discretion in Federal Sentencing – Real or Imagined?* 28 FEDERAL SENTENCING REPORTER 3, (February 2016), available at bit.ly/3RWNLCp.

Judge Bennett, relying on studies in a number of disciplines, concluded in 2014 that "[t]he gravitational pull of the Guidelines appears to be so strong that the change from mandatory to advisory Guidelines has had little to no impact on the average length of federal sentences." *Anchoring Effect*, at 521.

However, he also offers mechanisms for overcoming that "anchoring effect," including measures also utilized in self-recognizing implicit bias generally, *i.e.*, (1) "[p]eople must be aware that bias has occurred"; (2) "be motivated to correct the bias"; (3) "know the direction and magnitude of the bias"; and (4) "have sufficient control over their responses to be able to correct for the bias." *Id.*, at 529 (footnote omitted).

That "anchoring effect" can be amplified by the inclusion of a mandatory minimum term constituting one of the charges.  Here, the vacated Count Five required a 30-year mandatory minimum consecutive term.  Now, though, the Court is no longer constrained by any mandatory minimum term of imprisonment.  Thus, it is vested with the full discretion afforded it to impose a reasonable sentenced "sufficient, but not greater than necessary" to accomplish the objectives of sentences enumerated in §3553(a)(2)(A)-(D).

It is respectfully submitted that considering the new and subsequent information and materials discussed above, the initial sentence imposed should not impede the Court's discretion in imposing a reasonable sentence substantially lower than the initial 40-year prison term.

A.      ***Pham Has Throughout His Incarceration Demonstrated His Continued Commitment and Progress Toward His Rehabilitation***

In his letter to the Court, Pham declares unambiguously that he "renounce[s] all support and association with Al-Qaida[,]" and acknowledges that he "made a very terrible decision in late 2010 by traveling to Yemen and joining AQAP and I regret it everyday."  Letter from Minh Quang Pham, a copy of which is attached hereto as Exhibit 1, at ¶ 1. [4]

---

[4]  Judge Nathan noted at Pham's initial sentencing that "[h]e has, including as recently as his submission to me and his sentencing materials, continued to refer to Awlaki using the honorific title 'imam.'"  Transcript, May 27, 2016 (ECF # 130), at 48.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 8 of 44

Pham has been in custody since December 22, 2010 – 50 months in general population in the U.K. awaiting extradition, and subsequently on MCC's ultra-restrictive 10-South for 25 months, and next at ADX, BoP's most restrictive facility, where he has been confined since March 17, 2017. *See* Revised PSR, at ¶ 9. Remarkably, as the Revised PSR confirms, during his near-decade of confinement within the BoP system, "he has not committed any known disciplinary infractions to date." *Id*. He was also a model inmate in the U.K., in which he spent more than three years in general population. Further, he has throughout his incarceration in the U.S. been subject to Special Administrative Measures ("S.A.M.'s").

While in custody, and particularly since his initial sentencing almost eight years ago, Pham has performed a complete transformation. In marked contrast to his letter to the Court in advance of his initial sentencing, he now recognizes that

> I can never change my past but I can and will change my beliefs, my attitude, values, and character. I can unlearn extreme, deviant and dangerous ideology and learn to be law-informed, law-abiding and a productive member of society wherever I am.

Exhibit 1.

Pham also understands how he must manifest that reformation:

> I can prove so by committing to continuous self-education, engaging and completing available programs and continue to remain a model inmate, discipline free and continue to support and educate my family so they also can grow to be productive and informed members of society.

Exhibit 1.

Pham has pursued his rehabilitation diligently and persistently. Indeed, the Revised PSR lists 25 different programs Pham has completed since he was sentenced. *See* Revised PSR, at ¶ 12. Since the Revised PSR was prepared in 2021, Pham has completed additional programs, including an updated anger management program. Pham also receives regular counseling when the psychologist visits. Pham has found it to be very helpful with respect to coping, and managing expectations and outcomes. He also reads broadly in what he characterized, in a telephone conversation with counsel, as his "thirst for knowledge."

In addition, "records confirmed that since April 2023, the defendant has been working at

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 9 of 44

the facility as an orderly[.]" *Id*.  Pham's documented exemplary record while incarcerated has earned him placement in successive "step-down" programs at ADX that have enabled him to advance to Phase III of the step-down program.

Phase I, which Pham has already successfully completed, is solitary confinement, and entitles an inmate to additional showers (three per week, with an escort), and two telephone calls per month.  In Phase II, also solitary confinement, an inmate can shower daily – without an escort – and can avail himself of an additional monthly telephone call.[5]  Pham successfully completed Phase II as well.

Pham is currently in Phase III of the step-down program.  There are 16 spaces in the program.  It is the equivalent to being in general population except for the remaining S.A.M.'s restriction on outside communications.  He also is allotted four phone calls, with one more on holidays.  He uses those calls to speak regularly with his wife and two children (ages eleven and 12).

In Phase III, Pham does not need an escort for recreation.  He attends group therapy and anger management programs, as well as a program addressing family dynamics.  Pham also participates in an art program, in which he crochets.  Pham is permitted 90 minutes of indoor recreation and 90 minutes of outdoor recreation daily (except weekends) with other inmates.  In contrast, inmates in Phase I must exercise alone.

During the course of this progression, Pham was transferred from ADX's "H Unit" after only 30 months.  That required approval from multiple levels of BoP and Department of Justice ("DoJ") officials, as well as from law enforcement personnel monitoring him and his communications (as FBI agents read all of his correspondence and are parties to his telephone calls).

Pham is also an orderly in the laundry – a select assignment – and gets paid for that employment.  He is permitted to possess an MP3 music device (a privilege afforded only two units), and has been approved for a tablet that enables him to read e-books, watch movies, and

---

[5]  Pham's family members (wife, children, parents, siblings) reside in Great Britain. He has not seen them since he was extradicted to the United States in 2015.  Finances and obtaining visas are obstacles to traveling to Colorado. With the exception of a single legal visit, and one remote proceeding attended by counsel, he has not had a visit during the past five years. Moreover, as a result of the S.A.M.'s restrictions, relatives living in Denver – his aunt and cousin (her son) – have not been granted permission to visit because they are not considered immediate family.  As a result, Pham depends on phone calls to maintain contact with his family.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 10 of 44

perform other functions (without internet access).

ADX does not have any further step-down levels at the facility. He has made immense progress considering the obstacles created not only by the solitary confinement at ADX, but also the S.A.M.'s that further isolate him, as well as the stress and restrictions attendant to the three years of the Covid-19 pandemic (which at ADX eliminated even the modest socializing accommodations Pham had earned in the successive step-down programs).

Pham concludes his letter by reiterating that he "hold[s himself] absolutely responsible[,]" but with the "hope that the American people see me not only with so many faults but also see that I am capable of realizing my own faults an capable of change and rehabilitation." Exhibit 1, at ¶ 12.

Nor is Pham without skills upon his eventual reentry to society. He has graphic arts and animation training for which he earned degrees in the U.K., *see* Revised PSR, at ¶ 77, and has a history of legitimate employment. *Id*., at ¶¶ 79-80. In fact, prior to his regrettable involvement in the offense conduct, "he was the main financial provider for his household in the United Kingdom." *Id*., at ¶ 81.[6]

Reclamation is possible, and Pham is serving as an example. The reviewer of *Austen on Corrections and Parole* observed that parole boards, in "deciding whether to free someone" too often concentrate only on "the crime the person committed, not their time in prison, not their rehabilitation or likelihood to reoffend." Lennon Review (*see* **ante**, at 2).

Describing the author's point of view, the reviewer concludes that "[d]espite the uncertainty and arbitrariness of the parole process he uncovers, Austen still believes in this system, and in second chances, writing that he's 'more convinced now than ever that parole is

---

[6] In addition, Pham is now 41 years old, and defendants older than 41 years of age present a dramatically reduced danger of recidivism from those in their 20's. United States Sentencing Commission, *Recidivism of Federal Offenders: A Comprehensive Overview Report-At-A-Glance*, at 2, available at https://bit.ly/3hRwnPN ("*Recidivism of Federal Offenders*"). *See also United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. 2005); United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, December 2017, at 3, available at bit.ly/391akz6; Daniel Glaser, *Effectiveness of A Prison and Parole System*, 36-37 (1964); P.B. Hoffman & J.L. Beck, *Burnout – Age at Release from Prison and Recidivism*, 12 J.CRIM.JUST. 617 (1984).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 11 of 44

central to a correction, to a change in the country's values.'" *Id*.[7]

**B.** ***Pham Had an Extraordinarily Traumatic and Unstable Childhood***

Pham's personal history of repeated trauma – first as a refugee shuttling from temporary displacements to, finally, a stable home in England, and then, as a child abused physically and otherwise by his parents, as well as ostracized as an outsider in England – unfortunately launched him on a familiar, predictable, and desultory trajectory that culminated in his recruitment into toxic terrorist ideology.

---

[7] In 2020, the Second Circuit, in the context of discussing the virtues of the long-discontinued federal parole system, and while affirming on direct appeal a 55-year sentence in *United States v. Portillo*, 981 F.3d 181 (2d Cir. 2020) – an EDNY MS-13 quadruple-homicide case in which the defendant was ineligible for the death penalty because he was 15 years old at the time of the offense – explained that the case "serves as a classic illustration of the unfortunate consequences of the congressional decision to eliminate parole in the Sentencing Reform Act of 1984." *Id*., at 182 (footnote omitted).

The Court in *Portillo* pointed out that the parole process "reflects an aggregate assessment of not only the prisoner's conduct in prison but also his or her prospects for leading a law-abiding life upon release." *Id*., at 185. The Court further observed that

> if parole were available, there would be two consequences worth considering. On the one hand, [appellant]'s custodians would have an effective means of encouraging his observance of prison regulations, resulting from his awareness that misconduct would jeopardize any hope of parole. On the other hand, [appellant] would have an incentive to obtain an education, participate in rehabilitative programs, and just possibly demonstrate, at some point in the future, that he has matured beyond the seemingly incorrigible person of his youth to become an adult whom parole authorities might reasonably think should be permitted to rejoin society.

*Id*., at 187. *See also* Charles Fried, "A Failure of the Imagination," *Inquest* (August 12, 2021), available at inquest.org/charles-fried-a-failure-of-the-imagination/ ("[a] death sentence changes the offender into a corpse, while imprisonment at least gives the offender a chance to reflect, to learn and become useful to himself and others, to rejoin the free community").

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 12 of 44

Yet Pham, while conscious of that adverse past, has now transcended that history, and, committed to moving forward in a positive direction, concentrates on the positive features of his relocation, writing that

> I can never thank the British people enough for accepting my family and I into the United Kingdom.  It was due to their public support and their humanitarian values that made it possible for my family and I to be transported to London from Hong Kong via a passenger jet, and providing us with full welfare and housing along with all citizen rights.

Exhibit 1, at ¶ 3.

1.  *Pham's Personal History and Background*

The profound trauma Pham has experienced in his lifetime began even before his birth as his pregnant mother, his father, and his mother's family sought to flee war torn Vietnam in 1983 by embarking on the harrowing journey across the South China Sea to Hong Kong.  *See* Revised PSR, at ¶ 64;  2016 Letter from Huyen Thu Pham, attached hereto as Exhibit 2-D[8]; 2016 Letter from Pham Thanh Hai and Hoang Thi Binh, attached hereto as Exhibit 2-E.

As the Revised PSR states, Pham "reported that during his infancy, his family (including his parents, maternal grandparents, uncles and aunts) left Vietnam in a fishing boat and navigated waters for two months until arriving in Hong Kong."  Revised PSR, at ¶ 64.  Pham's father, Pham Tranh Hai, recalled that "[a]t times, we faced incredible angry winds and waves – we could not imagine how we could survive.  During the days and months on the ocean, we did not have enough congee or food.  We spent more than three months to reach Hong Kong[.]"  2016 Letter from Pham Thanh Hai and Hoang Thi Binh (Exhibit 2-E).

It was "a treacherous journey."  2023 Letter from Huyen Thu Pham, attached hereto as Exhibit 9.  Indeed, as described in this section, Pham's family was among the "almost two million Vietnamese [who] risked their lives to flee oppression and hardship after the Vietnam

---

[8]  All letters from 2016 were submitted as exhibits to Pham's initial April 22, 2016, sentencing submission (ECF# 113) and labeled Exhibits A through K.  Those letters are attached hereto as part of Exhibit 2.  Accordingly, they will be referenced throughout this letter as attachments to Exhibit 2, *i.e.*, Exhibit 2-C.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 13 of 44

War, in one of the largest mass exoduses in modern history."[9]

Their exit from Vietnam was extraordinarily precarious for multiple reasons.  For instance, due to a lack of proper equipment for an oceanic voyage and the urgency of their escape, Pham's family, like other boat refugees, ventured out on a Vietnamese fishing boat unsuitable for the rough seas.  *See* Brian F. Licuanan, *The Psychological Impact of the Boat Experience on Vietnamese Refugees*, (2010), at 8-9 (Ph.D. dissertation, University of Oklahoma) ("*Psychological Impact of the Boat Experience*"), available at https://bit.ly/3UFgBM6.

Also, families and civilians often possessed little or no maritime skills, making them vulnerable to the "rough weather of the seas" and "Thai pirates patrolling the waters."  *Id*., at 9.[10]  As a result of the combination of these deficits, as well as food and water scarcity, survivors of this voyage "estimated the death rate to be as high as fifty percent."  *Id*., citing Hien Duc Do, *The Vietnamese Americans* (Greenwood Press:  1999).

The personal accounts recited in *Psychological Impact of the Boat Experience* are both harrowing and tragic.  *See, e.g., id*., at 11-12, *citing* Mary Terrell Cargill & Jade Quang Huynh, *Voices of Vietnamese boat people:  Nineteen narratives of escape and survival*, (McFarland & Company, Inc.:  2000).

As the Revised PSR states, "once in Hong Kong, Pham and his parents were placed in a refugee camp where they lived until 1991, when he was seven years old."  Revised PSR, at ¶ 64.  While "[t]he rest of the family was allowed to travel to Australia, [] defendant and his parents were required to stay in the camp in Hong Kong because his father engaged in a fight, precluding them from being permitted to leave."  *Id.*

Though Pham's parents worked hard in a nearby factory, they experienced severe poverty.  Revised PSR, at ¶ 64.  While living in the camp, Pham did not attend school and was largely unsupervised and "adventurous" while his parents were working.  *Id.*  Mr. Pham's parents describe "[l]ife in the refugee camps at that time []as extremely complicated."  2016 Letter Pham

---

[9] These statistics are from the oral history project, "Vietnamese Boat People," available at https://www.vietnameseboatpeople.org/.

[10] Vietnamese boat refugees often encountered pirates in the Gulf of Thailand.  Their boats were looted, and the groups were physically and sexually assaulted.  The violence, especially against women, was egregious, and included reports of "women raped 30 times over the course of three or four days."  John Burgess, Pirates Plaguing Vietnamese Refugees, *The Washington Post*, September 2, 1980, available at https://wapo.st/3UHwUIt.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 14 of 44

Thanh Hai and Hoang Thi Binh (Exhibit 2-E).

Pham's younger sister, Huyen Thu Pham – who was born while the family lived in the refugee camp – shares that their "mother and father said there was great hardship and hunger during that period of their lives." 2023 Letter from Huyen Thu Pham (Exhibit 9).

In 1997, a Human Rights Watch report criticized the "conditions in the camps where [Vietnamese refugees] were detained." Human Rights Watch, *Hong Kong Abuses Against Vietnamese Asylum Seekers in the Final Days of the Comprehensive Plan of Action*, Vol. 9, No, 2 (1997), available at https://www.hrw.org/legacy/summaries/s.china.9612.html. In a 1992 court hearing, a refugee testified that those in the camps "had chemicals poured on their heads, were forced to sleep on the floor for a week without blankets, suffered sickness and hunger, and had no fans or ventilation in their accommodation." "HKFP Lens: Inside an Abandoned Hong Kong Detention centre for Vietnamese refugees fleeing war," *Hong Kong Free Press* (March 15, 2023), available at https://bit.ly/4b9IGkk.

In 1991, after years of waiting, Pham and his family were finally granted permission and the necessary documents to resettle in England. *See* Revised PSR, at ¶ 65. The family was placed "in an inner London area." 2023 Letter from Huyen Thu Pham (Exhibit 9). Though Pham was provided the basic necessities, his family struggled financially despite the fact that his parents worked very hard. *Id.* His sister Huyen Thu recalls that "[o]ur parents did their best, but we were very poor, and most of our clothes were from goodwill growing up." *Id.*

Ms. Pham poignantly recounts that "[a]lthough we finally had our freedom, we felt like outsiders growing up as English was not our first language." *Id.* Ms. Pham attributes the combination of her family's poverty and being seen as "outsiders" as the cause of the Pham children experiencing a lot of bullying by their peers while in school. *See id.* She reports that in that context, Pham has "always been protective of [his sister] and has stood up for me against bullies," *id.*, even as the young Pham experienced bullying himself.

For example, Ms. Pham recalled that "[i]t was especially hard on Minh as he was older and so he stood out among his peers as being different. On one occasion when Minh was ten years old, he was picked on by three classmates for wearing what they perceived to be pyjamas to school." *Id.*. Indeed, school was new to Pham. He "did not attend school while living in the camps, and his parents, due to their own lack of education, did not provide him with any home schooling." Revised PSR, at ¶ 64.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 15 of 44

Ms. Pham recounts that

> Minh was involved in a scruffle, and the incident was reported to
> our parents as a formality.  Although Minh's teacher was
> sympathetic about the incident, our parents were very hard on him.
> They did not fully understand the situation due to the language
> barrier and had simply assumed Minh was being reported for bad
> behaviour.

2023 Letter from Huyen Thu Pham (Exhibit 9).

Both Pham and his sister note that their parents were strict disciplinarians, particularly
when it came to doing well in school.  *See id*;  Revised PSR, at ¶ 66.  In addition to experiencing
bullying at school, Pham also "reported experiencing verbal, emotional, and physical abuse from
his parents, and 'received no affection from them.'"  Revised PSR, at ¶ 66.  This abuse
"continued through his teenage years."  *Id*., at ¶ 67.  *See* BoP Psychology Services Diagnostic
and Care Level Formulation Report ("*2020 BoP Psychology Report*"), December 9, 2020 (a copy
of which is attached hereto as Exhibit 6), at 2.

For example, the Revised PSR reports that

> explained that his parents were raised to be strict disciplinarians
> and expected him to behave a certain way.  The defendant stated
> that his parents instilled discipline by hitting him with electrical
> cords and employing other means of physical punishment.  The
> defendant recalled an occasion when his father, as a means of
> punishment, forced his head in a toilet and flushed it, almost
> drowning him.

Revised PSR, at ¶ 66.

Pham's good friend, Lubna Speitan, writes that she was "[s]ometimes [] able to press and
pry out of him the violence and abuse he tolerated from his Father. I was very unsettled that he
was living in such circumstances, yet understood that was all he knew and wouldn't part or
remove himself from his family home in a negative manner."  2016 Letter from Lubna Speitan,
attached hereto as Exhibit 2-G.

Pham's sister explains that "[l]ike many Asian households, our parents adopted the tiger
parenting method which Minh really struggled with as he was not very academic but gifted in the

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 16 of 44

Arts.  Sadly, this caused a lot of friction between our parents and Minh as they could not see him having a successful career in this field."  2023 Letter from Huyen Thu Pham (Exhibit 9).

While literature suggests that "strong emotional family support helps refugee children adapt to their new environment," Pham's household environment evidently lacked that element. Rita Chi-Ying Chung, et al., *Vietnamese Refugees' Levels of Distress, Social Support, and Acculturation:  Implications for Mental Health Counseling*, 22 JOURNAL OF MENTAL HEALTH COUNSELING (Apr. 2000), at 150, available at https://bit.ly/44l1CdA.  *See also id.* ("[s]ignificant adults have a strong impact on Vietnamese refugee adolescents' psychosocial development").

Moreover, Pham's parents were also boat refugees and endured (and continued to suffer) the same traumas as Pham himself, perhaps to an even greater extent as they were Pham's caretakers and, as adults, fully conscious of the experience.  Among those refugees who survived, many have experienced severe forms of mental distress, including survivor's guilt, anxiety, and depression.  During the period of resettlement, feelings of anxiety and depression surrounding assimilation into a new culture, language, and education system were common within refugee families.  *Psychological Impact of the Boat Experience*, at 17-18.

Research has also established the understandable "spillover" effect of trauma from parent to child.  Thus, the "intergenerational transfer of trauma," manifests in myriad forms ranging from "harsh punishment to an inability to connect emotionally with their children due to the horrors they once faced."  Katrina Nguyen, "Vietnamese Boat People: Stereotype and PTSD," *Cold Tea Collective* (October 23, 2017), available at https://bit.ly/44oYywP.

The arc of Pham's development also conforms with the impact of childhood trauma generally:  "'Childhood trauma is a huge factor within the criminal justice system,' said Christopher Wildeman, a sociologist at Cornell University and co-director of the National Data Archive on Child Abuse and Neglect. 'It is among the most important things that shapes addictive and criminal behavior in adulthood.'"  Audra D.S. Burch, "A Gun to His Head as a Child.  In Prison as an Adult," *The New York Times* (October 15, 2017), available at https://nyti.ms/2kO9z8Z.

As a result of the overwhelming tensions at home, Pham recalls that as a teen "he did not have any plans for his future at that time and was feeling very depressed[,]" which likely caused him to "start[] abusing drugs, frequenting nightclubs with friends, and finding himself engaging in a lifestyle that was detrimental to him."  Revised PSR, at ¶ 67.  *See also id.*, at ¶ 75 (detailing Pham's considerable abuse of multiple controlled substances during that period).

Despite these manifold struggles, Pham attended to college to study graphic design.  *Id.*,

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 17 of 44

at ¶ 77.  While in college, "a friend who was of the Muslim faith gave him religious books about Islam which he found interesting.  In 2004, during his second year of college and with the mentor by his friend who took him to a mosque, [Pham] converted to Islam."  *Id.*, at ¶ 67.  That initially yielded beneficial results, as following his conversion, Pham "stopped using drugs, drinking, smoking and clubbing, as well as refrained from eating pork."  *Id.*, at ¶ 67.

At first, Pham's family did not approve of his conversion.  *Id.*  According to his sister, "[o]ur parents took the news very badly and their relationship with Minh became strained."  2016 Letter from Huyen Thu Pham (Exhibit 2-D).  Friend Lubna Speitan wrote that she was "extremely troubled to hear of [Pham's] Fathers response.  Minh's Father was furious, in a rage he had torn up the Qu'ran and threw it at Minh, if I remember correctly he may have been physically violent also (this was sadly a normality at home for Minh)."  2016 Letter from Lubna Speitan (Exhibit 2-G).

Pham's cousin, Lynda Tran, thought "it was very courageous that despite what my family's misconceptions were, he calmly and patiently accepted what they had to say and then tried to explain some of the misconceptions."  2016 Letter from Lynda Tran, attached hereto as Exhibit 2-F.  Ms. Tran explained, "We come from a very traditional Vietnamese family so it was a difficult path for Minh's conversion to be accepted . . . [but,] Minh overcame this with his loving, caring and honest nature. The family then saw his decision in a different light."  *Id*.

Indeed, Pham states that "eventually [his family] accepted [his conversion]."  Revised PSR, at ¶ 67.  Largely because, as his sister explains, "[d]uring Minh's transition as a Muslim, I noted many changes in him, he was more patient, extremely charitable and much more family oriented."  2016 Letter from Huyen Thu Pham (Exhibit 2-D).

Nonetheless, "[i]n spite of the many struggles and tribulations [Pham] had faced both growing up as a refugee in London and the abuse he tolerated (without retaliation) from his Father, he turned out to be one of the kindest, honest, most sincere, trustworthy and respectful people I have ever known."  2016 Letter from Lubna Speitan (Exhibit 2-G).

Pham's parents and siblings remember that Pham always took time to help his three younger siblings with their homework and earned their love and respect through his constant support.  *See* 2016 Letter Pham Thanh Hai and Hoang Thi Binh (Exhibit 2-E).  Pham's younger sister recalled that he "stood up for me against . . . our parents whenever they were being old fashioned.  Minh fought for my freedom from our parents in ways that he never got to enjoy as a child and for that I will always be grateful to him."  2023 Letter from Huyen Thu Pham (Exhibit 9).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 18 of 44

Pham was also "much loved by the elders in our Vietnamese community due to his respectful ways and had many friends." *Id. See also* Letter Pham Thanh Hai and Hoang Thi Binh (Exhibit 2-E) (noting that Pham "loved and helped his friends in need, wholeheartedly no matter how difficult, including our neighbors[.]"). Long-time friend, Tai Hung Hua wrote that Pham's "respect towards his elders and others made him. . . someone who others would also look up to and admire. He made me want to be a better person as he would always do small acts of kindness such as assisting my grandmother carry her shopping home whenever he saw her." 2016 Letter from Tai Hung Hua (attached hereto as Exhibit 2-I).

Friends and family describe Pham as "sincere, loyal and devout," 2023 Letter from Eema Nawaz (wife), attached hereto as Exhibit 7, as well as "wise, generous, peaceful and caring," 2016 Letter from Tai Hung Hua, attached hereto as Exhibit 2-I. But they worried that "[h]e always saw the best in people and would often take people at face value to his detriment and it got worse when he converted to Islam." 2023 Letter from Huyen Thu Pham (Exhibit 9). Ms. Speitan observed that "[Minh] was a very impressionable young man; one that would be better suited to receiving than imposing orders . . . he was easily influenced due to his naive, child-like innocence and trusting nature." 2016 Letter from Lubna Speitan (Exhibit 2-G).

Ms. Pham shares a story demonstrating why she was "concerned that Minh was becoming too charitable and that he was being taken advantage of." 2023 Letter from Huyen Thu Pham (Exhibit 9). As she recounts,

> [Pham] once befriended a Caucasian man he had met in his local mosque who had been disowned and made homeless by his family for converting to Islam. Upon hearing his plight, Minh invited the stranger he barely knew to live with him until he was able to get back on his feet. I was very shocked Minh had opened his doors to a stranger and expressed my concerns to Minh who shrugged it off. Sadly, my concerns were proven correct, and the stranger disappeared with Minh's money and his SLR camera that he relied on for income through his work as a graphic designer.

*Id*.

His sister has encapsulated Pham's personality as follows: "Minh has always been a simple and gentle soul and perhaps he was never destined for greatness but he made a lasting impression on those that were lucky enough to cross his path." 2016 Letter from Huyen Thu Pham (Exhibit 2-D).

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 19 of 44

 2. *The Impact of Pham's Imprisonment Upon His Wife and Children*

In March 2010, Pham married Eema Nawaz Chaudary, and together they are parents to 12 year-old daughter Asiyah and 11 year-old son Ilyas. Revised PSR, at ¶ 68. Because Mr. Pham has been incarcerated since 2010, he has missed the entirety of his children's growth into preteens and "has so much to make up for with his children and be truly present in their lives." 2023 Letter from Eema Nawaz (Exhibit 7).

Ms. Nawaz writes that "[i]t's been over a decade of separation and an arduous journey for us all." *Id*. Nonetheless, Pham does "his best to be supportive. He has written countless letters, made innumerable phone calls and sent gifts to his children – doing what he can (in his capacity), to maintain a connection, as a father and a husband – from a High Security Penitentiary Prison." *Id*. Nonetheless, parenting while incarcerated presents immense challenges.

Pham's daughter Asiyah remembers seeing "him [when she was] an infant – so the memory is hazy. . . [but] I'd really like to get to know him better after all these years . . .there is never enough time [for our calls] and we always get cut off mid conversation on the landline." Letter from Asiyah and Ilyas Amin, attached hereto as Exhibit 8. Despite not recalling a time when her father was present, Asiyah and her brother Ilyas miss their father. Friend Lubna Speitan lamented that Pham's "wife and children miss him terribly. I almost burst into tears after sitting with his daughter not too long ago when she told me she felt sad, I asked her why and she replied, 'I really miss my Abu, but when he comes home I will be soooo happy.'" 2016 Letter from Lubna Speitan (Exhibit 2-G).

Ms. Speitan further expressed her sadness that Pham "has made himself a beautiful family. He finally achieved what he always strived for . . . It really breaks my heart that he is now unable to have the chance to be there with them and share such precious and irreplaceable years with them." *Id*.

Pham is deeply missed by his family and friends. *See* 2023 Letter from Huyen Thu Pham (Exhibit 9); 2016 Letter from Tai Hung Hua (Exhibit 2-I); 2016 Letter from Lubna Speitan (Exhibit 2-G). His absence "has left a huge hole in our hearts, and we feel the emptiness most when we are together as a family with Minh's wife and his two young children who we see regularly." 2023 Letter from Huyen Thu Pham (Exhibit 9). Ms. Pham has "often caught [their] mother fighting back tears during these gatherings as it is a devastating reminder that Minh is not here to share in these precious family moments with [them]." *Id*.

Today, Pham fully realizes his agonizing personal journey, marked by difficulties he did not create, did not excuse his subsequent misbehavior: "I want to also say sorry to all the victims

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 20 of 44

of terrorism, I can never compare my trauma to their trauma and suffering, the grief, the mental trauma, the physical as well as the emotional wounds that may never heal and I really hate myself for associating with such cause."  Exhibit 1, at ¶ 10.

In his process of "unlearn[ing]" extremist ideologies – Pham describes his offense conduct as "a massive disservice to Islam" and his family, *id*., at ¶ 2 – he "can never and will never again support lawlessness, anarchy and terrorism.  I have children and family of my own and desire security for them." *Id*., at ¶ 8.  As a result, he has "realised now that there is many safe and lawful ways to express myself without putting myself and others in danger – I do not believe Al-Qaida is ever capable of making any positive change, in fact they are scaring people from Islam and Muslims through their mindless and wicked attacks."  *Id*., at ¶ 9

Nor is Pham's evolution merely internal.  His wife Eema Nawaz has noticed that Pham "has dispelled the clouds and phantoms of that old mentality that filled his mind with darkness and kept him in ignorance of his real duties and true interests." 2023 Letter from Eema Nawaz (Exhibit 7).

### 3.     *Pham Has a Supportive Family to Assist Him Upon Reentry*

As Pham's family "long[s] to have him back into our lives again,"daughter Asiyah believes that "[w]ith good surroundings and company, I know my father won't step foot on the path that led him to prison."  Letter from Asiyah and Ilyas Amin (Exhibit 8).  Asiyah continues, "I think he'll make a positive contribution enriching and rebuilding our broken world and shine his light on humanity if given the chance."  *Id*.

Asiyah's commitment is echoed by her mother, who adds, "Minh's supportive and loving family will also make sure he is never led astray.  It is a solemn promise." 2023 Letter from Eema Nawaz (Exhibit 7).  For Pham's wife, "[n]o words can describe the effects of continued incarceration."  *Id*.  Pham's daughter pleads, "Please give him a chance to be with us and please give us an opportunity to experience what it's like to have a father."  Letter from Asiyah and Ilyas Amin (Exhibit 8).

### C.     *Extended Imprisonment Would Be Harmful to Pham's Mental Health*

Undoubtedly, Pham's experience first as a "boat refugee," followed by a childhood in  a refugee camp and then immersion in an entirely new culture (and language), has shaped his development dramatically.  *See* Niveen Rizkalla, *et al*., *Children Are Not Children Anymore; They Are a Lost Generation:  Adverse Physical and Mental Health Consequences on Syrian Refugee Children*, 17 INT'L J. OF ENVTL RES. AND PUB. HEALTH 8378 (November 2020),  available

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 21 of 44

at https://bit.ly/3xVENRE, 32 ARCHIVES OF PSYCHIATRIC NURSING 885 (2018), available at https://bit.ly/3y6QV20.

It has also almost certainly contributed to the PTSD from which he suffers, and which was exacerbated by his long stretches of solitary confinement at MCC and ADX. That further amplifies the negative impact of his prison experience, and will continue to do so during the course of his incarceration.

1.      *Pham Has Been Diagnosed as Suffering from PTSD*

In December 2020, Pham, who turned 41 years old in February 2024, was diagnosed by a Bureau of Prisons ("BoP") psychologist with Post-Traumatic Stress Disorder ("PTSD"). *See 2020 BoP Psychology Report*, December 9, 2020 (a copy of which is attached hereto as Exhibit 6), at 2.

That assessment was based on Pham's "responses to items on diagnostic testing." *Id.*, at 1. The testing was designed to examine any "symptomology related to trauma he has experienced throughout his lifetime (including childhood)." *Id.*, at 2. In response, Pham "showed elevated scores" that led to the conclusion that "his results are likely interpretable and representative of his current clinical experience." *Id*.

The immediate triggering event for the onset of Pham's PTSD symptoms was the prospect of being returned to New York after one of the counts of conviction was vacated pursuant to *United States v. Davis*, 588 U.S. 445, 139 S. Ct. 2319 (2019). Thus, the *2020 BoP Psychology Report* notes, at 2, "most recently, [Pham] began expressing symptoms consistent with a trauma diagnosis. Symptom report was timely related to the possibility of returning to NYM where he detailed experiencing perceived unsatisfactory living conditions."

The *2020 BoP Psychology Report* further observed that Pham's test "results indicated that he showed elevated scores in multiple affective categories, such as anxiety and depression. Individuals who score high in these areas typically experience heightened arousal, physical tension, sleep disturbances, and frequent worrying or nervousness." *Id*.

In addition, Pham's "profile also indicated that he experiences elevated psychological symptoms directly related to at least one traumatic event." *Id. See also id.*, at 3 (Pham "is likely experiencing significant intrusive symptoms related to at least one traumatic experience and may exhibit externalized behaviors in order to cope with his instable emotion regulation abilities").

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 22 of 44

2.      *The Ordeal of Confinement on MCC's 10-South*

Pham identified his prior experience on MCC's 10-South unit as the "one traumatic event" that serves as the catalyst for his PTSD symptoms: "[s]pecifically, [Mr. Pham] discussed experiencing 'extreme solitary confinement' and 'torture' in '10 South[.]'" *Id.*, at 3.

During that period he was also subject to the S.A.M.'s that precluded contact with the outside world except with his counsel and restricted, monitored telephone contact with his immediate family, and further aggravated his isolation. *See, e.g.*, Aviva Stahl, "Prisoners Endure A Nightmare 'Gulag' In Lower Manhattan, Hidden In Plain Sight," *Gothamist* (June 19, 2018), available at: https://bit.ly/337EKm7;  Joseph Goldstein, "Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantánamo Bay," *The New York Times* (January 23, 2017), available at: https://nyti.ms/30gmSEL.

Judge Garaufis described the desolate existence on 10-South as follows:

> Unit 10 South is considered to be the most secure housing
> available at any [BoP] facility in the New York City metropolitan
> area, and is generally reserved for terrorism suspects, detainees
> who have shown themselves to be a danger to other inmates and/or
> prison guards, and cooperating witnesses.  Detainees in 10 South
> are confined to cells with blacked out windows 23 hours per day
> during the week, and round-the-clock on weekends.  Access to
> radios, and reading materials, including legal papers, appear in
> practice to be quite limited . . .  Meals are received on trays that are
> pushed through a narrow slot in the cell door.

*United States v. Basciano*, 369 F.Supp. 2d 344, 347 (E.D.N.Y. 2005) (internal citations omitted).

Judge Garaufis, in releasing the defendant in *Basciano* pending trial because the Court would not tolerate the defendant's "indefinite placement in solitary confinement" as a pretrial detainee, further noted that on 10-South telephone privileges are "nonexistent" and "contacts with other human beings are sharply curtailed." *Id.* at 351-53.  *See also United States v. Warsame*, 04 Cr. 29 (JRT), Memorandum Opinion On Sentencing (D. Minn. Aug. 24, 2009) (granting a downward departure based in part upon "the difficult conditions of Warsame's confinement" which "were significantly more onerous than the conditions faced by the ordinary

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 23 of 44

pretrial detainee").[11]

In *Gallina v. Barr*, 988 F.3d 137 (2d Cir. 2021), Judge Pooler in dissent declared that "[p]rolonged solitary confinement is one of the true horrors of the modern-day penal system." 988 F.3d at 148 (Pooler, J., *dissenting*). *See also id.* ("there is not a single study of solitary confinement wherein nonvoluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects") (internal quotation marks, brackets, and citations omitted), *quoting Williams v. Sec'y Pa Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017). *See also* Craig Haney, *A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons*, 35 CRIM. JUSTICE & BEHAVIOR 956 (2008) (describing "the overall consensus that has emerged on the harmfulness of long-term, punitive isolation and the risks to prisoners who are subjected to it").[12]

---

[11] Clearly, the extended solitary confinement that placement in the SHU entails is not in compliance with the United Nations' *Minimum Rules on the Treatment of Prisoners*, dating from 1955, were updated in 2015 to comprise what are now referenced colloquially as the "Mandela Rules." *See* www.solitaryconfinement.org/mandela-rules. Rule 43(a) prohibits "[i]ndefinite solitary confinement[,]" while Rule 43(b) prohibits "[p]rolonged solitary confinement." *Id.* Rule 44 defines "prolonged solitary confinement" as "in excess of 15 consecutive days." *Id. See also* United Nations Human Rights Office of the High Commissioner, "United States: Prolonged solitary confinement amounts to psychological torture, says UN expert," February 28, 2020, available at https://bit.ly/4a4yZCu .

[12] *See* Paul Hond, "The Trials of Solitary Confinement," *Columbia Magazine* (Spring/Summer 2022), available at bit.ly/3CMCVKV (discussing three papers published by Columbia University's Justice Lab covering different aspects of solitary confinement, "including its physical and mental toll, its relation to prison overcrowding, and its role in the social dynamics of prison life." *Id.* The papers "'found strong evidence of psychological distress as well as a lot of material hardship, including hunger, exposure to extreme heat or cold, and sleeplessness,' says [Bruce] Western, who is the co-principal investigator of the study with Jessica Simes, an associate research scholar at the Justice Lab and a sociology professor at Boston University." *Id.* For Kendra Bradner, "director of the Justice Lab's project on probation and parole reform, who along with Western and Simes conducted the cellblock interviews[,]" her "'enduring impression is of an incredible, almost impossible-to-capture experience of deprivation and harm'"). *See also* Hannah Pullen-Blasnik, Jessica T. Simes, Bruce Western, "The population prevalence of solitary confinement," *Science Advances 7* (November 26, 2021), available at bit.ly/3ywOoLX ("[e]xtended solitary confinement has been found to be especially harmful to mental health, associated with anxiety, depression, impulse control disorder, social withdrawal, lethargy, apathy, self-harming, and suicidal behavior") (footnote omitted); Bruce Western,

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 24 of 44

Nor, as discussed **ante**, was his confinement on 10-South the only trauma Pham has experienced.  As the *2020 BoP Psychology Services* noted, at 3, Pham "endorsed having experienced a high number of traumatic events in his lifetime, developed distress related symptoms around the time of at least one traumatic event, and experienced dissociative symptoms around the time of the event."  Exhibit 6.

Reflecting Pham's personal history, the *2020 BoP Psychology Report* continued that "he likely experienced abuse and/or neglect from a parental figure[,]" and that "[t]hese negative experiences with a parental figure during his development likely resulted in insecurity, fear of abandonment, and/or emotional avoidance in his interpersonal interactions."  *Id.*, at 3.

Consequently, "with the thought of potentially returning to [MCC] for a new trial, he described the surfacing of intrusive symptoms, avoidance behaviors, negative alterations in cognitions and mood, and marked alterations in arousal and reactivity."  *Id.  See also id.*, at 2 (Pham "experiences frequent, intrusive posttraumatic symptoms such as nightmares, flashbacks, and distressing thoughts and memories related to the event").

### 3.    *The Manifestations of Pham's PTSD*

As the *2020 BoP Psychology Report* notes, Pham "endorsed items suggesting that he avoids stimuli that remind him of the event so as to deter these experiences and symptoms."  *Id.*, at 3.  The *2020 BoP Psychology Report* concludes, Pham "is experiencing posttraumatic symptoms, many of which are resulting in emotional, interpersonal, and cognitive impairment."  *Id..*  As a result, "[h]e exhibits instability in his sense of self and his ability to interact with others.  These experiences often lead to depressive or other instable affective states."  *Id.*

In that context, important new research has confirmed that, according to Dr. Daniela Schiller, co-author of a November 2023 study, when someone suffers an episode of PTSD, "[t]he brain doesn't look like it's in a state of memory;  it looks like it is a state of present experience." Ellen Barry, "Brain Study Suggests Traumatic Memories Are Processed as Present Experience," *The New York Times* (November 30, 2023), available at https://nyti.ms/4aZjNba.  *See also id.* (Dr. Ruth Lanius, the director of PTSD research at the University of Western Ontario who was not involved in the study, said. "Traumatic memories are not remembered, they are relived and re-experienced");  Ofer Perl, Or Duek, Daniela Schiller, *et al.*, *Neural patterns differentiate*

_____

Jessica T. Simes, and Kendra Bradner, "Solitary confinement and institutional harm," *Incarceration* (March 2022), available at bit.ly/3ywKSkG;  Bruce Western, *Inside the Box: Safety, Health, and Isolation in Prison*, 35 J. OF ECON. PERSP. 1 (Fall 2021), available at bit.ly/3CIRPlf.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 25 of 44

*traumatic from sad autobiographical memories in PTSD*, NATURE (November 30, 2023), at 2227, available at https://go.nature.com/3Uqj0ZI.

PTSD's effects are also enduring and variable. Another recent study found that even decades later "[a] significant portion of the [Vietnamese American] population lives with depression due to experiences of war trauma and resettlement challenges." Lay Kodama, Brie Williams, and Nathaniel P. Morris, *Prioritizing Diversion and Decarceration of People With Dementia*, AMA J. ETHICS (October 2023), available at https://bit.ly/3WgLtDX.

In addition, Pham is currently classified by BoP at Care Level I. As a result, he does not receive any additional mental health assistance beyond the minimum provided by the utterly inadequate quality of BoP's mental health care.

> D.     ***Pham Has Spent His Entire Time In U.S. Custody (More Than Nine Years) In Harsh Conditions at MCC and ADX, and Through the Covid-19 Pandemic***

> 1.     ***Pham's Extended Confinement at MCC***

Pham spent 25 months at MCC – the entirety of his tenure there – in solitary confinement and subject to S.A.M.'S on the notorious 10-South. Perhaps no description of the conditions there could be more illustrative than the fact that once a senior Department of Justice official (separate from the Bureau of Prisons) – Deputy Attorney General Lisa O. Monaco – visited the facility during Summer 2021, it was almost immediately thereafter ordered *closed*. *See* Benjamin Weiser, "Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died," *The New York Times* (August 26, 2021), available at nyti.ms/3rm6bTt (""[t]he decision comes just weeks after the deputy attorney general, Lisa O. Monaco, visited the jail in order to get a first hand look at its operations, 'given ongoing concerns,' as the Justice Department said at the time").

Also, Tyrone Covington, (at the time) the president of the local union that represented MCC employees, told *The New York Times* "[w]e have called for a long time to have the facility fixed and upgraded for everyone to be safe, staff and inmates alike." *Id*.

As discussed **ante**, at 22-24, within that environment, 10-South was the most isolated and the bleakest location. The deplorable conditions at the MCC included filth, squalor, and vermin infestation that the Courts recognized and, ultimately, even DoJ conceded rendered the facility unfit for human habitation.

At an April 2021 sentencing, Judge McMahon commented on the woefully inadequate level of care MCC and Brooklyn's Metropolitan Detention Center ("MDC") provide. For

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 26 of 44

example, she responded to the defendant's attorney's description of conditions his client had endured in pretrial confinement by proclaiming that

> I wish that the Attorney General, whoever, head of the Bureau of Prisons and the leader of the Congress, would have heard that presentation.  The single thing in the five years that I was chief judge of this court that made me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC, especially at the MCC and the MDC, . . .  So there is no continuity, there is no leadership, there is no ability to get anything done.

*See* Sentencing Transcript, *United States v. Days*, 19 Cr. 619 (CM) (ECF # 35), (S.D.N.Y., April 29, 2021), at 19.  *See also* Shayna Jacobs, "Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions," *The Washington Post* (May 7, 2021), available at wapo.st/341MTWy.

Judge McMahon added that "[i]t is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *Id*.  As Judge McMahon pointed out, a federal detainee "shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons." *Id*., at 20.

### 2.      *Pham's Decade at ADX*

Pham has been a model inmate at every stage of his incarceration (including while in general population in the U.K.).  At ADX, that has continued, as his accomplishments, set forth **ante**, at 7-11, attest.  However, ADX, like the rest of the BoP system, has suffered from budgetary constraints and a lack of sufficient resources.

As a result, the quality of food and medical care have declined precipitously.  For example, routine dental care – basic cleaning – that was available every few months now has been provided only once in the past four years.  Nor is *halal* food served regularly.  The lack of medical care is even more material to inmates' health, and in a number of instances at ADX inmates have died because BoP waits until certain conditions, such as cancer, progress until they require acute care (and the resources are not provided for intervening care).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 27 of 44

> **3.** ***Courts Have Consistently Considered the Conditions***
> ***of Confinement at MCC in the Context of Sentencing***

Even prior to *United States v. Booker*, 543 U.S. 220 (2005), courts held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure." *See United States v. Carty*, 264 F.3d at 196. *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs); *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

In *United States v. Behr*, 2006 WL 1586563 (S.D.N.Y. 2006), the Court noted that a judge had "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at MCC[.]" 2006 WL 1586563, at *5. In light of the harsh conditions at MCC, the defendant in *Behr* was sentenced to a non-Guidelines sentence. *Id.*

The difficult conditions at MCC's 10-South or ADX make every day there more onerous than ordinary confinement. *See United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) ("in effect [the defendant] is arguing that the severity of a prison sentence has two dimensions: its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be. There is enough merit to the argument to allow a sentencing judge to take it into account . . .").

> **4.** ***In Fashioning Appropriate Sentences Courts Have***
> ***Recognized the Impact of Covid-19 on Incarceration***

The difficulties encountered in pretrial detention, amplified by the contracting, and even fear of contracting, Covid-19 and the increased tensions in many facilities, have been considered by many judges who have routinely imposed sentences that account for the ordeal of incarceration during the entire trajectory of the Covid-19 pandemic.

In the Southern and Eastern Districts of New York, those instances are too numerous to catalogue. In fact, a *New York Daily News* limited analysis (conducted in early July 2021, after only the first 17 months of the pandemic, while Pham endured the extended remainder as well) of 43 cases involving defendants with court-appointed counsel "shows that judges in Manhattan and Brooklyn federal courts imposed sentences that were on average 58% lower than what federal guidelines recommended[,]" with either the Court or the defendants' submissions explicitly

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 28 of 44

citing COVID-19 conditions in prison.  Stephen Rex Brown and Noah Goldberg, "Brutal conditions in NYC jails during COVID pandemic caused federal judges to impose lighter sentences:  analysis," *New York Daily News* (July 11, 2021), available at bit.ly/2Z8wX63.  *See also Chavez*, 2024 WL 50233, at *8 ("[i]n the height of the COVID-19 pandemic, it was commonplace for courts to find that the conditions of confinement at the MDC and MCC constituted 'extraordinary reasons' justifying release").

Recently, in granting motions to modify sentences (pursuant to 18 U.S.C. §3582(a)(1)(C)) for three defendants in a well-known terrorism prosecution, Judge McMahon reflected on the impact of Covid-19 on incarcerated individuals.  While noting that presently "COVID-19 is far from the dreaded killer that arrived on our shores in 2020[,]" Judge McMahon nevertheless acknowledged that "what is true on a going forward basis is not necessarily true when looking back."  *United States v. Williams*, No. 09 Cr. 558 (CM), 2023 WL 4785286, at *12 (S.D.N.Y. July 27, 2023).

In the companion case, *United States v. Cromitie*, 09 Cr. 558 (CM), 2024 WL 216540 (S.D.N.Y. January 19, 2024), Judge McMahon recognized that

> the pandemic was extremely hard on prisoners.  The necessary
> steps that the BOP undertook to stop the spread of the deadly virus
> – lockdowns, suspension of programs, and curtailed visitation – led
> to increased prisoner isolation and fewer program opportunities for
> inmates.  This created harsher than usual conditions of
> confinement, which is a factor the court can and does consider in
> deciding whether extraordinary and compelling circumstances
> warrant granting compassionate release for a COVID-19 era
> inmate.

*Id*., at *8.  *See also Williams*, 2023 WL 4785286, at *12.

Some reported cases further illustrate how courts have incorporated these unprecedented and distinct (although often related) circumstances – both the conditions of confinement during the pandemic, as well as the danger of contracting Covid-19 in an environment with decidedly sub par health care – into their sentencing determinations.  For example, in *United States v. De Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), the Court noted that the defendant had "served most of [his] time in prison so far during the worst pandemic in this country during the past 100 years[.]"  Sentencing Transcript, July 1, 2020, at 36 (ECF # 21).

The Court in *DeJesus* acknowledged that while "[p]rison is supposed to be punishment, []

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 29 of 44

it is not supposed to be trauma of that nature or close." *Id*. As the Court reasoned, "[m]y colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar. The same logic applies here, and then some . . ." *Id*.

Similarly, in *United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. April 2, 2021) (ECF #250), the Court "believe[d] that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served." *Id*. at 17.

Here, Pham suffered through all the restrictions, isolation, tension, and fear that the Covid-19 pandemic wrought in prisons throughout its entire course.[13] Accordingly, his sentence should reflect that substantial and unanticipated hardship. Even though the effects of Covid-19 are no longer a current factor in the conditions of detention, it is respectfully submitted that not accounting for the extended time Pham did spend in that environment would represent an unwarranted disparity considering the routine reduction of sentences in 2020 through 2023 for defendants who suffered incarceration through the Covid-19 pandemic.

E.      ***The Conduct Charged in Counts Five Through Nine Was Presented at the Initial Sentencing and Factored Significantly in the Sentence Imposed, and Thus Cannot Serve as Grounds for a Longer Sentence Than Initially Imposed***

Counts Five through Nine charge offenses were not expressly included in the initial Indictment. They were added after Count Five was vacated. However, the conduct underlying those counts was fully known at the time of Pham's initial sentencing. In fact, as detailed below, the government argued to the Court that those facts justified the maximum permissible sentence (50 years' imprisonment), and the Court relied explicitly on those same facts in its rationale for imposing a 40-year prison term.

---

[13] *See also United States v. Romero*, No. 15 CR. 445-18 (PAE), 2021 WL 1518622, at *4 (S.D.N.Y. Apr. 16, 2021) ("[a] day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. Although not intended as punishment, incarceration in such conditions is, unavoidably, more punishing"), *citing United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020); *United States v. Ng Lap Seng*, No. S5 15-CR-706 (VSB), 2021 WL 961749, at *6 (S.D.N.Y. Mar. 15, 2021) (same).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 30 of 44

## 1. *The Law Controlling Re-Sentencing*

In *North Carolina v. Pearce*, 395 U.S. 711 (1969), the Supreme Court made clear that when a defendant is before a court for re-sentencing, the sentencing court may not increase the defendant's original sentence based upon the defendant's exercise of his Constitutional or statutory rights to attack his prior conviction and sentence, nor based upon his attempts to seek a collateral remedy.  *Id*., at 723-25.

The Court in *Pearce* explained that such improper sentencing considerations would deny the defendant Due Process.  In the context of a re-sentencing after a new trial, the Court directed that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear[,]" and "[t]hose reasons must be based upon objective information concerning identifiable conduct on the part of the defendant *occurring after the time of the original sentencing proceeding*."  *Id*., at 726 (emphasis added).

Here, of course, Pham has not committed any new offenses, nor have new offenses only come to light since the time of his original sentencing.  *See United States v. Bryce*, 287 F.3d 249 (2d Cir. 2002) (affirming increase in sentence due to murder of government witness that only came to light after the original sentence had been imposed).  Rather, as set forth below, the government simply chose to charge certain offenses about which it had ample knowledge at the time of Pham's initial Indictment, and which it urged the Court to factor into its sentencing determination.

## 2. *At Pham's Initial Sentencing, the Government Presented the Heathrow Airport Plot to the Court as Grounds for the Maximum Term*

The government knew of and pointed out to the Court multiple times the nature of the conduct at the time of the initial sentencing.  *See* Government's April 29, 2016, Sentencing Memo (ECF # 113), at 10 ("[s]pecifically, Pham agreed to conduct a bombing at Heathrow International Airport"); 15 (eighth bullet point digesting Pham's post-arrest statements); 15 (second bullet point digesting Pham's post-arrest statements);  23 ("Pham ultimately agreed to detonate a bomb in the international arrivals area of London's Heathrow International Airport. . . .");  27-28; 29-30 ("[n]ot only was this action consistent with the instructions al-Aulaqi had given Pham in connection with the Heathrow bomb plot, *see* Exhibit 1-D").

The government also specifically tied the Heathrow Airport plot to the Court's evaluation of other §3553(a) factors beyond the seriousness of the offense.  *See id*., at 34;  36, 39 (same with respect to the enhancement of Pham's CHC level).

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 31 of 44

Likewise, the Heathrow Airport plot was referenced twice, at pages 1 and 2, in a March 2, 2015, FBI 302 detailing a March 1, 2015, interview of Pham conducted in Brooklyn, New York, upon his extradition from the United Kingdom. That FBI 302 was included as Exhibit 1-D to the Government's April 29, 2016, Sentencing Memo (ECF # 113).

The initial PSR, dated March 7, 2016, also included mention of the Heathrow Airport plot in the sixth bullet point on page 13 (as part of ¶ 45, which begins on the previous page). In response to the government's submission and the PSR, counsel's May 2, 2016, reply sentencing letter (ECF # 110, and attached hereto as Exhibit 4), addressed the issue at page 4.

### 3.     *The Court Expressly Relied – and Substantially So – On the Heathrow Airport Plot In Fashioning Pham's Initial Sentence*

Unsurprisingly, given the attention the government drew to the Heathrow Airport plot, that aspect of Pham's offense conduct occupied much of the Court's consideration at Pham's initial sentencing. Indeed, the proceeding commenced May 16, 2016, but was adjourned due to the Court's questioning whether the issue required an evidentiary hearing. *See* Transcript, May 16, 2016 (ECF # 123), at 5-16.

At sentencing eleven days later, the issue remained a focus of the Court's and parties' attention. For example, the Court announced that it had "reviewed the transcript from the guilty plea proceeding on June 8, 2016. At that time the government proffered that Mr. Pham admitted that Awlaki directed him to return to the U.K. to detonate an explosive device at Heathrow." Sentencing Tr., at 3 (Exhibit 5).

After entertaining additional argument, the Court concluded, "I deem it relevant conduct, and I think it is the government's burden to prove by a preponderance of the evidence it's relevant to the 3553(a) factors." *Id.*, at 10. Later, explaining the sentence it imposed, the Court stated, "*[p]erhaps most concerning*, I do conclude that at some point in June of 2011, Mr. Pham approached Awlaki and offered to conduct a suicide attack and sacrifice himself on behalf of al Qaeda upon his return to the U.K. . . . Prior to returning to London, Mr. Pham agreed in words to conduct a suicide bombing at Heathrow Airport on behalf of AQAP." *Id.*, at 46.

Thus, unmistakably, the Court's initial sentence not only fully encompassed the Heathrow Airport plot as "relevant conduct," but considered it "perhaps most concerning" among the various aspects of Pham's offense conduct. *See also id.*, at 49 ("I do conclude that Mr. Pham agreed to participate in a violent act upon his return, and took steps consistent with that intention").

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 32 of 44

> **4.      *Pham Readily and Truthfully Acknowledged His Involvement
> in the Heathrow Airport Plot In an Uncounseled Interview the FBI
> Conducted at ADX Two Years After Pham's Initial Sentencing***

In June 2019, nearly two and one-half years after Pham's initial sentencing, FBI agents traveled to ADX – without notifying Pham's counsel in this case – to interrogate Pham with respect to the Heathrow Airport plot. *See* Revised PSR, at ¶ 37.  During that two-day uncounseled interview June 12, 2018, and June 13, 2018, Pham "admitted that he was depicted in [certain] videos.  PHAM admitted that he had received instruction in making explosives from Aulaqi, and that the bomb PHAM was seen constructing in the video was the same type of explosive that PHAM was supposed to create in the United Kingdom for Aulaqi's planned attack at that location." *Id.  See also id.* ("[a]dditional videos showed PHAM sketching an explosive device to be contained in a backpack, which PHAM further admitted was the type of device that he was supposed to use in an attack in the United Kingdom. . . .   PHAM acknowledged that Aulaqi planned for the attack in the United Kingdom to be a suicide attack and that PHAM knew he would die during its commission"). *See also id.*, at ¶¶ 38-39.[14]

The government relied on those admissions by Pham in instituting the charges contained in Counts Five through Nine of the Superseding Indictment.

> **5.      *Other Factors That Mitigate Pham's Offense Conduct***

As a federal district judge observed in sentencing a defendant convicted of providing material support to a designated Foreign Terrorist Organization, in violation of  18 U.S.C. §2339B,

> there are many possible interpretations of the nature of [the
> defendant]'s activities in Afghanistan and his reasons for returning
> to the West. . . .   Ultimately, however, this Court's role at
> sentencing is not to construct the darkest possible interpretation of
> a defendant's conduct and potential and then sentence the
> defendant as if that interpretation is truth.

*United States v. Warsame*, Memorandum Opinion on Sentencing, p. 5, 04 Cr. 029 (JRT) (D.

---

[14]   The June 2018 interviews occurred less than two months after the Supreme Court's April 17, 2018, decision in *Sessions v. Demaya*, 584 U.S. 148 (2018), that resulted in Count Five being vacated.  Also, the government had previously bypassed counsel in interrogating Pham in 2015 during the extradition transfer process before he was first presented in court in the U.S.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 33 of 44

Minn. Aug. 24, 2009).

Here, it is respectfully submitted that Pham's vulnerability to recruitment purveyors of *jihadist* ideology should be considered in sentencing him, particularly in light of his subsequent (and current) renunciation of that indoctrination.

As the government's initial sentencing memo explained, al Qaeda Arabian Peninsula ("AQAP") "AQAP has proven adept at using the Internet to recruit American nationals and others in the West, and to popularize its message." Exhibit 3 (ECF # 113), at 3. *See* Revised PSR, at ¶ 22. Also, "AQAP is adept at using the Internet to recruit American nationals, and to popularize its message." Revised PSR, at ¶ 17.

Moreover, Pham was affected by the recorded lectures of Anwar al-Awlaki. The government, in its sentencing submission, at 2, stated that Mr. al-Awlaki, "[d]uring his time with AQAP, al-Aulaqi was known to be among the most vocal and effective proponents of attacks against the United States and Western interests."

Independent experts agree. Mr. al-Awlaki, was (until his death in 2011) "a charismatic American preacher who became al-Qa`ida's most effective English-language recruiter." Scott Shane, *The Enduring Influence of Anwar al-Awlaki in the Age of the Islamic State*, 9 CTC SENTINEL (July 2016),[15] at 15 (hereinafter "*Enduring Influence*"), available at https://bit.ly/3WiSCn5.[16]

Mr. Shane added that "[f]or years, when an American or a Canadian or a Briton has turned up in jihadist terrorism, investigators have routinely discovered a long trail of al-Awlaki material on his computer." *Id.* In fact, Mr. Shane found that when doing a search for Mr. al Awlaki on YouTube, there were "40,000 hits." Scott Shane, "The Lessons of Anwar al-Awlaki," *The New York Times* (Aug. 27, 2015), available at https://nyti.ms/3UCYBCa.

Mr.al-Awlaki was "able to connect across cultures" because he was born and completed his higher education in the United States, but he also had a deep familial connection and spent many years living in Yemen." *See* Christopher Heffelinger, *Anwar al-`Awlaqi: Profile of a*

---

[15] CTC stands for the Combating Terrorism Center at West Point.

[16] Scott Shane is a *New York Times* reporter, and also wrote an award-winning book on Anwar al Awlaki, *Objective Troy: A Terrorist, A President, and the Rise of the Drone* (Crown Publishing Group: 2016).

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 34 of 44

*Jihadi Radicalizer*, 3 CTC SENTINEL (March 2010), at 1, available at https://bit.ly/4a0rlsQ.[17]

He was an effective "motivational speaker for jihad, demonstrating a proven talent to drive believers into action." *Id.* Mr. Heffelinger, who wrote a book about al-Awlaki, observed that Mr. al-Awlaki was able to "manipulate his listeners by delivering messages that are both radical and unassuming[,]" earning him the reputation of being the "*gateway for [the] unsuspecting*." Christopher Heffelinger, Carnegie Endowment for International Peace, "The Rise of Anwar al-Awlaki" (June 1, 2010) , available at https://bit.ly/3Wo5nx0 (emphasis added).

Mr. al-Awlaki's message was particularly and intentionally resonant with a particular group of young men – "in-betweeners" – who are "caught between cultures, *sons of immigrant families, feeling lost or rejected* — and angry about American-led wars." Scott Shane, Richard Pérez-Peña and Aurelien Breeden, "'In-Betweeners' Are Part of a Rich Recruiting Pool for Jihadists," *The New York Times* (September 22, 2016) (hereinafter "*In-Betweeners*"), available at https://nyti.ms/4aZne1p (emphasis added).

Researchers and psychologists interviewed noted that these men do not feel British enough, for example, to be accepted by their peers or society at large, but when in their communities of origin, they do not fit in there either. *Id. See also* Alexander Meleagrou-Hitchens, "As American as Apple Pie: How Anwar al-Awlaki Became the Face of Western Jihad," The International Centre for the Study of Radicalisatoin and Political Violence (Sept. 2011), at 79 (hereinafter "*Face of Western Jihad*"), available at https://bit.ly/4a3FLIN.

J. Reid Meloy, a forensic psychologist and clinical professor at the University of California, San Diego, has found that these feelings make these men "vulnerable." *Id.* Consequently, Olivier Roy, a professor at the European University Institute in Florence, Italy, and the author of *Globalized Islam* (Columbia University Press: 2002), has found that "most such jihadist recruits are children of immigrants," particularly the second generation. *Id.*

Mr. al-Awlaki and other propagandists were gifted at "target[ing] the particular anxieties of Western Muslims from immigrant backgrounds, posing recruitment as a religious loyalty test. They call on supporters to reject the nations where they live and embrace instead a devotion to the ummah, the global community of Muslims." *Id.*

Mr. al-Awlaki offered both a diagnoses for the disaffected feelings these men were experiencing along with a possible solutions, such as "participating in global jihad." *Face of Western Jihad*, at 15. When these young men (and women) connected with al Qaeda and other

---

[17] Hereinafter "*al-`Awlaqi: Profile.*"

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 35 of 44

extremist groups, it "allows the individual to attach his identity to something that is larger and inflates his sense of himself."  *In-Betweeners*.

Like street and other gangs, terrorist organizations can fill that void.  *See* Randy Borum, Psychology of Terrorism 26 (2004), available at https://bit.ly/4a4z8G2, *citing* R. Luckabaugh, *et al.*, *Terrorist Behavior and United States Foreign Policy: Who is the Enemy? Some Psychological and Political Perspectives*, 34 PSYCHOLOGY 1 (1997) (arguing that "among potential terrorists 'the real cause or psychological motivation for joining is the great need for belonging'"); *id.*, *citing* Jerold M. Post, *Notes on a psychodynamic theory of terrorist behavior*, 7 TERRORISM 241 (1984), available at https://bit.ly/3WfxChc ("for these alienated individuals from the margins of society, joining a terrorist group represented the first real sense of belonging after a lifetime of rejection, and the terrorist group was to become the family they never had").

The above analysis describes a profile that the young Pham fit with perfect congruence. As the *2020 BoP Psychology Report* observed, Pham's "profile suggests that his experience with abuse or neglect likely left him without an adequate sense of identity."  Exhibit 6, at 3

In turn, "[t]his area of inmate PHAM's profile may be indicative of someone that struggles to be independent, is easily influenced and manipulated by others, and has a difficult time standing his ground when his thoughts or beliefs are challenged or disagreed with."  *Id*.

Thus, Pham was ripe for recruitment.  As the government noted in its initial sentencing submission, at 14, Pham "converted to Islam in 2004 and became increasingly radicalized by the lectures of leaders like al-Aulaqi and Imran Hossein."  Pham even "personally met and spoke with al-Aulaqi[,]" who personally trained Pham, which only cemented the connection.

Also, whether Pham would have implemented the Heathrow Airport plot is reduced to a hypothetical.  While Pham returned to the U.K. July 27, 2011, *see* Gov't Sentencing Submission (Exhibit 3), at 10-11, there is not *any* evidence that he pursued *any* steps in furtherance of the plot in the five months until his arrest.

Indeed, a search pursuant to Pham's December 22, 2010, arrest did not yield any materials related to bomb-making or anything else Pham was supposed to do to further the plot upon his return to UK.  *Id.*, at 12-13.  There has never been any allegation that Pham searched for or scouted targets in the U.K., or attempted to procure any materials in furtherance of any of the charged attempts or conspiracies included in Counts Five through Nine.

Indeed, Pham's interception and detention by U.K. authorities at the airport upon his arrival in the U.K. in July 2011, effectively dissuaded him from any further activity in

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 36 of 44

furtherance of any plots.  Even if, as the government posited at the initial sentencing, the prospect of surveillance discouraged Pham from action, that in itself establishes that Pham was not intent on consummating the plot once he was the subject of law enforcement attention.

      F.     ***Pham Could Remain in ICE Custody for an***
            ***Extended Period Following Completion of His Sentence***

       After completion of any prison term, Pham will be subject to removal proceedings, which would subject him to additional incarceration of uncertain duration in ICE facilities beyond what the Court finds "sufficient, but not greater than necessary" to achieve the purposes of sentencing. *See* Revised PSR, at ¶ 70 (Pham "has no legal status in the U.S.  A final order of removal was issued on January 8, 2016, which remains outstanding").

       Pham acknowledges that he put himself in this position:  "What I have done was reckless and highly reprehensible and unfortunately have cost me my life in Britain with my family and kids.  My citizenship has been revoked and I can never be allowed back into the U.K."  Exhibit 1, at ¶ 4.  Yet that does not diminish the impact of continued, and potentially indefinite, detention he will face following expiration of his sentence in this case.

       That ICE detention will be complicated – and likely extended – considerably because Pham is stateless.  He has lost his British citizenship (revoked by the Crown as a result of his offense conduct), and does not have any citizenship with respect to any other nation (including Vietnam).  Thus, he will be detained by ICE until an appropriate destination is found for him.  That process will also likely uproot his family, which has been in the U.K. for decades.  Indeed, it is the only environment his children have known.

       Courts have considered even the rudimentary consequences for a non-U.S. person once a sentence has expired, much less those facing Pham.  For example, in *United States v. Connolly (Black)*, Judge McMahon fashioned the sentence in light of that eventuality:

              And for reasons that are incomprehensible to me, were I to
              sentence him to a short term of imprisonment – which would be
              served in a private facility and not at some place like FCI
              Allenwood, or not at a medical facility, which I think I would
              strongly recommend, given what I know about Mr. Black's medical
              condition – for reasons I cannot comprehend, at the end of that
              term he could not walk out the door and be picked up by Mr.
              Levine and taken to the airport.  He would be treated like an illegal
              alien, and he would be released into the custody of ICE, and at

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 37 of 44

> some point long after my intended sentence had expired he would
> be deported.  And that's not right.

In *United States v. Connolly (Black)*, 16 Cr. 370 (CM) (S.D.N.Y.) (ECF Dkt # 457) (Sentencing Transcript, October 24, 2019), at 91-92.  *See also United States v. Wedd*, 15 Cr. 616 (KBF) (April 27, 2018) (ECF # 688), at 60 (reducing sentence Court would otherwise have imposed because of inevitable post-sentence ICE detention);  *United States v. Volpe*, 79 F. Supp.2d 76 (E.D.N.Y. 1999);  *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (remanded to permit District Court to depart downward because defendant's status as deportable alien increased severity of confinement).

Compounding the problem, conditions in ICE facilities remain demonstrably substandard, and are notoriously even worse than BoP institutions.  *See, e.g., Basank v. Decker*, 20 Civ. 2518 (AT), (S.D.N.Y. Mar. 26, 2020) (ECF # 11)*.  See also* Tom Dreisbach, "Government's own experts found 'barbaric' and 'negligent' conditions in ICE detention," *NPR* (August 16, 2023), available at https://n.pr/47fc8mc;  Office of the Inspector General, Department of Homeland Security, *Concerns About ICE Detainee Treatment and Care at Four Detention Facilities*," June 3, 2019, available at bit.ly/3kIOJSN (hereinafter "*2019 ICE OIG Report*"), at 4.

For example, a 2019 report by ICE's Office of the Inspector General regarding four ICE detention facilities found, "egregious" problems with food service at ECCF, including "open packages of raw chicken" which "leaked blood all over refrigeration units," and "moldy bread." *2019 ICE OIG Report*, at 4.

Additional conditions at ICE facilities further jeopardized inmates' mental and physical health.  While it is well-established that outdoor recreation has a positive impact on physical and emotional health – including reducing "stress, depressive symptoms, and interpersonal violence" (all of considerable importance in a detention context), *2019 ICE OIG Report*, at 7, four of the five detention centers inspected by both the OIG and Human Rights First lacked any outdoor recreation space at all, or provide only partial access to an outdoor space, depriving detainees of any meaningful opportunities for fresh air and sunlight. *Id.*  Instead, detainees' recreation occurred in "enclosures inside detainee living areas with mesh cages at the top to allow in outside air[.]" *Id.,* at 7.

Extended ICE detention could be particularly deleterious for Pham in light of his PTSD and prolonged solitary confinement, and the prevalence thereof in ICE facilities.  *See* Spencer Woodman, "ICE's Use of Solitary Confinement 'Only Increasing' Under Biden," *The Intercept* (February 6, 2024), available at https://bit.ly/3SAntbp;  Emily Baumgaertner, "Federal Records Show Increasing Use of Solitary Confinement for Immigrants," *The New York Times* (February

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 38 of 44

6, 2024), available at https://bit.ly/3OFA4Zz ("[a] new report by Harvard University-affiliated researchers and the nonprofit group Physicians for Human Rights ["PHR"] found the dangerous confinements have not only persisted over the past decade, but also increased in frequency and duration under the Biden administration").

The PHR Report also found that "[t]he average length of the recorded confinements was 27 days," thus "stretching well beyond the 15-day period that meets the threshold for 'inhuman and degrading treatment' defined by the U.N. special rapporteur on torture." *Id*. In addition, "researchers found that solitary confinement was often used as a disciplinary measure for minor infractions [,]" and "[t]he data revealed dozens of examples of facilities holding people in solitary confinement for over a year." *Id*. *See also* **ante**, at n.11.

Moreover, alarmingly, "[r]esearchers said the number is likely an undercount due to ICE's poor recordkeeping." *Id*. *See "Endless Nightmare": Torture and Inhuman Treatment in Solitary Confinement in U.S. Immigration Detention*, Physicians for Human Rights, February 6, 2024, available at https://bit.ly/3xTvdyq ("ICE's failure to ensure adequate medical resources in detention centers created life-threatening conditions for immigrants in solitary confinement"). *See also* Ian Urbina, "The Capricious Use of Solitary Confinement Against Detained Immigrants," *The Atlantic* (September 6, 2019), available at bit.ly/37T944q.

Of particular concern for Pham, "[s]ince 2019, the number of detainees with recorded mental health conditions placed in solitary confinement jumped from 35 percent to 56 percent in 2023, the reports state. U.N. experts have warned specifically about the grave dangers of isolating people with mental illness." *Id*. *See also id*. (the PHR "report also highlights ICE's troubling use of solitary confinement for 'medical isolation' of detainees who are sick, disabled, or experiencing a mental health crisis").

Thus, Pham's PTSD renders ICE detention problematic for him. As the *BoP Psychology Report* points out, regarding reactions to PTSD stressors.

> [o]ftentimes, these behaviors ruminate in a tendency to withdraw emotionally and socially as well as to shut out individuals who attempt to discuss his experiences with him (*e.g.*, psychologists), suggesting he may struggle to adhere to treatment plans related to his posttraumatic symptoms.

*Id*., at 3.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 39 of 44

> **G.**      ***Various Statistical Analyses, Including from JSIN and the Sentencing Commission, Demonstrate That a Sentence for Pham Well Below 40 Years Would Avoid an Unwarranted Disparity***

In sentencing a defendant a court is required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6).  As set forth below, the data demonstrate that a sentence for Pham significantly below the 40-year prison sentence initially imposed would be commensurate with the sentences imposed on the average offenders in terrorism cases.  Indeed, it would be consistent even with the sentences imposed in nearly all the sentences imposed in the Guantanamo Bay military commissions.

> **1.**      ***Sentences In Federal Material Support and Other Terrorism Cases***

> **a.**      ***The Data from Material Support and Terrorism Sentencing***

The April 22, 2016, letter by counsel in advance of Pham's initial sentencing referred briefly to data compilations and analysis conducted periodically by the Center on Law and Security at New York University Law School.  *See* Exhibit 2, at 18.[18]  Those studies examined all federal terrorism-related cases prosecuted in the U.S. for the decade after September 11, 2001, and then separately all federal criminal cases involving material support for or other criminal activity related to the Islamic State in the six years that followed.

As a whole, explored in more detail, those analyses establish that a sentence of even 25 years for Pham would well exceed the average for terrorism-related charges and cases.  Initially, the Center on Law and Security at New York University Law School published a "Terrorist Trial Report Card" ("TTRC") that cataloged terrorism-related prosecutions and their results.[19]  The TTRC's are also relevant because they collect data regarding cases in which the conduct alleged

---

[18]  The April 22, 2016, letter (Exhibit 2 hereto), at 11-18, also included a digest of specific cases involving terrorism offenses and sentences imposed therein.

[19]  In 2011, the creator of NYU Law School's Center on Law and Security, and of the TTRC as well, Dr. Karen Greenberg, left NYU and started the Center on National Security at Fordham University Law School.  Thus, subsequent publications and data analyses were issued by the Center at Fordham.  In the interest of disclosure, Mr. Dratel is a Senior Fellow for Legal Research- at the Fordham Center, was the same at the NYU Center, and has served as Senior Fellow for Legal Affairs for the some of the TTRC's, and as Project Advisor for the Fordham publications.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 40 of 44

occurred during generally the same period as Pham's (and not now, nearly 15 years later).

The final three versions, published in 2006, 2010, and 2011, each analyzed the data somewhat differently, but provide illuminating data.  The September 11, 2008, edition of the TTRC, based on the sentences imposed on the 370 defendants convicted of terrorism offenses (and sentenced) between September 11, 2001, and September 2008 reported that the average sentence for all defendants convicted of terrorism charges was approximately twelve years and eight months (12.67 years),[20] and the average sentence for convictions for material support for terrorism were 14.75 years (18 U.S.C. §2339A) and 11.92 years (§2339B).  Even for violations of 18 U.S.C. §2332 (murder of U.S. nationals outside the U.S., a potential capital offense), the average sentence was 26 years.[21]

The 2010 TTRC covered U.S. federal prosecutions between September 11, 2001, and September 11, 2009, and utilized slightly different nomenclature:  (i)  the "average sentence for persons convicted of terrorism" was 16 years (191.9 months);  (ii)  the "average sentence for persons charged with terrorism" was 19.7 years (236 months);  (iii)  the "average sentence for persons charged with national security violations but not terrorism" was 10.4 years (124.5 months);  and (iv)  the "average sentence for persons convicted of national security violations and not charged with terrorism" was 7.5 years (90.3 months).[22]

The September 2011 edition of the TTRC, covering September 11, 2001, through September 11, 2011, again altered the characterization, and provided the following average sentences graphically (and not in precise numbers):

(i)        for "Terror or National Security Top Charge":  between 10 and 15 years;[23]

(ii)       for "Material Support Top Charge":  also between 10 and 15 years, but less than for "Terror or National Security Top Charge;"

---

[20]  *Terrorist Trial Report Card, September 11, 2008*, available at https://bit.ly/3wf9G2W.

[21]  *Id.*

[22]  *Terrorism Trial Report Card, September 11, 2001-September 11, 2009* (published January 2010), at 13, available at https://bit.ly/3JJFX5q.

[23]  The 2011 TTRC did not define "material support" charges as "national security" offenses but rather as "terrorism.  *See Terrorism Trial Report Card, September 11, 2001-September 11, 2011*, Appendix A at 31, available at bit.ly/3TlmIBT

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 41 of 44

(iii)    for "Material Support Lesser Charge":  slightly less than 15 years;

(iv)    for "National Security Charge Conviction":  slightly more than 15 years;

(v)     for "Terror Charge Conviction":  also slightly more than 15 years, but slightly more than for "National Security Charge Conviction;" and

(vi)    for "Terror and National Security Charge Conviction":  25 years.[24]

In 2013, Fordham Law School's Center on National Security (*see* **ante**, at n. 19) began publishing the updated analyses.  In 2013, the Center also published "By the Numbers – U.S. Prosecutions of Jihadist Terror Crimes, 2001-2013,"[25] digesting 368 cases, 297 convictions (209 by guilty plea and 89 after trial).

The average sentence for all cases was 181 months (15 years, one month), and 201 months (16 years, 9 months) for convictions pursuant to 18 U.S.C. §2339A, and 199 months (16 years, 7 months) for convictions pursuant to 18 U.S.C. §2339B.  The Center has continued to publish periodic reports on terrorism prosecutions, particularly those involving persons charged with offenses connected to the Islamic State.  In those reports, the data again demonstrate that the average sentences imposed were significantly lower than the 25-year statutory maximum in this case (particularly in those cases resolved via guilty plea).[26]

**b.      *Sentences at the Guantanamo Bay Military Commissions***

As set forth in the April 22, 2016, letter (Exhibit 2 hereto), at 12-18, even persons convicted in the Guantanamo Bay military commissions – described by Secretary of Defense Donald Rumsfeld as "the worst of the worst" – received sentences dramatically below that which the Guidelines prescribe for Pham.  Since that letter, another case merits discussion.

---

[24]  2011 TTRC, at 7.

[25]  That report is available at https://bit.ly/4bhRMvk.

[26]  *See, e.g., The American Exception:  Terrorism Prosecutions in the United States – The ISIS Cases*, September 13, 2017;  *Case by Case: ISIS Prosecutions in the United States*, July 6, 2016;  *May 2017 Update: ISIS in the U.S.,* May 8, 2017;  *Statistical Overview*, February 24, 2017;  *By the Numbers: ISIS Cases in the United States*, June 22, 2015.  All reports are available at https://www.centeronnationalsecurity.org/terrorism-database.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 42 of 44

In 2022, Hadi al-Iraqi, whom the government cast as Osama bin Laden's liaison to the Taliban and as a commander of insurgents who had attacked and killed American and allied forces as well as medical and humanitarian relief workers in wartime Afghanistan and Pakistan from 2003 to 2004, pleaded guilty "to war crimes charges related to his role as a commander of insurgent forces in Afghanistan in the early 2000s."  Carol Rosenberg, "Iraqi at Guantánamo Bay to Plead Guilty in Afghan War Crimes Case," *The New York Times* (June 10, 2022), available at nyti.ms/3rQF41K.

Hadi's plea agreement provided that while "a military jury will hear the evidence against him and be asked to choose within a range of 25 to 30 years of confinement, starting with his plea[,]" afterward "the senior Pentagon official responsible for overseeing the war court will reduce it to 10 years."  Carol Rosenberg, "Commander of Afghan Insurgency Pleads Guilty at Guantánamo Bay," *The New York Times* (June 13, 2022), available at nyti.ms/3Crhj5u.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 43 of 44

    **2.**    *JSIN and U.S. Sentencing Commission Data Regarding Sentences Imposed in Federal Terrorism and National Defense Prosecutions*

    **a.**    *The JSIN Data*

The JSIN data is limited because within the period covered by JSIN (which was not in existence when Pham was sentenced in 2016) – from Fiscal Year 2019 through Fiscal Year 2023 – there was not any data for defendants at Offense Level 43 and CHC VI. However, for Offense Level 42 and CHC VI, there were three defendants whose primary guideline, like Pham, was §2M5.3. None of those three defendants received a §5K1.1 substantial assistance departure, and their average length of imprisonment imposed was 214 month(s) and the median length of imprisonment imposed was 240 month(s). *See* JSIN, available at https://jsin.ussc.gov/.

Two of the three defendants were sentenced within their Guidelines range; the third was sentenced below the applicable Guidelines range. *Id.*

    **b.**    *The Sentencing Commission Data*

Sentencing Commission data also support a sentence well below 40 years. For Fiscal Year 2023, for the 237 sentences imposed for "national defense" crimes, nationally the mean sentence was 38 months, and the median sentence was 24 months. *See* U.S. Sentencing Commission, *2023 Sourcebook*, at Table 15, available at https://bit.ly/3WmTjMr.[27]
For that same cohort of defendants convicted of national defense crimes, 38.1% were sentenced within the applicable Guidelines range; 42% received a variance below the Guidelines; and 6.5% received a downward departure. *Id.*, at Table 31. None received an upward departure. *Id.*

Similarly, Table 27 of the *2023 Sourcebook* establishes that for the 23 defendants in CHC VI and convicted of National Defense crimes, the mean sentence was 140 months, and the median 144 months. *Id.*, at Table 27.

Regarding National Defense crimes specifically, for the first quarter of FY 2024, the 48

---

[27] "National Defense" crimes include treason, sabotage, espionage, evasion of military service, prohibited financial transactions and exports, providing material support to designated foreign terrorist organizations, nuclear, biological, and chemical weapons, and weapons of mass destruction. This category includes offenders sentenced under USSG §§2M1.1, 2M2.1, 2M2.2 (deleted), 2M2.3, 2M2.4 (deleted), 2M3.1, 2M3.2, 2M3.3, 2M3.4, 2M3.5, 2M3.6 (deleted), 2M3.7 (deleted), 2M3.8 (deleted), 2M3.9, 2M4.1, 2M5.1, 2M5.2, 2M5.3, 2M6.1, and 2M6.2. *See* Appendix A, *2023 Sourcebook*.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Richard M. Berman
United States District Judge
Southern District of New York
May 1, 2024
Page 44 of 44

defendants convicted of National Defense offenses were sentenced to a mean term of 28 months' imprisonment, while the median term was 18 months.  *See* United States Sentencing Commission, *1st Quarter Release Preliminary Fiscal Year 2024 Data Through December 31, 2023*, at Table 6 ("*Q1 Quarterly Data Report*"), at Table 6, available at https://bit.ly/3y0RPxd.

For those same 48 defendants, 31.3% were sentenced within the applicable Guidelines range, 8.3% received a downward departure, and 52.1% received a variance below the Guidelines.  *Id*., at Table 10.  Again, there were no upward departures.  *Id*.

### Conclusion

Accordingly, for all the reasons set forth above, it is respectfully submitted that a sentence for Pham far below the 40-year prison previously imposed would be reasonable and appropriate, and satisfies §3553(a)(2)'s mandate that a sentence be "sufficient, but not greater than necessary" to achieve the objectives of sentencing enumerated in §3553(a)(2)(A)-(D).

Respectfully submitted,

Joshua L. Dratel

Bobbi C. Sternheim

JLD/
Encls.