

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K., Javitz Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 15, 2024

**Via ECF**

Honorable Richard M. Berman
United States District Judge for the
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    <u>United States v. Ming Quang Pham</u>, S2 12 Cr. 423 (RMB)

Dear Judge Berman:

      The Government respectfully writes in advance of the sentencing scheduled for December 17, 2024 at 2:00 p.m. to provide a brief response to defendant Ming Quang Pham's November 22, 2024 supplemental sentencing submission. (Dkt. 287, the "Defendant's Supplemental Submission"). The Defendant's Supplemental Submission makes sentencing arguments based on a newly effective policy statement to U.S.S.G. § 5H1.1 and responds to certain arguments in the Government's May 10, 2024 sentencing submission. (Dkt. 284, the "Government's May 2024 Sentencing Submission").[1] These arguments, like those in the defendant's primary sentencing submission (Dkt. 282, the "Defendant's Sentencing Submission"), do not support a variance from the Stipulated Guidelines Sentence of 50 years' imprisonment and the Court should impose that sentence.

      In December 2010, at the age of 27 years old, the defendant left his home in London, England to travel to Yemen and join al Qaeda in the Arabian Peninsula ("AQAP"). He received hands-on training—which is documented in chilling videos now before this Court (*see* Gov't May 2024 Sentencing Submission Exs. A-F) and which were not available to Judge Nathan at the time of sentencing in 2016—and returned to his home in the United Kingdom with a clear mission: commit a suicide attack in Heathrow International Airport ("Heathrow Airport") and, specifically, target the area where flights arrived from the United States or Israel. The defense's arguments misapprehend the import of that conduct. It is not accurate, as the defendant argues, that the Government's position is that "defendants are beyond redemption" and that rehabilitation is of no consequence in sentencing. (*See* Def. Supp. Submission at 8-9). What the Government actually contends is that through his extraordinary criminal conduct, as in part demonstrated through new evidence obtained in 2017 and now before the Court, the defendant has frighteningly and repeatedly revealed himself to be a highly cable terrorist whose avowed goal was to inflict death and horror. The defendant has also shown himself to be a liar who

---

[1] Defined terms herein have the same meaning as those in the Government's May 2024 Sentencing Submission, unless otherwise noted.

cannot be trusted when he claims to be rehabilitated. For those reasons, as well as those set forth below and in the Government's May 2024 Sentencing Submission, the Government respectfully requests that the Court impose the Stipulated Guidelines Sentence of 50 years' imprisonment.

### I. The 3553(a) Factors Support a Stipulated Guidelines Sentence

The defendant argues that he—who when he traveled to Yemen in 2010 to join AQAP was 27 years old, had obtained numerous degrees in arts, graphic design, and animation (PSR ¶ 77), and was married to his wife who was then eight months pregnant (PSR ¶ 20)—should receive a lower sentence because of his purported "delayed brain development and maturation" at the time of the offense conduct pursuant to the new policy statement accompanying Guidelines Section 5H1.1.[2] (Def. Supplemental Submission at 2-3). That argument ignores the defendant's obvious intelligence, capability, and unambiguous statements—documented verbally, in writing, and on video—that he made a conscious decision to travel to Yemen to join AQAP, where he used his skills to generate propaganda for AQAP and trained to build and detonate a suicide vest to massacre civilians at Heathrow Airport. The defendant's contention that he was, based on research findings, "less capable of controlling [his] impulses, exercising self-regulation, assessing and avoiding risk, and rationally considering alternative outcomes of their behavior" (*id.* at 3-4) is flatly contradicted by the record. The defendant considered those "outcomes" repeatedly and unambiguously. (*See e.g.*, Gov't May 2024 Sentencing Submission at 17, Ex. G). It is precisely the defendant's premeditated, thoughtful consideration and calibrated course of action—including, by his own admission, constructing a false narrative that he had traveled to Yemen for tourism and intentionally not doing anything "for the first three months" back in the U.S. so that he could target the arrivals section at Heathrow during the "Christmas/ New Year season" to inflict maximum casualties—that invalidate the defense's arguments.

Likewise, the Government does not seek to "freeze Mr. Pham, as well as the Court's consideration . . . at a fixed point in time more than a decade ago . . . ." (Def. Supp. Submission at 8). To the contrary, the Government seeks a Stipulated Guidelines Sentence of 50 years' imprisonment, in part, because "[t]he defendant *remains* a capable, well-educated, highly skilled terrorist who is recorded on video practicing detonating an explosive-laden backpack, which he intended to use to commit a horrific suicide attack in an international airport targeting flights arriving from the United States and Israel." (Gov't May 2024 Sent. Submission at 2). Such a sentence is also necessary to ensure that the defendant, at 41 years old and having been in U.S. custody since his extradition from the U.K. in February 2015, does not return to terrorism upon

---

[2] Effective November 1, 2024, Section 5H1.1 was amended to remove certain language and to add, among other things, the following: "A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation." *See* U.S.S.G. § 5H1.1, Amendment 829, *available at* https://www.ussc.gov/guidelines/amendment/829.

his release; which is especially the case given his education and skillset. Indeed, a defendant's relative youth has been routinely recognized by courts in terrorism cases as a factor that supports incapacitation for substantial amounts of time to protect the public. (*See* Gov't May 2024 Sentencing Submission at 35-36) (citing *United States v. Ressam*, 679 F.3d 1069, 1089-90 (9th Cir. 2012) (en banc) and *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011)). A less serious sentence than the Stipulated Guidelines Sentence of 50 years' imprisonment—and, certainly, a sentence lower than the 40-year one Judge Nathan imposed in 2016—would provide the defendant with the opportunity to resume his terrorist activities, with years to spread terrorist propaganda and effectuate an attack like the one he sought to carry out before his arrest. *See* 18 U.S.C. §§ 3553(a)(B), (C).

To be sure, the Government does not discount rehabilitation as a purpose of sentencing. The problem for this defendant is that his repeated, calculated, and dishonest conduct demonstrates that rehabilitation is not a basis for a variance *here*. The defendant is a proven liar, and his deceits are many: the false story he told his then eight-month-pregnant wife when he left the U.K. for Yemen, the cover he used to travel to Yemen, and the stories he told U.K. authorities on his return. And, as most relevant here, the defendant's claims in a letter to Judge Nathan in connection with his sentencing in 2016, when the defendant wrote that he "did not intend[]" to carry out the Heathrow suicide attack, but "only accept it [and] was willing to accept any plot to go home." (Gov't May 2024 Sentencing Submission at 8-9). That was a lie and the evidence obtained following the 2016 sentencing, described in detail in the Government's May 2024 Sentencing Submission and appended to that submission on a disc provided to the Court, *see* 12-18, Exs. A-F, definitively proves the opposite.[3] The Government did not have this evidence at the 2016 sentencing, and Judge Nathan did not review or consider (and could not have reviewed or considered) it in connection with that proceeding. As the defendant correctly theorized during his June 2018 interviews with the FBI about this newly-discovered evidence, had Judge Nathan seen a July 2011 video of him exhorting individuals in the West to commit violent *jihad* abroad or in their home countries, *see* Gov't May 2024 Sentencing Submission Ex. A, he probably would have received a lengthier sentence (*id.* at 14).

That assessment is correct, for obvious and good reason, and this evidence is one reason why the Court should sentence the defendant to a lengthier term of imprisonment now. On the other hand, the defendant's new arguments relating to rehabilitation are, like his earlier arguments of the same kind, unpersuasive and contradicted by his own actions. For this reason, among others, the Government respectfully submits that the Court should reject the defendant's new arguments relating to U.S.S.G. § 5H1.1.

---

[3] As detailed in that submission, this evidence includes (1) video recordings showing Pham constructing and detonating a test explosive device virtually identical to the one Pham told law enforcement was to be used in his planned suicide attack on Americans and Israelis at Heathrow Airport; (2) video recordings of Pham associating with high-ranking members of AQAP; (3) a video recording of Pham describing his goal of waging jihad and his desire to martyr himself (together with (1) and (2), the "Yemen Videos"); and (4) a document containing instructions for executing the attack upon Pham's return to London. The Government reviewed this evidence with defense counsel in December 2019 and produced a copy of the evidence to the defense thereafter.

## II. The Government's May 2024 Sentencing Submission

The Government incorporates its May 2024 Sentencing Submission, and will be prepared to address any questions the Court has at sentencing. However, in view of the meritless arguments advanced in the Defendant's Supplemental Sentencing Submission, the Government addresses a few specific points here.

*First*, the defense persists with its inaccurate position that all of the defendant's conduct was before Judge Nathan in 2016. (*See* Def. Supplemental Submission at 9-10). The defendant's contention is plainly wrong: the Yemen Videos; the document containing instructions for executing the attack at Heathrow Airport upon the defendant's return to London; and the admissions in his June 2018 interview, were all not before the Court in 2016. Those materials are described in detail in the Government's May 2024 Sentencing Submission and provide chilling insight into the defendant's intention and actions as a devoted terrorist before his arrest. (*See* Gov't May 2024 Sentencing Submission at 12-18). It is true, as the defendant notes, that "[d]uring his postarrest interview conducted on March 1, 2015 . . . Pham specifically stated that Aulaqi had instructed Pham to target the arrivals section at Heathrow Airport, with a specific focus on the area where flights arrived from the United States or Israel." (*Id.* at 25). It is also true, as detailed in the Government's submission, that in connection with his 2016 sentencing the defendant swore under oath to the accuracy of a handwritten statement that read, in part, that he "never intended" to carry out the plot. (*Id.* at 8-9). As is apparent from Exhibits A through G to the Government's May 2024 Sentencing Submission, that was a lie, and one that should give the Court tremendous pause in considering the defendant's request for leniency. At the 2016 sentencing, Judge Nathan observed that the defendant had not completed the Heathrow Airport plot and that "I cannot know for sure why that is so." (*Id.* at 10). Now this Court knows: the only reason the defendant did not carry out his murderous plot was because—by extraordinarily good fortune—he was arrested in the U.K. in December 2011, while he was following instructions to lay low before inflicting maximum damage in the time period around Christmas and New Year's. He was otherwise prepared and practice to carry out a deadly terrorist attack. That knowledge, and the new evidence underlying it, is alone enough to support a Stipulated Guidelines Sentence.[4]

---

[4] The defendant also continues to harp on the meaningless point that the Government did not bring new charges based on this conduct until 2021, which Judge Nathan rejected in denying the defendant's meritless motion for relief based on supposedly vindictive prosecution. (*See* Dkt. 239, April 1, 2022 Order at 21-25. On April 21, 2018, Judge Nathan entered an order notifying the parties that she had received a letter from the defendant requesting that the Court vacate his conviction on Count Five in light of the Supreme Court's decision in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), which the Court construed as a motion to vacate the defendant's sentence under 18 U.S.C. § 2255. (Dkt. 139). Then, only after the Supreme Court's decision in *United States v. Davis*, 588 U.S. 445, 445, 139 S. Ct. 2319, 2321, 204 L. Ed. 2d 757 (2019), which was delivered in June 2019, did the parties notify Judge Nathan that they agreed that *Davis* compelled granting the defendant's § 2255 motion as to Count Five. (Dkt. 166, Sept. 16, 2019 Letter). After plea negotiations were unsuccessful, in August 2020, the Government alerted the Court and defense counsel to its intention to file new charges after receiving a waiver of the Rule of Specialty from the U.K. (Dkt. 184, Aug. 14, 2020 Letter). Prior to the Supreme Court's decision in *Davis*,

*Second*, the defendant seeks to distinguish plainly applicable cases. (*See* Def. Supplemental Submission at 10-12). The Government does not restate the circumstances and sentences in *Rahimi* and *El Bahnasawy*, with which the Court is familiar. (*See* Gov't May 2024 Sentencing Submission at 27-31). In his reply submission, the defendant focuses on *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), for the general proposition that, because no one ultimately was harmed, Pham should receive less punishment. That was not, however, even the uniform position in *Stewart*. As Judge Walker correctly recognized in his opinion, "[W]e are not relegated to wait[ing] until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism." *Stewart*, 590 F.3d at 175 (Walker, J., concurring in part and dissenting in part) (internal quotation marks omitted). "Congress has been unmistakably clear that, as a general matter, the achievement of actual harm may aggravate the seriousness of a terrorism crime but that the absence of proven harm does not mitigate such a crime." *Id.* As in *Stewart*, the absence of more concrete injuries "is in no sense attributable" to the defendant. *Id.* Judge Woods followed similar logic in a recent case in this District, *United States v. Melzer*, in sentencing the defendant to 45 years' imprisonment in connection with an uncompleted plot to murder U.S. servicemembers. *See United States v. Melzer*, 20 Cr. 314 (GHW). Judge Woods observed, "[t]hat the attack did not take place was not for lack of trying by Mr. Melzer." *Id.* at Dkt. 171, March 3, 2023 Sent. Tr. at 48-49.[5] Indeed, defendants in material support cases, especially those involving attempts to commit deadly terrorist attacks on Americans, have frequently received substantial sentences, often the maximum term allowed by statute—even where, as here, the attack did not occur. *See, e.g.*, *United States v. Kourani*, 6 F. 4th 345, 357–59 (2d Cir. 2021) (affirming district court's sentence of 40 years' imprisonment for defendant's conviction of various offenses, including providing and conspiring to provide material support to Hizballah, in part because sentence "simply reflects Congress' judgment as to the appropriate national policy for such crimes" (alterations and internal quotation marks omitted)). According to his plan, as articulated and avowed in Exhibits A through G to the Government's May 2024 Sentencing Submission, the defendant was lying in wait upon his return to the U.K., lulling law enforcement into a false sense of security and preparing to complete his horrific attack—fortunately, he was thwarted, but that does not lessen his deadly intent.

*Third*, the defendant seeks to cast aside general deterrence as a relevant sentencing factor, arguing that the initial sentencing "did not receive any attention" and that, regardless, the Government has pointed to no empirical evidence to support the effectiveness of general deterrence in terrorism-related cases. (*See* Def. Supplemental Submission at 14-15). The Government's intended audience for deterrence is not necessarily a casual reader reached by a press release. Rather, it is individuals harboring hate or terrorist goals whom the defendant explicitly sought to inspire and recruit; *especially* home-grown would-be extremists like the

---

unsuccessful plea negotiations, and the U.K.'s waiver, the Government would have had no reason to supersede.

[5] *Melzer* is a useful comparison to Pham in other ways as well. Melzer was 21 years old at the time of his offense conduct (24 when sentenced) and, in evaluating the § 3553(a) factors at sentencing, Judge Woods recognized, among other things, Melzer's youth and "chaotic childhood." *Id.* at Tr. 48-50. Melzer was substantially younger than Pham—who was 27 at the time of his offense conduct—and, in contrast to Pham's multiple advanced degrees, Melzer did not complete high school.

defendant residing in Western nations. (*See* Gov't May 2024 Sentencing Submission Ex. A). The capacity of terrorist organizations like AQAP to perpetuate themselves and wreak death and destruction hinges in large part on recruitment—their ability to attract, indoctrinate, and enlist new followers, like the defendant, who are committed to their goals. It is only through this, by way of propaganda like the defendant's and otherwise, that AQAP and other terrorist groups can fulfill their missions of hate, murder, and violence. The defendant argues that it is "spurious" for the Government to reference the AQAP-inspired 2019 shooting at the Pensacola Naval Air Base. (*See* Def. Supplemental Sentencing Submission at 9, n.6). But that is *precisely* the point. Atrocities like the one at Pensacola come at the hands of individuals, like the defendant, who espouse hate and terror. The Government does not share the defense's nihilist view that terrorism cannot be dissuaded through general deterrence. To the contrary, the full force of the law should be brought to bear on individuals, like the defendant, who seek to recruit others and commit attacks themselves, to demonstrate the appropriately severe consequences to other would-be terrorists. Deterrence of individuals like the defendant can have very real consequences and save lives; the defendant's arguments to the contrary should be swiftly and categorically rejected.

The defendant's other arguments are similarly meritless. The Government relies on its May 2024 Sentencing Submission and is prepared to address any questions the Court has about additional arguments by the defendant at sentencing.

### III. Conclusion

In 2016, the Government sought a Guidelines sentence of 50 years' imprisonment. Such a sentence was warranted then, and even more so now. The only reason for Judge Nathan's downward variance to a sentence of 40 years' imprisonment was the defendant's purported rehabilitation. The new evidence conclusively demonstrates that the primary claim underpinning that assertion of purported rehabilitation—that the defendant never actually intended to commit the Heathrow Airport suicide attack—was false. One need only watch the defendant operate a suicide vest, smiling, to know exactly what he intended to do. (*See* Ex. F; Gov't May 2024 Sentencing Submission at 16-17). The green light on his suicide vest meant untold death, horror, and loss. The Government respectfully submits that the defendant should receive a sentence commensurate with that conduct, which is the Stipulated Guidelines Sentence of 50 years' imprisonment.

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney

By: /s/
Jacob H. Gutwillig
Assistant United States Attorney
(212) 637-2215

cc: Defense Counsel (by ECF)